EXHIBIT

**A**

STATE OF MAINE                                         SUPERIOR COURT
SAGADAHOC, ss.                                         CIVIL ACTION
                                                       DOCKET NO.: CV-2026-

| | |
|---|---|
| **CAROLINE M. THIBEAULT**, individually and in her capacity as legal guardian of **NOAH THIBEAULT**, <br><br>     Plaintiffs <br><br> v. <br><br> **OAK HILL CONDOMINIUMS**, a Maine condominium association, <br><br> **OAK HILL CONDOMINIUM OWNERS ASSOCIATION**, a Maine condominium association, <br><br> **ROLAND GUERETTE**, individually and as a member of the Oak Hill Condominiums Association Board, <br><br> **PETER LEONE**, individually and as a member of the Oak Hill Condominiums Association Board, <br><br> **CARLA CHATTERTON**, individually and as a member of the Oak Hill Condominiums Association Board, <br><br> **PAULA MCKENNA**, individually and as a member of the Oak Hill Condominiums Association Board, <br><br> **STEVEN LARY**, individually and as a member of the Oak Hill Condominiums Association Board, <br><br>     Defendants. | **VERIFIED COMPLAINT** |

NOW COME Plaintiffs Caroline M. Thibeault, by and through undersigned counsel, individually and on behalf of her disabled adult son, Noah Thibeault (hereinafter collectively,

1

"Plaintiffs"), and hereby complain against Defendants Oak Hill Condominiums and Oak Hill Condominium Owners Association, and the members of its Board, Defendants Roland Guerette, Peter Leone, Carla Chatterton, Paula McKenna, and Steven Lary (the "Board") (hereinafter collectively, "Defendants") pursuant to 5 M.R.S.A. § 4621 and 42 U.S.C. § 3613, as follows:

## INTRODUCTION

As set forth below, this action arises from Plaintiffs' residence within a condominium community governed by a recorded Declaration and Rules and Regulations that restrict and regulate the use of individual units, including provisions addressing "commercial activity" as interpreted and applied by the Defendants. Plaintiff Caroline Thibeault is the lawful occupant of 17 Ruby Lane, Unit 1 within Oak Hill Condominiums in Topsham, Maine, where she resides with her severely disabled adult son for whom she is the sole caregiver and legal guardian. Plaintiffs bring this action against Defendants for disability discrimination, including failure to grant a reasonable accommodation necessary to allow her to provide limited in-home hairstyling services as a means of maintaining employment while providing continuous care for her son, and for engaging in a pattern of selective enforcement, discrimination, retaliation, surveillance, and escalating financial penalties, including fines and foreclosure proceedings, arising from her request for accommodation. Defendants have continued to assess and collect daily fines, pursue foreclosure, and refuse to engage in a good faith interactive process required under state and federal fair housing law.

## PARTIES

1.      Plaintiff Caroline Thibeault ("Plaintiff") is the legal occupant of 17 Ruby Lane, Unit 1, Topsham, Maine 04086 (the "Property"), being part of the Oak Hill Condominiums.

2.      Plaintiff is also the mother and legal guardian to her adult son, Noah Thibeault, who

is severely disabled and also a legal occupant of 17 Ruby Lane, Unit 1, Topsham, Maine 04086 with his mother.

3.      Plaintiff's mother, Diane Marchetti, is the record owner of the Property, as more fully described in a Deed of Sale by Personal Representative (Testate) dated September 30, 2019, and recorded in the Sagadahoc County Registry of Deeds at Book 2019R, Page 06725 (the "Property"). and currently resides in a nearby assisted living facility, The Highlands, with a mailing address of Box 609, Topsham, Maine 04086.

4.      Defendant Oak Hill Condominiums is a condominium unit owners association established pursuant to Title 33, Chapter 31 of the Maine Revised Statutes for owners of all units within Oak Hill Condominiums and is a Maine non-profit corporation, with a principal place of business in Topsham, County of Sagadahoc, State of Maine and a mailing address of 33 Beryl Loop, Topsham, Sagadahoc County, Maine 04086. A true and accurate copy of the Oak Hill Declaration recorded in the Sagadahoc County Registry of Deeds in Book 3439, Page 278, is attached hereto and incorporated herein as **Exhibit A.**

5.      Defendant Oak Hill Condominium Owners Association is a condominium unit owners association established pursuant to Title 33, Chapter 31 of the Maine Revised Statutes for owners of all units within Oak Hill Condominiums, and is registered as a non-profit corporation, Charter Number 20090278ND, with a principal place of business in Topsham, County of Sagadahoc and a mailing address of 2 Cascade Road, Suite 336, c/o Dave Middleton, Old Orchard Beach, Maine 04064 (Defendants Oak Hill Condominiums and Oak Hill Condominium Owners Association are hereinafter collectively referred to as "Oak Hill").

6.      Defendant Roland Guerette ("Guerette") is the current President of Oak Hill's Board and is an adult individual with a residence and mailing address of 33 Beryl Loop, Topsham,

3

Maine 04086, being part of the Oak Hill Condominiums.

7.      Defendant Peter Leone ("Leone") is a current member of Oak Hill's Board and is an adult individual with a residence and mailing address of 39 Tourmaline Drive, Topsham, Maine 04086, being part of the Oak Hill Condominiums.

8.      Defendant Carla Chatterton ("Chatterton") is a current member of Oak Hill's Board and is an adult individual with a residence and mailing address of 44 Tourmaline Drive, Topsham, Maine 04086.

9.      Defendant Paula McKenna ("McKenna") is a current member of Oak Hill's Board and is an adult individual with a residence and mailing address of 12 Mica Court, Topsham, Maine 04086.

10.     Defendant Steven Lary ("Lary") is a current member of Oak Hill's Board and is an adult individual with a residence and mailing address of 24 Mica Court, Topsham, Maine 04086.

## JURISDICTION AND VENUE

11.     Plaintiffs complain against Defendants pursuant to 5 M.R.S.A. § 4621 and 42 U.S.C. § 3613.

12.     The Court has personal jurisdiction pursuant to 14 M.R.S.A. § 704-A.

13.     The Court has subject matter jurisdiction pursuant to 4 M.R.S.A. § 105.

14.     Venue in proper in this Court pursuant to 14 M.R.S.A. § 501 because Plaintiffs' residence and Defendants' place of business and individual residences are located in Topsham, County of Sagadahoc, in the State of Maine.

## FACTS/GENERAL ALLEGATIONS

15.     Plaintiffs repeat and reallege Paragraphs 1–14 as if set forth fully and incorporated herein.

16.    Plaintiff is the mother and legal guardian of Noah Thibeault, her twenty-five-year-old son ("Plaintiff's son").

17.    Plaintiff's son is severely disabled and has been diagnosed with severe autism spectrum disorder and anxiety, causing significant emotional dysregulation, communication impairments, and behavioral challenges.

18.    As a result, he requires continuous, 24-hour care and supervision, which Plaintiff provides as his sole caregiver.

19.    During this time, Plaintiff and her son were residing with Plaintiff's mother, Diane Marchetti, who owned the Property located in the Oak Hill community.

20.    In February 2025, Plaintiff's mother, Ms. Marchetti, suffered a medical event that required her to transition to an assisted living facility.

21.    Plaintiff and her son continued to reside in the unit, and Plaintiff assumed full responsibility for the Property, including all maintenance and financial obligations.

22.    Plaintiff is a licensed hairstylist, which is her primary occupation and sole source of income.

23.    While Plaintiff's son was enrolled in high school, he had access to a support system and supervision, and Plaintiff was able to maintain consistent employment as a hairstylist.

24.    However, since completing high school, Plaintiff's son has been unable to access formal day programs or support services due to significant backlogs and limited available services in the State of Maine, requiring Plaintiff to provide him with 24/7 care and supervision while also remaining employed.

25.    After Plaintiff's son completed high school, Plaintiff secured employment as a hairstylist in a setting that allowed her to bring her son to work, enabling her to maintain

employment while continuing to provide him with full-time care and supervision.

26.    However, since the onset of the COVID-19 pandemic in 2020 and continuing through 2023, Plaintiff has been repeatedly required to relocate her workspace as a hairstylist, which operates on a booth/chair rental basis, due to circumstances beyond her control, including changes in ownership or management, property sales, and construction-related disruptions.

27.    Plaintiff's son's autism spectrum disorder creates a heightened need for routine, structure, and consistency, all of which were significantly disrupted by these repeated relocations as Plaintiff brought him to work.

28.    During this period, Plaintiff and her son's medical providers identified that this lack of stability and consistency in Plaintiff's workplace contributed to severe emotional dysregulation, increased anxiety, and worsening behavioral conditions, including increased aggression and obsessive-compulsive disorder ("OCD").

29.    Some of these behavioral episodes occurred while Plaintiff was working with her son present, resulting in disruption and discomfort to clients and others in the workplace.

30.    Plaintiff's son's medical providers advised Plaintiff to seek a more stable and controlled environment to reduce his anxiety, support improved emotional regulation, and facilitate consistent opportunities for exercise in a setting where he feels safe and comfortable.

31.    In early 2023, in response to her son's escalating needs and his providers' medical directive, Plaintiff began exploring alternative arrangements that would better support his disability while allowing her to continue earning a living to support both of them.

32.    In early 2023, the Oak Hill Rules and Regulations governing the condominium association expressly permitted commercial activities provided they met certain conditions.

33.    Rule 19 of the rules in effect at the time ("2023 Rules"), entitled "Commercial

Activity Within Units" provides:

> Unit owners are permitted to conduct business from their units under the following circumstances:
>
> a) the existence or operation of the business activity is not apparent or detectible by sight, sound, or smell from the exterior of the unit;
>
> b) the business activity is legal and conforms to all zoning requirements for the Oak Hill Condominium Owners Association;
>
> c) the business does not unreasonably increase vehicular traffic or parking-related issues within the Oak Hill Condominium Owners Association;
>
> d) the business activity does not increase the insurance premium paid by the Oak Hill Condominium Owners Association or otherwise negatively affect the Association's ability to obtain insurance coverage;
>
> e) the business activity does not place an undue burden on the infrastructure of the buildings of the Oak Hill Condominium Owners Association property;
>
> f) the business activity is consistent with the residential character of the Oak Hill Condominium Owners Association and does not constitute a nuisance or a hazardous or offensive use or threaten the security or safety of other residents of the Association; and
>
> g) the business activity does not result in a materially greater use of the common areas or Association services within the Oak Hill Condominium Owners Association.

A true and accurate copy of Rule 19 of the Oak Hill Rules and Regulations is attached hereto as **Exhibit B**.

34.    Rule 19 of the 2023 Rules had been implemented by the Board in or around 2021 to permit commercial activities within units, subject to the foregoing conditions.

35.    Since the adoption of Rule 19, many Oak Hill residents engaged in various commercial activities, including but not limited to, a quilting business, pet care services, interior and exterior contracting work, the manufacture and sale of custom bicycle racks, counseling services, seamstress services, catering, and stained-glass sales.

36.    Many of these commercial activities have routinely involved in-person customer visits to individual units, including the drop-off and pick-up of tailored clothing and quilts, as well

as the collection of catering orders, bicycle racks, stained glass items, and other goods.

37.     In accordance with the 2023 Rules, Plaintiff began providing limited hairstyling services from her unit in the spring of 2023, seeing only one client at a time by appointment only.

38.     This arrangement enabled Plaintiff to maintain employment while providing her son with a stable and familiar environment.

39.     Working from home also made it easier for Plaintiff's son to attend appointments with his various service providers in a setting that is familiar and supportive of his needs.

40.     Plaintiff's hairstyling services were conducted in compliance with Rule 19 of the 2023 Rules.

41.     Pursuant to Rule 19(a), Plaintiff's hair services were not detectable from outside the unit, as clients arrived at prearranged times, one at a time, and no external signage was used. **Exhibit B.**

42.     Pursuant to Rule 19(b), Plaintiff's activities were lawful and complied with all applicable zoning requirements for the Town of Topsham. **Exhibit B.**

43.     Pursuant to Rule 19(c), Plaintiff's activities did not unreasonably increase vehicular traffic or create parking issues, as she served only one client at a time and clients parked in her driveway. **Exhibit B.**

44.     Additionally, neither the 2023 Rules nor the current rules restrict the number of guests permitted to visit a resident at any given time.

45.     Although Oak Hill provides designated guest parking spaces, Plaintiff's clients did not utilize them and instead parked in Plaintiff's driveway.

46.     Pursuant to Rule 19(d), Plaintiff's activities did not increase Oak Hill's insurance premium or otherwise impair Oak Hill's ability to obtain insurance coverage. **Exhibit B.**

8

47.     Under Rule 19(e), Plaintiff's activities did not place an undue burden on building infrastructure as her services were limited in number, strictly by appointment (no walk-ins), involved only one client at a time, and did not involve use of any common areas other than the roadway necessary to access her driveway. **Exhibit B.**

48.     Under Rule 19(f), Plaintiff's activities were consistent with the residential character of Oak Hill as a "minor home occupation", which was confirmed by both the Topsham Code Enforcement Officer ("CEO") and Oak Hill's Property Manager, and did not constitute a nuisance, offensive use, or threat to the safety or security of other residents. **Exhibit B.**

49.     Pursuant to Rule 19(g), Plaintiff's activities did not result in a materially greater use of common areas or Oak Hill services, as clients did not access common areas and entered only Plaintiff's unit via her driveway. **Exhibit B.**

50.     In light of her compliance with these provisions, and her observation that other residents engaged in commercial activities within their units, Plaintiff reasonably understood her conduct to be permissible under the 2023 Rules.

51.     In May 2023, Oak Hill's Property Manager, Wil Sligh ("Sligh"), contacted Plaintiff to inquire whether her hair services would increase traffic within Oak Hill. A true and accurate copy of the emails exchanged between Sligh and Plaintiff dated May 8, 2023 to May 16, 2023 is attached hereto as **Exhibit C.**

52.     Plaintiff responded that her services would not increase traffic, explaining that clients would park in her driveway, that she would not accept walk-ins, that all appointments would be scheduled in advance, that she would limit the number of clients per day, and that she would serve only one client at a time. **Exhibit C**, at 3.

53.     In response, Sligh confirmed that Plaintiff's limited hair services complied with the

9

2023 Rules, stating in his email, "[T]hanks for the information. You are following the rules." **Exhibit C**, at 4.

54.    To further confirm her compliance, Plaintiff contacted the Topsham CEO, Tom Lister ("Lister") to ensure her activities were permissible under Topsham's Zoning Ordinance.

55.    Lister advised Plaintiff that her activities were in compliance with the Zoning Ordinance, as they constituted a "minor home occupation" that was "incidental and secondary" to her use of the unit for residential purposes.

56.    After receiving these questions regarding her activities, Plaintiff contacted the Board to confirm that she was in compliance with the 2023 Rules, as she had received inconsistent communications from the Property Manager and the Board.

57.    Thereafter, the Board, through its President, Nancy Weingarten ("Weingarten"), contacted legal counsel, Attorney Daina Nathanson, to determine whether Plaintiff's activities violated the 2023 Rules.

58.    In correspondence to counsel, Weingarten, as President of the Board, communicated that Plaintiff's activities were conducted from home in order to "care for her adult son who is autistic," demonstrating that the Board was aware of the circumstances of Plaintiff's situation. A true and accurate copy of the letter sent from Weingarten to Attorney Daina Nathanson is attached hereto as **Exhibit D.**

59.    In this letter, Weingarten further noted that the Oak Hill Declaration provides that "no commercial activity of any nature shall be permitted on the property", but acknowledged that, in December 2020, the Board adopted Rule 19 permitting certain commercial activities within units, based on its belief that Section 10(A) of the Declaration authorized it to promulgate such rules governing unit use. **Exhibit D**, at 1.

10

60.    In response, Attorney Nathanson, acting as the Board's counsel, provided the Board with a detailed memorandum analyzing Plaintiff's activities in light of Oak Hill's governing documents and applicable law. A true and accurate copy of the Memorandum from Attorney Nathanson to the Board dated June 1, 2023 is attached hereto as **Exhibit E.**

61.    In that memorandum, counsel advised that the Oak Hill Declaration is the controlling document for the Association and that all rules and regulations must be consistent with the Declaration. **Exhibit E**, at 1.

62.    However, counsel further noted that, although the Declaration prohibits "commercial activity," neither the Declaration nor the Rules and Regulations define that term, leaving the intended scope of the prohibition unclear. **Exhibit E**, at 2.

63.    Counsel explained that in the absence of a clear definition or directly applicable case law, the appropriate framework is to look to cases addressing accessory uses and whether an activity is "incidental and subordinate" to the primary residential use of the property. **Exhibit E**, at 2–4.

64.    Counsel advised that relevant considerations may include whether the use is clearly incidental and subordinate to residential use, as well as the applicable zoning ordinance, the nature of the primary use of the property, and comparable uses by neighboring units. **Exhibit E**, at 4.

65.    Counsel further stated that "if certain activities are incidental and subordinate to the use of a unit as a residence, then arguably they are not prohibited under the Declaration, but instead are consistent with the required residential use," and also analyzed the Topsham's Zoning Ordinance governing minor home occupations. **Exhibit E**, at 4.

66.    Although counsel suggested that providing hair services from a residence may constitute a "major home occupation" which is not permitted in the Urban Residential Zone where

Oak Hill is located, she also acknowledged uncertainty, noting that if the activity satisfies the requirements for a "minor home occupation," it may be permissible, and recommended consultation with the Topsham CEO for clarity. *Id.* at 5.

67. Counsel's analysis reflects that the Board did not inform her that Plaintiff had already obtained confirmation from the Topsham CEO that her activities qualified as a permissible minor home occupation.

68. Upon information and belief, the Board's attorney was terminated shortly thereafter.

69. Evidenced by later communications between Plaintiff and the CEO, he stated that he had met with the Board and explained to them that Plaintiff's activities were permissible under the Town's Zoning Ordinance. A true and accurate copy of emails exchanged between Lister and Plaintiff dated September 13-14, 2023 are attached as **Exhibit F.**

70. Despite this guidance from the Board's counsel and the CEO, on June 21, 2023, the Board voted to table Plaintiff's request to confirm her compliance for another month to allow for further evaluation.

71. At that time, the Board did not attempt to review or clarify its current rules, but instead decided to continue its evaluation of the Plaintiff by soliciting additional input from community members regarding Plaintiff's activities.

72. The feedback received by the Board from its residents was mixed and included statements of support for Plaintiffs, observations that many other residents were conducting commercial activities from their units, concerns regarding the lack of state support for adults with disabilities (including waitlists exceeding 2,000 individuals for day and residential programs), and requests that the Board enforce its Rules consistently rather than selectively against Plaintiffs while

12

permitting similar conduct by others.

73.    Additional comments urged the Board to recognize the need for an accommodation for Plaintiff's son, a resident with complex disabilities.

74.    Around this time, Plaintiff's friend, Dusty Post, informed Plaintiff that she overheard another community member, Judith Redwine ("Redwine"), who was known to be close to members of the Board, loudly discussing Plaintiff, her son, and his disability at a local restaurant.

75.    Redwine made statements demeaning Plaintiff's intelligence and caregiving abilities and referred to Plaintiff's son as a "menace."

76.    Redwine further stated that the Board had already decided to deny Plaintiffs' request for review and that it had asked certain residents to record individuals coming to and from Plaintiffs' home.

77.    Plaintiffs' friend, Allison Helper, also observed an individual photographing her vehicle as she was leaving Plaintiffs' unit, and when she turned around to confront them, the individual entered one of the condominium units.

78.    Upon information and belief, no other residents of the community were surveilled or scrutinized like Plaintiff and her son.

79.    On or about July 19, 2023, Plaintiff was informed that the Board had determined that her activities were not permitted within the community, despite Plaintiff having received prior confirmation that her activities were in compliance from Oak Hill's Property Manager and Topsham's CEO. A true and accurate copy of the Board Minutes dated July 19, 2023 are attached hereto as **Exhibit G.**

80.    Plaintiffs were not afforded an opportunity to be heard directly by the Board prior to this determination.

13

81.  This determination was made even though the Board continued to allow other unit owners and occupants to engage in commercial activities within their homes, and the Board's minutes further reflect that the Board did not discuss other members engaging in similar commercial activities or compare those activities to Plaintiff's, nor did the Board address that Plaintiff conducted her activities from home for the purpose of caring for her disabled son.

82.  The Board's Minutes further reflect that Weingarten stated that "those of us on the Board have a fiduciary duty to adhere to the laws and contracts that govern the operation of our condominium" and "to those who would have us ignore the Declaration, as a document that was not developed by the current residents, or to interpret it in a manner that is simply not consistent with what it says, I would reply that we cannot do that if we are to remain true to our role as fiduciaries." **Exhibit G**, at 6.

83.  Notwithstanding these statements, Weingarten did not address that the Board's own counsel had identified the Declaration's prohibition on "commercial activity" as ambiguous due to the absence of any clear definition, nor counsel's advisement to look to Topsham's Zoning Ordinance for guidance regarding the definition of minor home occupations, nor did the Board take any action to invalidate Rule 19 as inconsistent with the Declaration's language.

84.  The Board took no action to amend Rule 19 or the Declaration, or otherwise clarify the definition of "commercial activities," before determining that Plaintiffs were in violation, without considering other commercial activities conducted within Oak Hill units.

85.  A month later, on August 11, 2023, the Board informed Plaintiffs that it had received complaints from other community members regarding her activities.

86.  On August 14, 2023, Plaintiffs requested copies of those complaints by email so as to understand the allegations against them, but the Board did not provide the requested information

or produce the complaints.

87.    On August 17, 2023, Plaintiff was again contacted by Weingarten, who questioned her regarding the number of vehicles traveling to her unit in connection with service providers assisting her son, including those providing medical and/or social services. A true and accurate copy of the email between Weingarten and Plaintiff dated August 17, 2023 is attached hereto as **Exhibit H** ("[C]an you tell me approximately how many different service providers come each day?").

88.    These inquiries caused Plaintiffs to feel targeted and uncomfortable, as Plaintiff believed her home, and her son's service providers, were being monitored to track the number of individuals entering and leaving her residence.

89.    These inquiries also demonstrate that the Board had actual knowledge of Plaintiff's son's disability and her need to work from home in order to care for him.

90.    Weingarten's email further stated that the Board was concerned that if Plaintiff was being compensated for her hairstyling services, this would constitute a violation of the Oak Hill Declaration. **Exhibit H.**

91.    Weingarten did not reference the 2023 Rules still in effect, referring only to the Declaration, which as the Board's counsel noted, did not define the term "commercial activities."

92.    Additionally, she asserted that Plaintiff's receipt of compensation from clients would constitute a violation, which is not a condition prohibited under Rule 19 as it was in effect at that time.

93.    On August 19, 2023, the Board sent a notice to Plaintiff's mother, Diane Marchetti, regarding Plaintiff's activities that they deemed to be in violation of the rules.

94.    Despite having already determined that Plaintiff's activities were not compliant

with the Rules and Regulations in July of 2023, on or about September 17, 2023, the Board held another meeting to discuss Plaintiff's activities.

95.    Plaintiff then reached out to the Topsham CEO, again, who confirmed that her activities were in compliance with the Topsham Zoning Ordinance as a "minor home occupation" and that he had met with the Board previously and explained to them that Plaintiffs business did fit under Topsham's Zoning Ordinance. **Exhibit F.**

96.    On October 12, 2023, the Board notified the community that, at its next meeting scheduled for October 18, 2023, it would consider whether to revise Rule 19 governing "Commercial Activities".

97.    The notice provided by the Board violated its own Bylaws, which require that written notice shall be provided "not less than ten (10) days nor more than sixty (60) days before the meeting," as notice was provided only six (6) days prior to the meeting. **Exhibit I,** Bylaws of OHCOA Board (emphasis added), Art. III, § 3 ("Meetings and Notice").

98.    The Board's Bylaws further require that the meeting notice adequately informs residents as to what topics will be discussed in order to afford them an opportunity to speak on the matter if they choose. **Exhibit I**, Art. III, § 3 and Art. IV, § 4.

99.    Upon information and belief, the Board intentionally removed Plaintiffs from the Oak Hill residents' email list to prevent them from receiving communications and being able to access and view Oak Hill meetings, even though Plaintiffs were a subject of discussion at those meetings.

100.    The Board further revoked Plaintiffs' access to the Oak Hills payment portal, thereby preventing Plaintiff's autopayments for assessed common expenses, and also failed to deposit checks tendered by Plaintiffs for monthly HOA fees.

16

101. At the October 18, 2023 meeting, the Board did not merely *consider* whether to revise Rule 19, as indicated in its notice to residents, but instead proceeded to revise the Rule at that very meeting.

102. This action also violated the Bylaws because residents were not given notice that Rule 19 would be amended at that time, but were instead led to believe the meeting would only involve discussion of whether to consider such amendments.

103. At that meeting, the Board amended Rule 19 in a manner that specifically targeted Plaintiff's activities and served to reinforce its prior determination that she was in violation of the Rules and Regulations, despite having already reached that conclusion months earlier when the 2023 Rules were still in effect. A true and accurate copy of the revised Rules and Regulations for Oak Hill are attached hereto as **Exhibit J** ("Revised Rules").

104. The Board had previously and repeatedly asserted that Plaintiff's activities were prohibited because the Declaration bans all commercial activity.

105. However, at the October 18, 2023, meeting, the Board did not eliminate Rule 19, which permits certain commercial activities, nor did the Board consider whether to adopt a definition for "commercial activities" to remove any ambiguity.

106. The Board instead amended only one subsection of the Rule, suggesting that the Declaration's provisions were not the source of the issue, despite the Board's counsel's guidance to the contrary.

107. Specifically, Rule 19(d) was revised to state that "[t]he activity does not generate or result in any employees, customers, or clients visiting the unit or traveling on, parking in, or otherwise using the limited common elements and/or common elements of the Oak Hill condominium development." **Exhibit J**, at 11.

17

108.    In addition, the Board adopted a new subsection to the Rule separate from the conditions, addressing "Violations, Fines, Rights and Remedies," and authorizing the imposition of daily fines for violations and providing that, in the Board's discretion, if a violation "has not been satisfactorily resolved after ninety (90) days, the daily fines will be doubled indefinitely."

109.    Notwithstanding its counsel's guidance, the Board continued to rely on the Declaration as limiting its authority, while simultaneously modifying only one subsection of Rule 19 in response to the alleged violation.

110.    The resulting amendments appear designed to align the rule with the Board's prior enforcement decision rather than to clarify any preexisting ambiguity in the governing documents.

111.    The timing and structure of these amendments, following the Board's determination that Plaintiffs were in violation, support an inference that the changes were intended to retroactively justify that prior decision rather than reflect a neutral or prospective clarification of the governing rules.

112.    Upon information and belief, the Board intentionally applied these restrictions selectively to Plaintiff, while continuing to permit other Oak Hill occupants to engage in comparable in-home commercial activities, and implemented amendments that had the effect of further defining, after the fact, the conduct it had already deemed to be in violation and modifying a Rule already judged to be inconsistent with the Declaration.

113.    Continuing to the present, the Board has repeatedly asserted that the Declaration's blanket prohibition limits its authority and is difficult to amend, notwithstanding its prior determination that Plaintiff was in violation and its subsequent amendments to Rule 19.

114.    Viewed in context, this shifting rationale supports an inference that the Declaration was invoked as justification for the Board's actions following Plaintiffs' request for a reasonable

18

accommodation based on disability, further demonstrating its use of the Declaration as pretext for its intentional discrimination and retaliation against Plaintiff for asserting her and her son's legal right to a reasonable accommodation based on disability.

115. Around this time, Plaintiff retained legal counsel to advise her regarding her rights to challenge the Boad's actions, including its selective enforcement of the 2023 Rules against her while permitting similar activities by other residents and ignoring her real need for support to enable her to take care of her son and earn a living.

116. On October 15, 2023, Plaintiff's then-counsel, Attorney Dan Nuzzi, received an email from Weingarten stating that the Board's decision that Plaintiff's activities were in violation was not a policy decision by the Board, but a legal judgment dictated by several provisions of the Oak Hill Declaration and further stated that the Board would not provide a detailed explanation here.

117. Following the meeting on October 30, 2023, Plaintiff's counsel, Attorney Nuzzi, submitted a formal request for reasonable accommodation to the Board's new counsel, Attorney Julia Pitney. A true and accurate copy of the Reasonable Accommodation Request from Attorney Nuzzi to Attorney Pitney dated October 30, 2023 is attached hereto as **Exhibit K.**

118. The request set forth the basis for accommodation on behalf of Plaintiff's disabled son and sought a limited exception to Rule 19(d) of the Revised Rules to permit clients to visit Plaintiff's unit, subject to restrictions including limited hours, no walk-ins, and no more than one client at a time. **Exhibit K**, at 1–3.

119. Plaintiff's counsel clearly expressed their intention to engage in an interactive dialogue with Oak Hill regarding how Plaintiff, on behalf of her son and his disability-related needs, could be reasonably accommodated, while also highlighting that other unit owners were

19

still operating businesses out of their units. **Exhibit K**, at 3.

120.     Attorney Nuzzi further opined out that the Board's assertions that their hands were tied by the Declaration's language were pretextual and reflected an unwillingness to meaningfully engage in a dialogue regarding Plaintiffs request for a reasonable accommodation.

121.     A reasonable accommodation is a change, exception, or adjustment to a rule, policy practice, or service that is necessary for a person with a disability to have an equal opportunity to use and enjoy their dwelling, including public and common areas.

122.     Under the Fair Housing Act ("FHA") and Maine Human Rights Act ("MHRA"), a housing provider must engage in the interactive process with the resident and is required to grant a reasonable accommodation where a resident demonstrates that (1) they have a disability, (2) the requested accommodation is necessary and reasonable, and (3) that it does not impose an undue burden on the housing provider.

123.     The Board's contrary position, suggesting that granting an accommodation would open the door to widespread commercial activity, is inconsistent with both the meaning and purpose of a reasonable accommodation under the FHA and MHRA and the existing presence of similar activities within the community, including activities occurring prior to Plaintiff's conduct.

124.     Attorney Nuzzi also referenced the analysis provided to the Board by its previous counsel, which noted that because the term "commercial activities" is undefined in the Declaration and no cases directly address the issue outside of one, the Board should apply a test to determine whether such activities are incidental and subordinate to residential use, consistent with Topsham's Zoning Ordinance. **Exhibit K**, at 2.

125.     Attorney Nuzzi summarized the legal analysis from Board's counsel as follows:

> . . . as [Oak Hill's counsel] acknowledges, interpreting the Declaration's restriction
> on commercial activity literally would have the effect of banning common and

20

innocuous home behaviors, so a literal interpretation cannot be correct. And if the Board follows the "subordinate and incidental" rule suggested by the [Oak Hill] Memorandum, my client's proposed activity plainly meets that criteria, as confirmed by the Code Enforcement Officer of Topsham, which has determined that this activity is a "minor home occupation," a status which incorporates the very same test.

**Exhibit K**, at 5.

126.    Plaintiffs' counsel further stated that "[w]hile my client disputes that her proposed activity violates the Declaration, she requests that if the Board continues to disagree, it decline to enforce the Declaration as it believes it is written, as a reasonable accommodation to support her son's disability care needs" is permitted under the law, and emphasized that Plaintiff "remains willing and able to discuss, in an interactive process, specific limitations that might ease the Board's concerns." **Exhibit K**, at 5.

127.    Before the Board ever responded to this first reasonable accommodation request, it issued a Notice of Violation to Plaintiffs on December 4, 2023. A true and accurate copy of the Notice of Violation dated December 4, 2023 is attached hereto as **Exhibit L.**

128.    The Notice of Violation was sent directly to Plaintiffs as well as her mother, Diane Marchetti, as the record title owner of the unit, and stated that on December 11, 2023, the Board would begin assessing a daily fine of $75 "as permitted in Rule 19" of the Revised Rules. **Exhibit L**, at 2.

129.    The Notice of Violation issued by the Board additionally alleged that Plaintiff's hair services were being operated without the required state license, despite Plaintiff holding a valid license for her services.

130.    Upon information and belief, the Board coordinated a plan to report Plaintiff's activities to her licensing board despite her having a current and valid license.

131.    Oak Hill members individually contacted Plaintiff's state licensing board to report

her activities, filing complaints with the Maine Cosmetology Licensing Board on December 14, 2023; December 17, 2023; December 20, 2023; December 27, 2023; January 14, 2024 and January 18, 2024. True and accurate copies of these complaints are attached hereto as **Exhibit M.**

132.    The complaints submitted by residents contained strikingly similar language, with several using nearly identical phrasing, and did not identify any actual licensing violations but instead repeated arguments previously advanced by the Board at meetings and in correspondence, including statements such as: "The bureau of licensure needs to be aware of the activity and the fact that a commercial activity is being operated against the decision of the association's board of directors and against most of the wishes of the community. The community is also curious how this license could be awarded to a condominium that has so may limitations and interferes with the adjacent units." **Exhibit M**, at 2–3.

133.    The consistency and repetition of these letters, which were all sent within a month-long period, indicate that they were not independent submissions, but rather part of a coordinated effort directed at Plaintiff and her son. **Exhibit M.**

134.    In December of 2023, Board President Weingarten also sent a complaint to Bath Savings Bank, Plaintiffs' mortgage lender, regarding Plaintiff's license to provide hair services in a further effort to have Plaintiff removed from the Property.

135.    Attorney Pitney, as Oak Hill's counsel at the time, did not respond to Plaintiffs' reasonable accommodation request until January 12, 2024, over a month after daily fines had begun accruing from the issuance of the notice of violation.

136.    In her response, Attorney Pitney stated "there is no suggestion in your correspondence or otherwise communicated to the Association that Ms. Thibeault is an individual with a physical or mental disability. Likewise, there is no allegation that granting Ms. Thibeault's

request would afford her an equal opportunity to use/enjoy her housing that she is currently not receiving on account of a disability that she has." A true and accurate copy of Attorney Pitney's response to Attorney Nuzzi's reasonable accommodation request dated January 12, 2024 is attached hereto as **Exhibit N.**

137.    This response both ignores the facts known to the Board and Plaintiffs' counsel's request, which clearly asserted that the accommodation was being requested on behalf of Plaintiff's son, who has a severe, well-documented disability, and that reasonable accommodation requests can be made by a parent or legal guardian on behalf of an individual with a disability.

138.    The Board's response demonstrates willful ignorance and bad faith, as they refused to engage in the interactive process or even to acknowledge Plaintiff's son's disability, despite having referenced his disability in earlier discussions.

139.    Attorney Pitney further justified the denial by asserting that permitting Plaintiff's activities would constitute a "fundamental alteration to the nature of the housing" from residential to commercial, which is prohibited by the Declaration, and such activities would not be permissible "absent a revision to the Declaration by unanimous vote of the owners." **Exhibit N**, at 1.

140.    If the 2023 Rules actually prohibited Plaintiff's conduct as the Board asserts, then there was no reason for the Board to revise the Rule in order to enforce it explicitly against Plaintiff and her son and to begin issuing notices of violation.

141.    Attorney Pitney's response to Plaintiffs' reasonable accommodation request, illustrates the Board's failure to engage in the interactive process required under the MHRA and FHA, as the Board offered no compromises, alternatives, or limitations that could have allowed Plaintiff's activities, nor did it demonstrate how the proposed accommodation would impose an undue burden on Oak Hill.

142.    Moreover, the Board's broad reasoning reflects a fundamental misunderstanding of what constitutes a reasonable accommodation under Maine and federal law as Plaintiff and her son are not requesting that the Board attempt to amend its Declaration to allow additional types of commercial activities for all residents.

143.    Instead, as defined in 14 M.R.S.A. § 6001(5), a reasonable accommodation is a change, exception, or adjustment to a rule or policy necessary for a person with a disability to use and enjoy their dwelling.

144.    Such an exception does not alter the overall character of a residential development, nor does it allow other residents to engage in the same commercial activities, as instead it requests an exception for an individual to not abide by a specific policy or rule because of their disability. Such an exception does not alter the overall character of a residential development, but merely permits a qualified individual to have relief from a specific policy or rule.

145.    Since December of 2023, the Board has continued to assess daily violation fines against Plaintiff and her son.

146.    In 2024, Plaintiff's son was involved in a car accident, resulting in significantly worse anxiety and OCD, as well as a diagnosis of Post-Traumatic Stress Disorder ("PTSD").

147.    The accident altered his disability-related needs and exacerbated behavioral challenges, including increased aggression, obsessive compulsions, and heightened sound sensitivity, making it even more difficult for Plaintiff to provide effective care.

148.    Throughout 2024, Plaintiff continued to explore alternative solutions for her son's care, but again, due to the lack of available state resources, there were extensive waitlists for assigning a new case manager, which was a prerequisite for accessing direct service providers for day services and programming.

24

149. During this period, Plaintiff's son's doctors and other providers, including Dr. David Inger (PCP) and Lauren Radovich (Behavior Consultant), continued to adjust his medications and treatment, and further emphasized the importance of providing a stable environment that would allow him to remain at home to support his need for routine and consistency.

150. On November 22, 2024, Plaintiffs and Diane Marchetti received a demand letter from Oak Hill asserting that Plaintiffs owed $54,413.62 for common charges and assessments.

151. Around the same time, Oak Hill began implementing a new and unapproved accounting method as the daily rule violation fines accrued.

152. Instead of applying Plaintiffs' payments toward the association's assessed common expenses as Plaintiff intended, Oak Hill began applying those payments first to alleged rule violation fines and related late fees, and in doing so, Defendants prioritized these charges over common expenses, effectively creating an artificial delinquency in Plaintiff's account for the condominium's assessed fees and causing Plaintiffs to be subject to the subsequently filed foreclosure action.

153. Plaintiff was not making payments for the rule violation fees because she was continuing to contest their validity through her legal counsel.

154. Upon information and belief, this change in accounting practices was implemented to manufacture a delinquency for common expenses owed to Oak Hill.

155. After the Board sent multiple emails to residents regarding a potential special assessment against Plaintiff because of the alleged rule violations, Oak Hill resident, Paula Joy, contacted the Board and Board member Roland Guerette ("Guerette"), who was elected Board President shortly thereafter, to question why the emails had been repeatedly distributed to the entire

community, noting that doing so further ostracized and embarrassed Plaintiff and her son. A true and accurate copy of this email dated January 18, 2024 is attached hereto as **Exhibit O.**

156.    In response, Guerette sent only a middle finger emoji, demonstrating inappropriate, discriminatory, and retaliatory behavior toward Plaintiff and her son. **Exhibit O.**

157.    On January 22, 2025, Oak Hill filed a Complaint for Foreclosure and Sale in the Sagadahoc County Superior Court, Docket Number RE-25-01 for "common charges and assessments, Rule Violation Fines, and fees and costs of collection to date in accordance with the Declaration and Bylaws of Oak Hill Condominiums." A true and accurate copy of the Complaint is attached hereto as **Exhibit P.**

158.    Because of this foreclosure action, Plaintiffs are at risk of losing their home.

159.    In the pending foreclosure suit brought against Plaintiff's mother, Diane Marchetti, Marchetti has asserted the defense of reasonable accommodation due to Defendants' lack of engagement in the interactive process as well as its discriminatory behavior and targeted harassment against Plaintiff and her son because of his disability.

160.    In or around early 2025, Plaintiffs obtained new counsel to represent their interests both in the foreclosure suit as well as with making another reasonable accommodation request because of the significant changes in her son's disability-related needs following his car accident.

161.    On April 30, 2025, undersigned counsel submitted a new reasonable accommodation request on behalf of the Plaintiffs, outlining her son's increased needs following his car accident and Plaintiff's needs as his primary caregiver and legal guardian to provide him with a stable home environment at home while allowing her to make a modest living. A true and accurate copy of the reasonable accommodation request dated April 30, 2025 is attached hereto as **Exhibit Q.**

26

162. The letter detailed the grounds for the reasonable accommodation and set forth numerous restrictions Plaintiff was willing to impose on her hair services, including further limiting the number of daily appointments, limiting operating hours during the day, serving only established clients, and ensuring no walk-ins.

163. Only hours later, Oak Hill's new counsel, Attorney Jonathan Flagg, denied the request without engaging in any interactive process. A true and accurate copy of Attorney Flagg's denial of the reasonable accommodation is attached hereto as **Exhibit R.**

164. His response stated:

> I do not see how Caroline cannot rent a commercial space and take her son to work with her. That would be better for all concerned rather than turning a residential condo into a commercial space as she has done. If she were a surgeon, would the Association need to allow a surgical unit in the residential condo? . . . The Association has made its position clear and Caroline has made her position clear. I think Caroline would be best served renting a commercial space which she would have to do with or without her son and she can go there to conduct her business and take her son with her if that is necessary for her needs.

**Exhibit R**, at 1.

165. This response demonstrates Oak Hill's willful ignorance of Plaintiff's son's disability-related needs and the essential purpose of the accommodation request, allowing Plaintiff to work from home to provide a stable and consistent environment for her son, as directed by his healthcare providers.

166. Repeated disruptions to their living and caregiving arrangements worsened her son's condition, making relocation to a commercial setting both impracticable and detrimental to his well-being.

167. Given the lack of available, alternative care, Plaintiff has no viable option but to provide care from home in her son's best interest.

168. On or about May 28, 2025, Plaintiffs, through undersigned counsel, filed a

Complaint with the Maine Human Rights Commission ("MHRC") setting forth the circumstances explained described herein and asserting discrimination in housing based on disability against Oak Hill.

169.    On June 3, 2025, Plaintiffs were assigned an Investigator with the MHRC to conduct a preliminary investigation to determine whether reasonable grounds existed to believe that unlawful discrimination had occurred.

170.    During the investigation, the MHRC Investigator collected additional information from both parties, including witness lists, responses to written questions, and participation in an Issues & Resolution Conference to define the issues and explore potential resolution.

171.    The Issues & Resolution Conference was held on August 6, 2025, with Guerette attending on behalf of Oak Hill.

172.    Upon conclusion of the conference, the Investigator determined that no resolution could be reached and that further investigation was required prior to issuing a report.

173.    MHRC requested additional information from both parties, which was subsequently provided.

174.    On September 9, 2025, the MHRC Investigator issued a report containing numerous Findings of Fact and a detailed Legal Analysis. A true and accurate copy of the MHRC Investigator's Report dated September 9, 2025 is attached hereto as **Exhibit S.**

175.    The Investigator found:

[Plaintiff] established her prima-facia case. Son comes within the protections of the MHRA as a person with disabilities, as does [Plaintiff] given her association with a disabled person, *see* 5 M.R.S. § 4553(1-D). [Oak Hill] knew of Son's disabilities. [Plaintiff] requested authorization to offer limited hair services from her home, and subsequently, a halt to foreclosure proceedings and the elimination of accumulated fees and late charges due to what [Oak Hill] viewed as continue rule violations. [Plaintiff] and Son needed the requested accommodation because Plaintiff must simultaneously work and care for Son, and she is unable to bring Son to an off-

Premises work location. Given the limited scope of [Plaintiff's] business activity, the requested accommodation was reasonable on its face, and [Oak Hill] rejected [Plaintiff's] accommodation request. [Oak Hill] failed to establish a defense to [Plaintiff's] reasonable accommodation request by showing the request was unreasonable. . . . [Oak Hill] failed to engage in an informal, interactive process to determine whether an appropriate, feasible accommodation existed. Instead of engaging in good faith dialogue with [Plaintiff], [Oak Hill] amended its rule to the detriment of [Plaintiff] and Son.

**Exhibit S**, at 4.

176.    The MHRC Investigator concluded that "[t]here are Reasonable Grounds to believe that Oak Hill Condominiums Association discriminated against [Plaintiff] based on disability."

**Exhibit S**, at 5.

177.    On October 27, 2025, the MHRC held a public hearing before the commissioners to vote on whether to affirm or deny the Investigator's findings based on further investigation and testimony of the parties.

178.    Defendants Guerette and Leone attended the meeting on behalf of Defendants.

179.    During the public meeting, the MHRC commissioners noted that Plaintiffs' reasonable accommodation requests on behalf of her son were ignored by Oak Hills and determined that the timing and severity of the financial penalties against Plaintiffs strongly suggested discriminatory, punitive, and retaliatory intent rather than legitimate enforcement.

180.    The MHRC commissioners further observed that Oak Hill's position would likely not withstand judicial scrutiny as they did not meet their burden of proof, and warned of serious consequences, with multiple commissioners describing the case as "highly problematic" and emphasizing that the combination of fines and foreclosure demonstrate discriminatory and retaliatory conduct.

181.    On October 28, 2025, MHRC issued a public Statement of Findings, affirming the Investigator's decision and concluding that "there are reasonable grounds to believe that unlawful

29

discrimination has occurred" based on the "information received during the course of the investigation of the complaint, including the Investigator's Report, any written submissions, and any oral presentations made." A true and accurate copy of the MHRC Meeting Minutes dated October 27, 2025 is attached hereto as **Exhibit T.**

182.    Pursuant to 5 M.R.S.A. § 4622 and 4613, Plaintiffs first filed a complaint with the MHRC and the commission failed to enter into a conciliation agreement to which Plaintiffs and MHRC were a party within ninety (90) days after finding reasonable grounds to believe that unlawful discrimination occurred.

183.    After the MHRC hearing and the public release of MHRC's findings and recording of the meeting, several residents of the Oak Hill community sent emails to other members expressing support for Plaintiffs, and urging the Board to cease its discriminatory actions, warning that continue misconduct risked liability for all residents.

184.    One such email stated: "Commissioners warned of serious consequences. At least two commissioners described this case as "highly problematic" and cautioned that the combination of foreclosure and fines would "inflame a jury." A true and accurate copy of emails dated November 1, 2025, sent by residents in response to the MHRC Findings is attached hereto as **Exhibit U.**

185.    The email further emphasized:

At this point, continuing down this path serves no purpose other than to prolong conflict, deepen division, and increase legal exposure for the Association. It is time for this Board to demonstrate leadership, fairness, and integrity—and to correct a grave injustice. Failure to act now would not only perpetuate discrimination but would also represent a reckless disregard for the MHRC's findings and for the well-being of a vulnerable resident and her disabled child.

**Exhibit U**, at 1–2.

186.    More recent emails among Oak Hill residents have attacked anyone who tries to

30

support the Plaintiffs, and in one such email where resident Debbie Dionne urges her fellow residents to stop the discrimination, others respond with "Caroline is not disabled, and she has made questionable choices, and there is no chance she and Noah will go homeless. They are not vulnerable." A true and accurate copy of this email chain dated February 2, 2026 is attached hereto as **Exhibit V.**

187.    In the months that have followed, Plaintiffs have continued to experience persistent harassment, discrimination, and surveillance from the Board, which includes but is not limited to, pictures taken of their home by other residents and threats to issue additional violations and assess fines for trivial matters, such as the wattage of a lightbulb outside their unit and ordering her to take a set of string lights down. A true and accurate copy of these communications between the Board and Plaintiff are attached hereto as **Exhibit W.**

188.    In December 2025, as Plaintiff left her home to visit a neighbor, she encountered Board President Guerette's wife waiting outside, where she told Plaintiff that she hoped Plaintiff was not going to the neighbor's house to watch the Board Meeting, stating that Plaintiff was not permitted to do so.

189.    Defendants engaged in a deliberate and continuing pattern of harassment, discrimination, and retaliation within Plaintiffs' residential community, including conduct carried out by Plaintiffs' neighbors, individuals with whom she and her son must live with on a daily basis.

190.    This pattern of conduct pervaded Plaintiffs' residential community and home environment, depriving her of any meaningful refuge, and was extreme and outrageous, exceeding all possible bounds of decency and constituting behavior that is atrocious and utterly intolerable in a civilized community.

191.    Defendants owed Plaintiffs fiduciary duties, including duties of good faith, fair

31

dealing, loyalty, due care, and consistency and non-arbitrary enforcement of the governing documents.

192.   Defendants breached these duties by selectively enforcing Rule 19 and related provisions against Plaintiffs, interpreting the term "commercial activity" in an arbitrary and inconsistent manner, denying Plaintiffs due process and an opportunity to be heard regarding the alleged violation, failing to provide and satisfy the required notice and content requirements for Oak Hills meetings.

193.   Defendants acted with malice, ill will and spite toward Plaintiffs, or, alternatively, engaged in such outrageous conduct with deliberate disregard for Plaintiffs' rights that malice may be implied.

194.   Plaintiff Caroline Thibeault has suffered and continues to suffer severe extreme emotional distress as a direct and proximate result of Defendants' conduct.

195.   Defendants intended to cause, or acted with reckless disregard of the substantial certainty that their conduct would cause such distress.

196.   Plaintiff Caroline Thibeault's injuries include but are not limited to, severe anxiety, fear, humiliation, and significant emotional suffering of a kind no reasonable person should be expected to endure.

197.   Within this pattern of discriminatory, harassing, and retaliatory conduct, it is concerning that the Board has again demonstrated the same pattern of revising a rule to specifically target certain individuals, and then issuing warnings of violations to those individuals for being in violation of the newly revised rule for lights.

198.   These actions constitute clear pretextual discrimination and demonstrate the Board's ongoing targeted conduct against Plaintiffs.

## <u>COUNT I: DECLARATORY JUDGMENT</u>
### 14 M.R.S.A. §§ 5951 *et seq.*
### (All Defendants)

199.    Plaintiffs repeat and reallege Paragraphs 1–198 as if set forth fully and incorporated herein.

200.    This Count is brought pursuant to the Maine Declaratory Judgment Act, 14 M.R.S.A. §§ 5951 *et seq.*

201.    This Court has jurisdiction to declare the rights and obligations of the parties.

202.    An actual and justiciable controversy exists between Plaintiffs and Defendants concerning the interpretation and application of the Oak Hill Declaration, Bylaws, and Rules and Regulations, including Rule 19 concerning commercial activities within residential units, and the Board's determination that Plaintiff's activities were not permitted under the 2023 Rules.

203.    The controversy arises from Defendants' enforcement actions against Plaintiffs under the 2023 Rules, which at the time permitted commercial activities within units so long as certain conditions were satisfied.

204.    Plaintiff was in compliance with all conditions of the 2023 Rules when providing her limited hair services from her unit, as was affirmed by Oak Hill's Property Manager and Topsham's CEO, and many other residents also engaged in similar commercial activities (catering services, tailoring services, counseling services, etc.).

205.    Despite these confirmations of compliance, Defendants began a pattern of intense scrutiny, surveillance, discrimination, and questioning of Plaintiff's conduct, and began relying on Oak Hill's Declaration which broadly prohibited all commercial conduct.

206.    When Defendants sought legal guidance regarding enforcement of Rule 19, counsel advised that, although the Declaration governs over the Rules and Regulations, the term

"commercial activities" is not defined in either document and is therefore subject to interpretation.

207. Counsel further advised that, in the absence of a definition, the Board should look to applicable case law and analogous provisions, including the Topsham Zoning Ordinance, for guidance in distinguishing between prohibited commercial uses and permissible limited in-home activities, such as those consistent with "minor home occupations."

208. This guidance reflects that not all revenue-generating activity within a residence is categorically prohibited and that a fact-specific analysis is required.

209. Despite this guidance, and Plaintiff's confirmation from the Topsham CEO that her activities were consistent with the Zoning Ordinance as referenced by the Board's legal counsel, Defendants did not revise or clarify the meaning of "commercial activities" under the Declaration or Rules, instead determining that Plaintiff's activities violated Rule 19 as it existed under the 2023 Rules.

210. Notwithstanding that determination, several months later, the Board undertook to amend Rule 19 without providing proper notice or complying with required meeting procedures.

211. At that meeting, the Board did not define the term "commercial activities" or resolve the purported inconsistency with the Declaration on which it had relied to find Plaintiffs in violation.

212. Rather, the Board adopted only one new subsection to Rule 19 prohibiting outside guests from visiting a resident's unit for commercial purposes, a restriction aimed directly at Plaintiff's limited in-home services and intended to reinforce the Board's prior position that her activities were impermissible.

213. The Board's decision to amend Rule 19 in this manner underscores that Plaintiff's activities were not prohibited under the 2023 Rules as written, because had they been, no

amendment specifically targeting such conduct would have been necessary.

214. After Rule 19 was amended, Plaintiffs submitted a reasonable accommodation request to the Board to request an exception to the new policy to allow Plaintiff to remain at home with her disabled son and continue earning a living.

215. Before responding to this request, Defendants began issuing formal violation notices and began assessing fines and penalties against Plaintiff for her activities.

216. A further actual and justiciable controversy exists between the parties as to whether Plaintiffs' requested reasonable accommodations were necessary and reasonable, and whether Defendants unlawfully denied those requests and failed to engage in the required interactive process.

217. Defendants did not respond to Plaintiffs' request until a month later, after fines had been accruing for over a month, and did not engage in any discussion with Plaintiffs to determine whether they could come to a compromise that would allow she and her son to have equal use and enjoyment of their dwelling.

218. A year later, after Plaintiff's son had been involved in a car accident which further changed his medical needs, Plaintiffs submitted a new reasonable accommodation request, expressing Plaintiff's willingness to engage in discussions to limit her working hours even further or find other ways to reduce any possible disruption to other residents.

219. Defendants' counsel responded to this request in less than an hour and once again, categorically denied Plaintiffs' request and refusing to engage in discussion.

220. Defendants further did not point out how the proposed accommodation would cause an undue burden or be disruptive to the community.

221. Plaintiffs seek a judicial declaration that (i) Plaintiff's limited hair services were

consistent with the 2023 Rules as properly interpreted and were not contrary to the Oak Hill Declaration; (ii) Defendants wrongfully decided that Plaintiff's conduct violated Oak Hill's governing documents; and (iii) Defendants later amended the 2023 Rules in a manner that reinforced and sought to justify their earlier determination of Plaintiffs' alleged violation, while selectively enforcing the revised interpretation against Plaintiffs in a discriminatory and inconsistent manner.

222.    Plaintiffs further seek a judicial declaration that (i) Plaintiffs' requested reasonable accommodations, allowing limited in-home work because it is necessary to enable her to care for her disabled son while maintaining employment to provide him with an equal opportunity to use and enjoy his dwelling, was reasonable and should have been granted under the MHRA and FHA; (ii) Defendants were obligated to engage in a good faith interactive process and failed to do so; and (iii) Plaintiff is entitled to engage in the limited business activities from her home as a reasonable accommodation related to her son's disability, consistent with Maine law, federal law, and local zoning ordinances.

WHEREFORE, Plaintiffs respectfully request that this Court enter a declaration that: (i) Plaintiff's activities complied with Rule 19 under the 2023 Rules and did not violate the Oak Hill Rules and Regulations or the Oak Hill Declaration; (ii) Plaintiffs' requested reasonable accommodations were necessary and reasonable, did not impose an undue burden, and should have been granted; and (iii) Defendants were required to engage in a good faith interactive process but failed to do so. Plaintiffs further request such other and further relief as the Court deems just and proper.

## COUNT II: DISABILITY DISCRIMINATION IN HOUSING IN VIOLATION OF MHRA

## 5 M.R.S.A. § 4551 *et seq.*
## (All Defendants)

223.    Plaintiffs repeat and reallege Paragraphs 1–222 as if set forth fully and incorporated herein.

224.    Plaintiff's son is a person with a disability as defined under the MHRA.

225.    Plaintiff is his parent, legal guardian and primary caregiver.

226.    Defendants knew of Plaintiff's son's disability and Plaintiff's need to provide care for him from home.

227.    Since 2023, Plaintiffs have experienced harassment, surveillance, targeted enforcement of Oak Hill rules and regulations, and unlawful denials of reasonable accommodation requests without participation in the interactive process.

228.    Harassment and discrimination of Plaintiff and her son were based on his disability.

229.    Plaintiffs' reasonable accommodation requests were necessary to afford Plaintiffs an equal opportunity to use and enjoy their dwelling.

230.    Plaintiffs requested a reasonable accommodation from Defendants to provide full-time care and supervision for her twenty-five-year-old son who is severely disabled, while providing limited hair services from her home under limited conditions.

231.    Defendants failed to engage in the interactive process required by law, ignored the medical and professional recommendations regarding Plaintiff's son's care needs, and denied the accommodation requests outright.

232.    Defendants failed to respond or participate in the interactive process in a timely or meaningful manner to Plaintiff's requests for accommodation.

233.    Defendants' failure to provide a reasonable accommodation caused Plaintiffs' damages; denied Plaintiffs the equal opportunity to use and enjoy their dwelling; resulted in

37

discrimination, retaliatory conduct and fines, harassment, threats, and selective enforcement of rules; and violates the MHRA, which requires housing providers (including condominium associations) to grant reasonable accommodations to persons with disabilities when necessary and reasonable.

234.    Defendants' actions were discriminatory, intentional, malicious, and demonstrate willful ignorance and pretextual discrimination.

235.    Defendants selectively enforced the Oak Hill Rules and Regulations and Declaration against Plaintiffs while allowing other unit owners to conduct similar commercial activities.

236.    Despite having ruled in summer of 2023 that Plaintiff was in violation of Rule 19 of the 2023 Rules, Defendants later revised Rule 19 to retroactively bolster their decision to find Plaintiff in violation prior to the issuance of formal notices of violation.

237.    Defendants did not provide Plaintiffs with an opportunity to be heard regarding this issue in violation of her due process rights.

238.    Defendants revised Rule 19 of its Rules and Regulations to specifically target Plaintiff's activities even after she received confirmation that she was in compliance with the rule from Oak Hill's Property Manager, that she was in compliance with Topsham's Zoning Ordinance as confirmed by the Topsham CEO, and Oak Hill's attorney advised them to consider the minor home occupation test under the Topsham Zoning Ordinance because the term "commercial activities" in the Oak Hill Declaration is ambiguous.

239.    Defendants also specifically revised Rule 19 to allow them to both issue additional fines against her for the alleged violations and to double those daily fines under the Board's discretion.

240.    Defendants issued fines and violations targeting Plaintiffs in retaliation for requesting reasonable accommodations on behalf of her disabled son.

241.    Defendants engaged in an unauthorized accounting method against Plaintiffs to manufacture a delinquency and to bring the associated foreclosure proceeding against Plaintiffs and her mother, by applying payments intended to be for common assessment payments to the fines and associated late fees instead.

242.    Defendants further removed Plaintiffs from Oak Hill's mailing list, revoked their access to Oak Hill's payment portal without notifying them thereby cancelling Plaintiffs' autopayments, and refused to deposit Plaintiffs' checks for assessed common expenses to intentionally create a basis for which to pursue foreclosure and remove Plaintiffs from the Oak Hills community.

243.    Upon information and belief, Defendants subjected Plaintiff and her son to ongoing discrimination, harassment, and surveillance, including asking residents to take pictures of guests visiting Plaintiff's home and monitoring how many service providers came to her unit to provide care for her son an

244.    Defendants' actions constitute discrimination in housing on the basis of disability in violation of the MHRA, 5 M.R.S.A. § 4551 *et seq.*

WHEREFORE, Plaintiffs respectfully request that this Court: (i) enter judgment in their favor and declare that the conduct engaged in by Defendants was in violation of Plaintiffs' rights under the MHRA; (ii) order Defendants to cease all discriminatory conduct, dismiss the violations against Plaintiffs and the foreclosure action filed against Plaintiffs' unit with prejudice, and vacate all fines, fees, and penalties associated with the violations and foreclosure action; (iii) grant Plaintiffs' most recent reasonable accommodation request to allow her to provide limited in-home

services while providing full-time care and supervision to her disabled son; (iv) award Plaintiffs' compensatory and punitive damages in an amount to be determined at trial of this matter; (v) award Plaintiffs attorney's fees including legal expenses and costs; (vi) award Plaintiffs pre-judgment interest; and (vii) grant Plaintiffs such other and relief as the Court deems just and proper.

**COUNT III: DISABILITY DISCRIMINATION IN HOUSING**
**IN VIOLATION OF FHA**
**42 U.S.C. § 3604**
**(All Defendants)**

245.    Plaintiffs repeat and reallege Paragraphs 1–244 as if set forth fully and incorporated herein.

246.    Plaintiff's son is a person with a disability as defined under the FHA.

247.    Plaintiff is his parent, legal guardian and primary caregiver.

248.    Defendants knew of Plaintiff's son's disability and Plaintiff's need to provide care for him from home.

249.    Since 2023, Plaintiffs have experienced harassment, surveillance, targeted enforcement of Oak Hill rules and regulations, and unlawful denials of reasonable accommodation requests without participation in the interactive process.

250.    Harassment and discrimination of Plaintiff and her son were based on his disability.

251.    Plaintiffs' reasonable accommodation requests were necessary to afford her son an equal opportunity to use and enjoy their dwelling.

252.    Plaintiffs requested a reasonable accommodation from Defendants to provide full-time care and supervision for her twenty-five-year-old son who is severely disabled, while providing limited hair services from her home under limited conditions.

253.    Defendants failed to engage in the interactive process required by law, ignored the medical and professional recommendations regarding Plaintiff's son's care needs, and denied the

40

accommodation requests outright.

254. Defendants failed to respond or participate in the interactive process in a timely or meaningful manner to Plaintiff's requests for accommodation.

255. Defendant's failure to provide a reasonable accommodation denied Plaintiff and her son the equal opportunity to use and enjoy their dwelling; resulted in retaliatory fines, harassment, threats, and selective enforcement of rules; and violates the MHRA, which requires housing providers (including condominium associations) to grant reasonable accommodations to persons with disabilities when necessary and reasonable.

256. Defendants' actions were discriminatory, intentional, malicious, and demonstrate willful ignorance and pretextual discrimination.

257. Defendants selectively enforced the Oak Hill Rules and Regulations and Declaration against Plaintiffs while permitting other unit owners to conduct similar commercial activities.

258. Despite having ruled in summer of 2023 that Plaintiffs were in violation of Rule 19 of the 2023 Rules, Defendants revised Rule 19 to retroactively bolster their decision against the Plaintiffs and her activities.

259. Defendants did not provide Plaintiffs with an opportunity to be heard regarding this issue in violation of her due process rights.

260. Defendants revised Rule 19 of its Rules and Regulations to specifically target Plaintiff's activities even after she received confirmation that she was in compliance with the Rule from Oak Hill's Property Manager, that she was in compliance with the Topsham Zoning Ordinance as confirmed by the Topsham CEO, and Oak Hill's attorney advised them to consider the minor home occupation test under the Topsham Zoning Ordinance because the term

41

"commercial activities" in the Oak Hill Declaration is ambiguous.

261.    Defendants also specifically revised Rule 19 to allow them to both issue additional fines against her for the alleged violations and to double those daily fines under the Board's discretion.

262.    Defendants issued fines and violations targeting Plaintiffs in retaliation for requesting a reasonable accommodation on behalf of her disabled son.

263.    Defendants engaged in an unauthorized accounting method against Plaintiffs to manufacture a delinquency and to bring the associated foreclosure proceeding against Plaintiff and her mother, by applying payments intended to be for common assessment payments to the fines and associated late fees instead.

264.    Defendants further removed Plaintiffs from Oak Hill's mailing list, revoked their access to Oak Hill's payment portal without notifying them thereby cancelling Plaintiffs' autopayments, and refused to deposit Plaintiffs' checks for assessed common expenses to intentionally create a basis for which to pursue foreclosure and remove Plaintiffs from the Oak Hills community.

265.    Upon information and belief, Defendants subjected Plaintiff and her son to ongoing harassment and surveillance, including asking residents to take pictures of guests visiting Plaintiff's home and monitoring how many service providers came to her unit to provide care for her son.

266.    Defendants' actions constitute discrimination in housing on the basis of disability in violation of the FHA, 42 U.S.C. § 3604.

WHEREFORE, Plaintiffs respectfully requests that this Court: (i) enter judgment in their favor and declare that the conduct engaged in by Defendants was in violation of Plaintiffs' rights

under the FHA; (ii) order Defendants to cease all discriminatory conduct, dismiss the violations against Plaintiffs and the foreclosure action filed against Plaintiffs' unit with prejudice, and vacate all fines, fees, and penalties associated with the violations and foreclosure action; (iii) grant Plaintiffs' most recent reasonable accommodation request to allow her to provide limited in-home services while providing full-time care and supervision to her disabled son; (iv) award Plaintiffs compensatory and punitive damages in an amount to be determined at trial of this matter; (v) award Plaintiffs attorney's fees including legal expenses and costs; (vi) award Plaintiffs pre-judgment interest; and (vii) grant Plaintiffs such other and relief as the Court deems just and proper.

### COUNT IV: RETALIATION IN HOUSING FOR ENGAGING IN PROTECTED ACTIVITY IN VIOLATION OF MHRA
### 5 M.R.S. § 4633
### (All Defendants)

267.    Plaintiffs repeat and reallege Paragraphs 1–266 as if set forth fully and incorporated herein.

268.    Plaintiff engaged in protected activity under the MHRA by requesting reasonable accommodations on behalf of her adult son who is severely disabled and asserting her legal rights to provide care for him from her home.

269.    Plaintiffs opposed acts or practices that were unlawful under the MHRA, and filed a charge and participated in investigations under the MHRA in MHRC proceedings.

270.    Following Plaintiffs' engagement in these protected activities, Defendants engaged in a series of adverse, discriminatory, and retaliatory actions, including but not limited to: denying Plaintiffs' reasonable accommodation requests without engaging in the required interactive process; issuing and continuing to assess fines, late fees, and notices of violation tied directly to the conduct underlying their accommodation requests; threatening additional enforcement actions for unrelated or minor conduct, including exterior decorative lighting, initiating and encouraging

multiple complaints to Plaintiff's professional licensing board despite her valid licensure and to Plaintiffs' mortgage lender; soliciting or encouraging monitoring of Plaintiffs' home activities, including photographing individuals entering and exiting her residence; harassment; and manufacturing and commencing foreclosure proceedings in the Sagadahoc County Superior Court based in part on alleged violations arising from the same protected conduct and Defendants' refusal to accept payments from Plaintiffs and their revocation of Plaintiffs' access to Oak Hills' payment portal.

WHEREFORE, Plaintiffs respectfully request that this Court: (i) enter judgment in their favor and declare that the conduct engaged in by Defendants was in violation of Plaintiffs' rights under the MHRA and in retaliation for Plaintiffs' protected activities; (ii) order Defendants to cease all discriminatory conduct, dismiss the violations against Plaintiffs and the foreclosure action filed against Plaintiff's unit with prejudice, and vacate all fines, fees, and penalties associated with the violations and foreclosure action; (iii) grant Plaintiffs' most recent reasonable accommodation request to allow her to provide limited in-home services while providing full-time care and supervision to her disabled son; (iv) award Plaintiffs' compensatory and punitive damages in an amount to be determined at trial of this matter; (v) award Plaintiffs attorney's fees including legal expenses and costs; (vi) award Plaintiffs pre-judgment interest; and (vii) grant Plaintiffs such other and relief as the Court deems just and proper.

## COUNT V: RETALIATION IN HOUSING FOR ENGAGING IN PROTECTED ACTIVITY IN VIOLATION OF FHA
### 42 U.S.C. § 3617
### (All Defendants)

271.    Plaintiffs repeat and reallege Paragraphs 1–270 as if set forth fully and incorporated herein.

272.    Plaintiffs engaged in protected activity under the FHA by Plaintiffs requesting

44

multiple reasonable accommodation on behalf of her adult son who is severely disabled, asserting her legal rights to provide care for him from her home, and filing complaints with the MHRC.

273.    Following Plaintiffs' engagement in these protected activities, Defendants engaged in a series of adverse, discriminatory, and retaliatory actions, including but not limited to: denying Plaintiffs' reasonable accommodation requests without engaging in the required interactive process; issuing and continuing to assess fines, late fees, and notices of violation tied directly to the conduct underlying their accommodation requests; threatening additional enforcement actions for unrelated or minor conduct, including exterior decorative lighting, initiating and encouraging multiple complaints to Plaintiff's professional licensing board despite her valid licensure and to Plaintiffs' mortgage lender; soliciting or encouraging monitoring of Plaintiffs' home activities, including photographing individuals entering and exiting her residence; harassment; and manufacturing and commencing foreclosure proceedings in the Sagadahoc County Superior Court based in part on alleged violations arising from the same protected conduct and Defendants' refusal to accept payments from Plaintiffs and their revocation of Plaintiffs' access to Oak Hills' payment portal.

WHEREFORE, Plaintiffs respectfully request that this Court: (i) enter judgment in their favor and declare that the conduct engaged in by Defendants was in violation of Plaintiffs' rights under the FHA and in retaliation for Plaintiffs' protected activities; (ii) order Defendants to cease all discriminatory conduct, dismiss the violations against Plaintiffs and the foreclosure action filed against Plaintiffs' unit with prejudice, and vacate all fines, fees, and penalties associated with the violations and foreclosure action; (iii) grant Plaintiffs' reasonable accommodation request to allow her to provide limited in-home services while providing full-time care and supervision to her disabled son; (iv) award Plaintiffs' compensatory and punitive damages in an amount to be

45

determined at trial of this matter; (v) award Plaintiffs attorney's fees including legal expenses and

costs; (vi) award Plaintiffs pre-judgment interest; and (vii) grant Plaintiffs such other and relief as

the Court deems just and proper.

## COUNT VI: BREACH OF CONDOMINIUM DECLARATION AND BYLAWS AND THE MAINE CONDOMINIUM ACT
### 33 M.R.S.A. § 1601-101 et seq.
### (All Defendants)

274.    Plaintiffs repeat and reallege Paragraphs 1–273 as if fully set forth and incorporated herein.

275.    The Oak Hill Declaration, Bylaws, and Rules and Regulations constitute binding governing documents that create contractual and fiduciary duties among the condominium association Board and unit owners.

276.    Every contract governed by the Maine Condominium Act imposes an obligation of good faith in its performance or enforcement under 33 M.R.S.A. § 1601-113.

277.    The Maine Condominium Act is further supplemented by general principles of law and equity, including law of corporations and unincorporated associations, the law of real property, and contract law. 33 M.R.S.A. § 1601-108.

278.    At all relevant times, Defendants were obligated to comply with and enforce the Declaration, Bylaws, and Rules and Regulations in manner consistent with their terms, in good faith, and in accordance with applicable law.

279.    The governing documents require, among other things, that the Board act in accordance with established procedures, provide proper notice of meetings and rule changes, and apply rules uniformly and in a non-arbitrary manner.

280.    Defendants breached these obligations by selectively enforcing Rule 19 and related provisions against Plaintiffs while permitting other unit owners to engage in similar in-home

46

commercial activities without enforcement action, and disallowing Plaintiff's due process rights to be heard on the issue of the alleged violation.

281.    Defendants further breached their fiduciary duties under the governing documents by interpreting and applying the term "commercial activity" in an arbitrary and inconsistent manner, including applying enforcement actions without a clear or uniform definition and without first clarifying the governing provisions.

282.    Defendants breached their duties under the governing documents and under Maine law, 33 M.R.S.A. § 1603-108, by failing to provide the required ten (10) days' notice of the association meeting at which revisions to Oak Hill's Rules and Regulations would be considered, and by failing to give adequate notice that such revisions would be acted upon at that meeting.

283.    Defendants breached their duties to provide notice stating the items on the agenda at the meeting, including the general nature of any proposed amendment to the declaration or bylaws pursuant to 33 M.R.S.A. § 1603-1108.

284.    As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered damages, including but not limited to, fines, legal expenses, loss of income, emotional distress, and interference with the use and enjoyment of their unit.

285.    Pursuant to 33 M.R.S.A. § 1601-114, Plaintiffs are entitled to remedies under the Maine Condominium Act, which are to be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed.

WHEREFORE, Plaintiffs respectfully request that this Court: (i) enter judgment in their favor and declare that the conduct engaged in by Defendants was in breach of Oak Hill's Declaration, Bylaws, and Rules and Regulations and the Maine Condominium Act; (ii) order Defendants to cease all violating conduct; (iii) award Plaintiffs' compensatory and punitive

damages as allowed under applicable law in an amount to be determined at trial of this matter; (iv) award Plaintiffs attorney's fees including legal expenses and costs; (v) award Plaintiffs pre-judgment interest; and (vi) grant Plaintiffs such other and relief as the Court deems just and proper.

## COUNT VII: INTERFERENCE WITH EXERCISE OF CIVIL RIGHTS IN VIOLATION OF THE MHRA
### 5 M.R.S.A. § 4551 et seq.
### (All Defendants)

286.    Plaintiffs repeat and reallege Paragraphs 1–285 as if fully set forth and incorporated herein.

287.    Plaintiff and her son have protected rights under the MHRA and FHA to request and obtain reasonable accommodation necessary to afford equal opportunity to use and enjoy their dwelling.

288.    Defendants intentionally interfered with Plaintiffs' exercise of these rights by denying reasonable accommodation requests, selectively enforcing Oak Hill rules, and imposing fines and penalties in response to Plaintiffs' exercise of protected rights.

289.    Defendants' conduct was undertaken with knowledge of Plaintiff's son's disability-related accommodation needs and with disregard for Plaintiff's rights under the MHRA and FHA.

290.    As a direct and proximate result, Plaintiffs have suffered damages including economic loss, emotional distress, and deprivation of equal housing opportunity.

WHEREFORE, Plaintiffs respectfully request that this Court (i) enter judgment in their favor and declare that the conduct engaged in by Defendants interfered with the lawful exercise of Plaintiffs' civil rights; (ii) order Defendants to cease all violating conduct; (iii) award Plaintiffs' compensatory and punitive damages in an amount to be determined at trial of this matter; (iv) award Plaintiffs attorney's fees including legal expenses and costs; (v) award Plaintiffs pre-judgment interest; and (vi) grant Plaintiffs such other and relief as the Court deems just and proper.

48

## COUNT VIII: AIDING AND ABETTING UNLAWFUL DISCRIMINATION IN VIOLATION OF THE MHRA
### 5 M.R.S.A. § 4551 et seq.
**(Defendants Guerette, Leone, Chatterton, McKenna, and Lary)**

291.    Plaintiffs repeat and reallege Paragraphs 1–290 as if fully set forth and incorporated herein.

292.    The MHRA prohibits aiding, abetting, inciting, compelling, or coercing unlawful discrimination, including discrimination in housing and retaliation or the exercise of protected rights.

293.    Under 5 M.R.S.A. § 4633(2), "It is unlawful for a person to coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of the rights granted or protected by this Act . . . or has aided or encouraged another individual in the exercise or enjoyment of, those rights."

294.    Defendants and their agents, knowingly participated in, authorized, directed, and/or facilitated discriminatory and retaliatory conduct against Plaintiffs, including selective enforcement of Oak Hill Rules and Regulations, denial of Plaintiffs' reasonable accommodation requests, and the continued improper accrual and collection of fines, penalties, and enforcement actions, including foreclosure-related measures, in response to Plaintiffs' protected activity.

295.    Defendants further aided and abetted discriminatory and retaliatory conduct by adopting, modifying, and enforcing rules in a manner designed to target Plaintiffs' protected activity and disability-related accommodation request.

296.    Defendants also engaged in and facilitated retaliatory conduct against Plaintiffs for engaging in protected activity under the MHRA and FHA, including but not limited to, initiating and prosecuting enforcement actions premised on her accommodation requests; encouraging or directing complaints to Plaintiff's professional licensing board despite her valid licensure and her

mortgage lender; soliciting or encouraging surveillance of Plaintiffs' residence and visitors; and pursuing foreclosure proceedings based in substantial part on conduct tied to Plaintiffs' exercise of their statutory rights.

297.    As a direct and proximate result of Defendants aiding and abetting of unlawful discrimination and retaliation, Plaintiffs have suffered damages as set forth above, including economic loss, emotional distress, loss of housing stability, and ongoing interference with their rights under the MHRA.

WHEREFORE, Plaintiffs respectfully request that this Court (i) enter judgment in their favor finding that Defendants Guerette, Leone, Chatterton, McKenna, and Lary have aided and abetted Defendants' unlawful discrimination against the Plaintiffs in violation of the MHRA; (ii) order Defendants to cease all violating conduct; (iii) award Plaintiffs' compensatory and punitive damages in an amount to be determined at trial of this matter; (iv) award Plaintiffs attorney's fees including legal expenses and costs; (v) award Plaintiffs pre-judgment interest; and (vi) grant Plaintiffs such other and relief as the Court deems just and proper.

## COUNT IX: BREACH OF FIDUCIARY DUTY
### (Defendants Guerette, Leone, Chatterton, McKenna, and Lary)

298.    Plaintiffs repeat and reallege Paragraphs 1–297 as if fully set forth and incorporated herein.

299.    Defendants, as members and agents of the Board, owed fiduciary duties to Plaintiffs and other unit owners, including duties of care, loyalty, good faith, and fair dealing in the enforcement of governing documents pursuant to 33 M.R.S.A. § 1601-113.

300.    Defendants breached these fiduciary duties by acting arbitrarily, selectively enforcing rules against Plaintiffs, failing to act in good faith, and using their authority to target Plaintiffs following their protected activities and accommodation requests.

301. Defendants further breached their fiduciary duties by failing to enforce governing documents uniformly, adopting post hoc rule modifications intended to justify prior enforcement actions, and failing to adhere to the required procedural rules for the Board including required timeliness and content of meeting notices.

302. As a direct and proximate result, Plaintiffs suffered damages including financial loss, fines, and interference with their property rights.

303. Pursuant to 33 M.R.S.A. § 1601-114, Plaintiffs are entitled to remedies under the Maine Condominium Act, which are to be liberally administered to the end that the aggrieved party is put in as good a position as if the other party had fully performed.

WHEREFORE, Plaintiffs respectfully request that this Court (i) enter judgment in their favor and declare that Defendants Guerette, Leone, Chatterton, McKenna, and Lary breached their fiduciary rights under Oak Hill's governing documents; (ii) order Defendants to cease all violating conduct; (iii) award Plaintiffs' compensatory and punitive damages in accordance with applicable law in an amount to be determined at trial of this matter; (iv) award Plaintiffs attorney's fees including legal expenses and costs; (v) award Plaintiffs pre-judgment interest; and (vi) grant Plaintiffs such other and relief as the Court deems just and proper.

## COUNT X: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

304. Plaintiffs repeat and reallege Paragraphs 1–303 as if fully set forth and incorporated herein.

305. Defendants owed Plaintiffs a duty to act reasonably, in good faith, and in compliance with their fiduciary duties in the enforcement of condominium rules and in their dealings with Plaintiffs as Oak Hill residents.

306. Defendants engaged in extreme and outrageous conduct, including selective

51

enforcement, retaliatory fines, surveillance activities, denial of reasonable accommodations, and threats of enforcement and foreclosure.

307. Defendants further harassed Plaintiffs through coordinated efforts to file complaints with Plaintiff's licensing board and mortgage lender in an effort to remove her from the Oak Hills community, and intentionally caused Plaintiff emotional distress by removing her from Oak Hill's mailing list, revoking her access to Oak Hill's payment portal thereby cancelling her scheduled automatic payments, and refusing to deposit checks provided by Plaintiffs for assessed common expenses.

308. Defendants engaged in conduct that intentionally or recklessly caused emotional distress to Plaintiff Caroline Thibeault, and Defendants were certain or substantially certain that severe emotional distress would result from their conduct.

309. Defendants' conduct caused Plaintiff Caroline Thibeault severe emotional distress, including anxiety, fear, humiliation, and emotional suffering.

310. Defendants' conduct was so extreme and outrageous so as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable.

311. Plaintiff Caroline Thibeault suffered and continues to suffer severe emotional distress as a result of Defendants' conduct.

WHEREFORE, Plaintiff Caroline Thibeault respectfully requests that this Court (i) enter judgment against Defendants in an amount which will fairly compensate her for damages as well as punitive damages, and (ii) any and all other relief deemed just in the premises including an award of Plaintiffs' costs and attorney's fees.

## COUNT XI: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (All Defendants)

52

312. Plaintiffs repeat and reallege Paragraphs 1–311 as if fully set forth and incorporated herein.

313. Defendants owed Plaintiffs a duty to act reasonably and in compliance with their fiduciary duties in the enforcement of condominium rules and in their dealings with Plaintiffs as Oak Hill residents.

314. Defendants breached this duty by acting negligently by engaging in inconsistent enforcement, failing to properly evaluate accommodation requests, and imposing fines and penalties without reasonable basis.

315. Defendants further harassed Plaintiffs through coordinated efforts to file complaints with Plaintiff's licensing board and mortgage lender in an effort to remove her from the Oak Hills community, and intentionally caused Plaintiff emotional distress by removing her from Oak Hill's mailing list, revoking her access to Oak Hill's payment portal thereby cancelling her scheduled automatic payments, and refusing to deposit checks provided by Plaintiffs for assessed common expenses.

316. As a direct and proximate cause of Defendants' negligence, Plaintiff Caroline Thibeault suffered severe emotional distress that was certain or substantially foreseeable given her caregiving responsibilities and the ongoing nature of the enforcement actions.

317. Plaintiff Caroline Thibeault's emotional distress manifested in significant anxiety, fear, stress, and disruption to her daily life.

WHEREFORE, Plaintiff Caroline Thibeault respectfully requests that this Court (i) enter judgment against Defendants in an amount which will fairly compensate her for damages as well as punitive damages, and (ii) any and all other relief deemed just in the premises including an award of Plaintiffs' costs and attorney's fees.

53

## COUNT XII: PRELIMINARY INJUNCTION

318. Plaintiffs repeat and reallege Paragraphs 1–317 as if fully set forth and incorporated herein.

319. Plaintiffs have no adequate remedy at law for Defendants' ongoing and continuing conduct.

320. Plaintiffs are at risk of continuing and irreparable harm, including the continuing incurrence of fines, enforcement actions, selective enforcement, harassment, retaliation, foreclosure-related measures, and continued denials of reasonable accommodations.

321. Unless enjoined by this Court, Defendants will continue to engage in conduct that violates Plaintiff's rights under the MHRA, FHA, Maine Condominium Act, and Oak Hill's governing documents.

322. Plaintiffs seek a temporary restraining order and/or preliminary injunctive relief to maintain the status quo during the pendency of this action, and permanent injunctive relief thereafter, prohibiting Defendants from engaging in discriminatory, harassing, retaliatory, or selectively enforced conduct and requiring compliance with their obligations to provide reasonable accommodations under state and federal law.

WHEREFORE, Plaintiffs respectfully request that this Court (i) issue a temporary restraining order and/or preliminary injunction enjoining Defendants from engaging in discriminatory or retaliatory conduct against Plaintiffs; (ii) order Defendants to grant Plaintiffs' most recent reasonable accommodation request to allow her to provide limited hair services from her unit subject to reasonable conditions including one client at a time, by appointment only, to be operated between the hours of 8 a.m. to 5 p.m.; (iii) order Defendants to dismiss the foreclosure action with prejudice; (iv) discharge of any and all alleged violations and related fees, fines, and

penalties; and (v) grant Plaintiffs such other and relief as the Court deems just and proper.

## COUNT XIII: PERMANENT INJUNCTION
### (All Defendants)

323.    Plaintiffs repeat and reallege Paragraphs 1–322 as if fully set forth and incorporated herein.

324.    Plaintiffs have no adequate remedy at law for Defendants' ongoing and continuing conduct.

325.    Plaintiffs are at risk of continuing harm, including ongoing fines, enforcement actions, selective enforcement, retaliation, harassment, foreclosure-related measures, and continued denials of reasonable accommodations.

326.    Unless enjoined by this Court, Defendants will continue to engage in conduct that violates Plaintiffs' rights under the MHRA, FHA, Maine Condominium Act, and Oak Hill's governing documents.

327.    Plaintiffs seek a permanent injunction prohibiting Defendants from engaging in discriminatory, retaliatory, or selective enforcement conduct and requiring compliance with reasonable accommodation obligations under state and federal law.

WHEREFORE, Plaintiffs respectfully request that this Court (i) issue a permanent injunction enjoining Defendants from engaging in discriminatory or retaliatory conduct against Plaintiffs; (ii) order Defendants to grant Plaintiffs' most recent reasonable accommodation request to allow her to provide limited hair services from her unit subject to reasonable conditions including one client at a time, by appointment only, to be operated between the hours of 8 a.m. to 5 p.m.; (iii) order Defendants to dismiss the foreclosure action with prejudice; (iv) discharge of any and all alleged violations and related fees, fines, and penalties; and (v) grant Plaintiffs such

55

other and relief as the Court deems just and proper.

Dated: April 23, 2026

James Belleau, Bar No. 8314
Meredith Scott, Bar No. 11129
*Attorneys for Plaintiffs*

Trafton, Matzen, Belleau & Frenette
P.O. Box 470, 10 Minot Avenue
Auburn, Maine 04212-0470
(207)784-4531
Jbelleau@tmbf-law.com
Mscott@tmbf-law.com

## VERIFICATION

Dated: April 23, 2026

Caroline Thibeault
**Caroline Thibeault**

STATE OF MAINE
ANDROSCOGGIN, ss.

Personally appeared before me the above-named **Caroline Thibeault** and made oath that the foregoing statements made by her are true to the best of her knowledge, information and belief, and to the extent that such statements are based upon information and belief, she believes them to be true.

Before me,

Megan a. Madore
~~Attorney-at-Law~~ Notary Public

56

EXHIBIT
Exhibit A
A

Bk 3439 Pg278 #8853
10-24-2012 @ 01:41p

# DECLARATION OF

# OAK HILL CONDOMINIUMS



# TOPSHAM, MAINE

**Maine Condominium Act**

## OAK HILL CONDOMINIUMS

### DECLARATION PURSUANT TO TITLE 33,
### CHAPTER 31, SECTION 1601-101 ET. SEQ.
### KNOWN AS THE MAINE CONDOMINIUM ACT

This Declaration dated October 24, 2012, is filed pursuant to Section 1602-101 of the Maine Condominium Act as appears in the Maine Revised Statutes, as amended, Title 33, Chapter 31, Section 1601-101, et. seq. to which reference is specifically made and which Act is incorporated herein by reference and to which all owners of units described herein, and their heirs, successors and assigns, shall be bound.

1. **Description of Land**. KASPRZAK HOMES, INC., a Maine corporation ("Declarant") of Waterboro, County of York and State of Maine, has submitted the land hereinafter described in Appendix I attached hereto and incorporated herein with the buildings and improvements thereon ("the Property"), located off Granite Hill Drive in the Town of Topsham County of Sagadahoc and State of Maine, to the provisions of said Maine Condominium Act.   The Property is subject to and shall have the benefit of all easements, rights of way and matters affecting title described or referred to in Appendix I or in the survey to which reference is hereinafter made.

     A properly prepared and certified plat of the land and plans of the units were recorded simultaneously with this Declaration in Plan Book _48_ Pages _69_ , in the Sagadahoc County Registry of Deeds. The Oak Hill Condominiums constitutes an approved subdivision and site plan for purposes of the Town of Topsham's ordinances and state law.   No amendments may be made to said subdivision plans without the approval of the Town of Topsham Planning Board.

2. **Creation of Units**. Declarant reserves the right to create 68 units, to be numbered one through sixty-eight, said units are to be created in seventeen (17) separate buildings of four (4) units each, all of which shall be declared and built as seventeen (17) separate phases, not necessarily in numerical order. As of the date of this Declaration, no Units have been created. The fractional interests in the condominium common elements and common expense liabilities set forth in Appendix II are apportioned between the respective condominiums and

shall automatically be adjusted proportionately when said units are created. The location of the buildings for all sixty-eight units are shown on the plat and plans referred to in Section 1 hereof. The actual unit design, footprint and location within the building area will be established at the time each phase is declared and may differ from the recorded plat and plans by square footage increase, deck relocation and/or replacement with a sunroom and the option of unit owners to add a sunroom at a later date; any such adjustments will automatically decrease the amount of adjoining common and/or limited common open space and may differ by increased or decreased square footage from the Typical Diagrammatic Floor Plans recorded with the plat. The Declarant will exercise the development right to create units by recording an amendment to this Declaration and recording new plats and plans pursuant to Section 1602-109(f) of the Act or an affidavit that the plats and plans previously recorded conform to the requirements of Section 1602-109(a), (b) and (c).

3. **Unit Numbers and Boundaries.** Reference is made to the recorded plat and plans referred to in Section 1 hereof for the identification number of each unit showing the location and dimensions of its boundaries. The boundaries of each unit are the interior surface of the roof rafters, walls, windows, and the basement concrete floor slab. All interior floor and wall coverings, including but not limited to linoleum, polyurethane, carpeting, paint, wallpaper, are included within the boundaries of a unit. The provisions of Section 1602-102 of the Maine Condominium Act are adopted and incorporated herein by reference where appropriate and not in conflict with the plat and plans. The provisions of Section 1602-112 of the Maine Condominium Act shall govern relocation of boundaries between units. The subdivision of a unit into two or more units is prohibited.

The buildings are of wood frame construction, having either one, one and one-half or two stories. The one and one and one-half story units will have one (1) bedroom on the first floor, bath and optional den that can be used as an additional bedroom and an unfinished second floor area which may be finished as an additional bedroom(s) and/or bath at the option of the unit owner. The two story units will have one or two bedrooms on the first floor and an unfinished second floor area which may be finished as additional bedroom(s) and/or bath at the option of the unit owner. All will be provided with oil or gas heat from a separate furnace and central air conditioning, gas fireplace or stoves, may be added at the option of the unit owner. Each unit will have at least a one car attached garage and an adjoining parking space

which will be designated a limited common element. Some unit styles provide two car garages and the adjoining parking spaces are designated as limited common elements. The building exterior is vinyl siding. Each building has a full foundation with basement. Some of the unit styles provide for a deck, an optional four season room with an optional deck or patio, an optional covered front porch, or an optional bulkhead or doghouse basement entry designated as limited common elements. Further, each unit will have the option of enclosing the deck as a separate sunroom. Once enclosed, the sunroom will become part of the Unit.

4. **Common Elements**. Each of the units will be conveyed together with its respective undivided interest in the common elements as hereinafter set forth and will have the benefit of the right to use the common elements in common with others entitled thereto as provided by Oak Hill Association (hereinafter referred to as the "Association") and the rules and regulations adopted by the Association. The common elements consist of all portions of the Property other than the units, which is all the property located within the boundaries of the parcel more fully described in Appendix I and which is also shown on the Site and Subdivision Plan for Oak Hill approved by the Town of Topsham. Joint ownership of the common elements includes the ownership rights and maintenance responsibilities including but not limited to site roads, drives, parking areas, landscaping, lighting and subsurface utilities. Maintenance of the common elements will be performed by the Association on behalf of the unit owners as herein provided. The water and sewer mains within the right of way are intended to be public and may be or may have been conveyed by Declarant to the appropriate municipality or utility company.

5. **Limited Common Elements**.

   A. **Description of Limited Common Elements**. Limited Common Elements shall mean those portions of the Buildings defined as such pursuant to Sections 1602-102(2) and (4) of the Act or as identified and designated as Limited Common Elements on the Plats and Plans, as the same may be amended or supplemented from time to time.

   B. **Specified Limited Common Elements**. The following portions of the Buildings or the Property are hereby designated as Limited Common Elements: natural gas lines and storage tanks, satellite dishes, solar collectors, geothermal wells or other alternative energy devices and service lines, shutters, awnings, window boxes, doorsteps, stoops,

balconies, porches and patios, if any, which are not part of the Unit but which are adjacent to and serve only such Unit.

C. **Easement for Access and Utilities.** Notwithstanding the location of limited common elements, all units shall have an appurtenant easement as required to use and improve said limited common elements and to connect to utility installations within the condominium, except that the owner of the Unit so benefitted shall be responsible for the cost of installation, maintenance and repair of the Limited Common Element, such as solar collectors, if so used and their placement shall be subject to reasonable regulation by the Association.

6. **Fraction of Common Element Interests, Voting Rights and Common Expense Liabilities.** The fraction of undivided interest in the common elements, voting rights and common expense liabilities appertaining to each unit is set forth in Appendix II attached hereto and incorporated herein by reference, which said fraction was determined by dividing each unit by the total of all Units. No fraction of undivided interest allocated to any unit shall be altered except upon the unanimous vote of all unit owners and their first mortgagees. The formula for votes is that each unit shall be entitled to one vote in Association matters.

7. **Special Declarant Rights.** The Declarant reserves the right until the sale of all 68 units on the land described in Appendix I is completed, or until ten years from the date of recordation of this Declaration, whichever occurs first, to:

A. Create Units, Common Elements and Limited Common Elements within the Condominium, to reduce or enlarge the size of any unsold Unit, to modify the location and design of buildings and improvements, to convert Units into Common Elements, to convert Common Elements into Units, and to convert Common Elements into Limited Common Elements. The parcels of real estate subject to the development rights described in this paragraph are the unit buildings depicted on the survey plat of the Condominium recorded in the Sagadahoc County Registry of Deeds in Condominium File No. _____, at Page _____. These development rights may be exercised with respect to different parcels of real estate at different times as Declarant, in its sole discretion, may determine. No assurances are made with respect to the order in which the parcels of real estate subject to the development rights will be subjected to the exercise of such development rights. If any such development right is exercised in any portion of the real

estate subject to such development rights, such development rights need not be exercised in all or any other portion of the real estate. As Units are added to the Condominium by the Declarant in the exercise of its development rights as reserved herein, the votes in the Association shall be reallocated among all the Units such that each Unit shall have one vote, and the percent of interest in common elements shall be reallocated so that the ownership of the common elements is allocated equally among all of the Units. No assurances are made in regard to the architectural style, quality of construction, size or location of any buildings or other improvements that may be erected pursuant to the development rights. No assurances are made as to the description of any other improvements that may be made and common elements that may be created, including the types and sizes of any limited common elements or the proportion of limited common elements to units pursuant to the exercise of any development right.

B. Locate on the Property, even though not depicted on the plat and plans, and grant and reserve easements and rights of way for the installation, maintenance, repair, replacement and inspection of, utility lines, wires, pipes, conduits, and facilities, including, but not limited to, water, electric, telephone and sewer.

C. Connect with and make use of utility lines, wires, pipes and conduits located on the Property for construction and sales purposes, provided that the Declarant shall be responsible for the cost of service so used.

D. Reserve an easement through and use the common elements to complete construction and for ingress and egress and otherwise discharge the Declarant's special Declarant rights for ingress and egress and for the storage of construction materials and equipment used in the completion of the improvements shown on the plats and plans.

E. Operate a management office and a sales office and have prospective purchasers and others visit such offices and use certain portions of the common elements including the roadways and parking spaces. The management office and sales office may be located in any unit owned by Declarant or on common elements and may be of such size and in such location as the Declarant shall deem convenient and shall not unreasonably interfere with use of the common elements by other unit owners. Any management office and sales office not designated a unit shall be the property of the Declarant, which Declarant

reserves the right to remove within forty-five (45) days after the Declarant ceases to be a unit owner.

F.  Install and maintain signs and lighting for sales.

G.  From the date of sale of the first unit, Declarant shall be empowered to appoint and remove the officers of the Association and members of the Executive Board, in accordance with the provisions of the Bylaws.  Provided, however, the Declarant shall relinquish all special rights expressed or implied through which he may directly or indirectly control, direct, modify or veto any action of the Association, its Board of Directors or the majority of unit owners, and control of the Owners Association and ownership of any working capital fund controlled by the Declarant shall pass to the owners of units within the Property not later than the earlier of the following:  sixty (60) days after the date by which seventy-five percent (75%) of the units which may be created have been conveyed to unit purchasers or fifteen (15) years from the date of conveyance of the first unit to a unit purchaser.  Declarant may voluntarily surrender the right to appoint and remove officers and members of the executive board before termination of that period, provided however, that any actions of the association or executive board which may affect the special Declarant rights set forth in paragraphs 7A-F above shall be approved by the Declarant before they become effective.  In any event, the period of Declarant control shall end no earlier than the later of:  (1) conveyance by the Declarant of 50% of the units; (2) termination of any Declarant right to appoint officers or members of the executive board; or (3) termination of any right of Declarant to approve or veto any actions of the association or the executive board.  The Declarant shall give written notice to all members and eligible mortgage holders not less than 10 days prior to the turnover date and shall call for a special meeting of members on the turnover date to elect a Board of Directors.  The requirements of this paragraph shall not affect the Declarant's rights, as a unit owner, to exercise the votes allocated to units owned by the Declarant.  This Section 7 shall not be amended without the consent of the Declarant.

8.  **Encroachments**.  If any portion of the common elements, or any other unit, encroaches at any time upon any unit or upon any portion of the common elements, as a result of minor variations or relocation during construction, settling of the building, alteration or repair to the

October 24, 2012                           -7-                        Oak Hill Condominiums
                                                                       Declaration and By-Laws

common elements made by or with the consent of the Board of Directors, repair or restoration of a unit or building after damage by fire or other casualty, or as a result of condemnation or other eminent domain proceedings, an easement shall exist for the encroachment and for its maintenance so long as the building stands.

9. **Eminent Domain.**

A. If a unit is acquired by eminent domain, or if a part of a unit is acquired by eminent domain leaving the unit owner with a remnant which may not practically or lawfully be used for any purpose permitted by this Declaration, any award therefore shall be paid to the unit owner as compensation for his unit and its percentage interest, whether or not any percentage of undivided interest is acquired. Upon acquisition, unless the decree otherwise provides, that unit's entire percentage of undivided interest, votes in the Association, and common expense liability shall be re-allocated to the remaining units in proportion to the respective interests, votes and liabilities of those units before the taking, and the Association shall promptly prepare, execute and record an amendment to this Declaration reflecting the allocations. Any remnant of a unit remaining after part of a unit is taken under this subsection shall be thereafter a common element.

B. Except as provided in subsection (A) hereinabove, if part of a unit is acquired by eminent domain, any award therefore shall be paid to the unit owner as compensation for the reduction in value of the unit. That unit's allocation of common element interest and common expense liability shall remain unchanged.

C. If a part of the common areas or facilities is acquired by eminent domain, the Association shall represent the unit owners in any condemnation proceedings or in negotiations, settlements and agreements with the condemning authority, and the award shall be paid to the Association for the use and benefit of the unit owners and their mortgagees as their interests may appear. The Association shall divide any portion of the award not used for any restoration or repair of the remaining common elements among the unit owners in proportion to their respective percentages of undivided interest before the taking, but the portion of the award attributable to the acquisition of a limited common element must be equally divided among the owners of the units to which that limited common element was allocated at the time of acquisition.

D. The court decree shall be recorded in the Sagadahoc County Registry of Deeds.

E. Nothing in this Declaration or the Bylaws, rules or regulations of the Association shall be deemed to give the unit owner or any other party priority over any rights of a first mortgagee of a unit pursuant to its mortgage documents in the case of a distribution to such unit owner of condemnation awards for the taking of units and/or common elements.

10. **Restrictions on Use and Occupancy.** Each unit owner shall comply strictly with the Bylaws and with the administrative rules and regulations adopted by the Board and with the covenants, conditions and restrictions set forth in this Declaration or in the deed to his unit. Failure to so comply shall be grounds for an action to recover damages or for injunctive relief or both maintainable by the Manager or Board of Directors on behalf of the Association of unit owners, or, in a proper case, by an aggrieved unit owner.

A. Each unit in the building is intended to serve as a self-contained living unit and shall be subject to the rules and regulations and Bylaws of the Association. No unit shall be used for other than residential purposes. Rules and regulations consistent with this Declaration may be promulgated by the Board of Directors in order to ensure the peace and security of each resident, and each member shall be notified in writing of the rules and regulations thus promulgated.

B. The common elements shall be used only for access, ingress and egress to and from the respective units by the members, their lessees, guests, household help and other authorized visitors and for outdoor recreational use incidental to the residential use of the respective units. The use, maintenance and operation of the common elements shall not be obstructed, damaged or unreasonably interfered with by any member. The Board of Directors may adopt rules and regulations that restrict the nature and location of recreational activities upon the common elements.

C. The Association and its authorized employees and representatives shall have access to and from the unit and limited common element as may be necessary for the repair, maintenance, replacement, alteration, care or protection of the common elements and utilities or any portion thereof. In the case of emergency repairs, such right of access shall be immediate and may be exercised without notice to the unit owner. Otherwise, the unit owner shall be entitled to reasonable notice of the time and purpose of any entry pursuant to this paragraph.

D. No unit owner shall do any work which may jeopardize the soundness or safety of the property, reduce the value thereof or impair any easement, rights, appurtenances or other hereditament consisting of common elements without the unanimous consent of all other unit owners. If said work is to his unit alone, then to the extent it effects the soundness or safety of the abutting unit, the prior written consent of the abutter shall be required.

E. Each member shall maintain his unit in good condition and in good order and repair at his own expense and shall not do or allow anything to be done in his unit which may increase the rate or cause the cancellation of insurance on other units or on the common elements. In the event that a member shall fail to so maintain his unit the Association shall have the right to undertake repairs and maintenance necessary to ensure that such unit is in good condition and in good order, and assess the member the costs of such repair and/or maintenance.

F. Trash and garbage and other waste shall be kept only in sanitary containers and shall be disposed of in a clean and sanitary manner in accordance with rules and regulations to be promulgated by the Board of Directors.

G. Household pets shall be allowed in such numbers as the Board of Directors determines will not create a nuisance to unit owners. The Board of Directors may adopt regulations with respect to the number, size and type of allowable household pets. Such regulations shall become effective when written notice thereof is delivered or mailed to the members and shall operate prospectively as to all pets subsequently brought into the Property. No animals shall be permitted in any common element unless accompanied by and under the direct supervision of a unit owner or member of unit owner's household.

H. No commercial activity of any nature shall be permitted on the Property.

I. The parking spaces are to be used only for the parking of motor vehicles owned for personal use. No commercial vehicles, trailers, boats or trucks with a gross weight over 6,000 pounds shall be permitted in the parking spaces except service vehicles, moving vans or the like at the property on business. No mechanical repairs of vehicles shall be performed and no stripped or junk vehicles and no recreational vehicles or boats shall

be placed or maintained on any part of the common elements or limited common elements.

J. The Association shall have the right to grant permits, licenses and easements over the common areas for all purposes necessary for the proper operation of the project.

K. The Association, at any regular or special meeting of members, may adopt additional rules and regulations governing the use of the common elements.

## 11. Common Expenses.

A. Each unit owner shall pay to the Unit Owners' Association, or its authorized representative, his proportionate share of the budgeted annual expenses of maintenance, repair, replacement, administration and operation of the common elements; management of the Association; and maintenance of adequate working capital and reserves, which expenses are hereinafter referred to collectively as "common expenses". Such proportionate share shall be the same as said unit owner's fractional interest in the common elements. The annual assessment shall be payable in equal monthly installments, provided that in the event of any default in the payment of a monthly installment when due, the Association may declare the unpaid balance of the annual assessment to be immediately due and payable. No unit shall be assessable hereunder until sold or, when built, upon the issuance of a certificate of occupancy.

B. In the event of the failure of a unit owner to pay such proportionate share when due, the amount thereof together with interest at the rate established by the Association, costs and reasonable attorney's fees shall constitute a lien attached to the unit, as provided by the Act; provided, however, that such lien shall be the personal liability of the Owner and not pass personally to successor purchasers without their agreement to assume the same, and that such lien shall also be subordinate to the lien of all recorded mortgages on the interest of such unit owner, and the foreclosure of such mortgages, sale or transfer pursuant to foreclosure or transfer to mortgagee in lieu of foreclosure shall extinguish a subordinate lien for common charges. The entire unpaid share of the common expenses or assessments by the Association of Unit Owners chargeable to such unit, which became due prior to the foreclosure, shall become common expenses collectible from all unit owners, including such acquirer, his heirs, successors and assigns. Such foreclosure shall

October 24, 2012                                        -11-                          Oak Hill Condominiums
                                                                                     Declaration and By-Laws

Bk 3439 Pg289 #8853

not release the delinquent unit owner from personal liability to the Association for unpaid common expenses.

C. Any unit owner in default in the payment of any amount due the Association or in violation of any provisions of the Condominium Act, this Declaration, the Bylaws or the rules and regulations of the Association, which violation continues for ten (10) days after notice thereof by the Association to the unit owner, may be prohibited by the Board of Directors from the use and enjoyment of any and all of the common elements not essential to access to the unit, in addition to all other remedies available to the Board of Directors and the Association may withhold services provided by it if such action does not endanger the health, safety or property of the defaulted unit owner.

D. Any delinquency in excess of 60 days in the payment of assessments for common expenses or charges by an Owner shall be reported in writing to that Owner's mortgagee, insurer or guarantor upon proper request.

E. Voluntary Resale of Units. The following provisions apply to the sales of Units by all Unit Owners other than the Declarant:

(1) No Unit Owner shall be liable for the payment of any part of the Common Expenses assessed against his/her Unit subsequent to the date of recordation of a conveyance in fee of such Unit by the Owner. In a voluntary transfer of a Unit, the grantee of the Unit shall be jointly and severally liable with the grantor for all unpaid assessments and special assessments for Common Expenses made by the Executive Board against the grantor up to the time of the recordation of grantor's transfer, without prejudice to the grantee's right to recover from the grantor the amounts paid by the grantee therefore. However, any person who shall have entered into an agreement to purchase a Unit from a Unit Owner shall be entitled to a certificate from the Executive Board as provided by Section 1604-108(b) of the Act, and the grantee shall not be liable for, nor shall the Unit conveyed be subject to a lien for, any assessments or unpaid special assessments made by the Executive Board against the grantor for Common Expenses in excess of those disclosed on such certificate.

(2) A voluntary transfer for the purpose of this paragraph shall be considered any sale, lease, gift, testate or intestate distribution, or the transfer of ownership of a corporation owning a Unit.

October 24, 2012                          -12-                      Oak Hill Condominiums
                                                                   Declaration and By-Laws

(3)   All Unit Owners shall comply with Section 1604-108 of the Act. Except as provided in this paragraph, there are no other restrictions governing the voluntary transfer of a Unit.

12. **Maintenance.** Each unit owner shall furnish and be responsible for, at his own expense, all the maintenance, repairs and replacements to his own unit. The Association shall maintain, repair and replace all common elements and limited common elements as a part of the common expenses. No unit owner may alter or otherwise change the appearance of any of the common elements without the prior written approval of the Association acting through the Board of Directors. The maintenance, repair and replacements as may be required for the functioning of or for the bringing of utilities, such as water, gas, electricity and sewer to the unit, shall be furnished by the utility or municipality, if public, or paid for by the individual unit owner, except to the extent they effect the common elements, then the Association shall pay and collect therefore as part of the common expenses. Maintenance, repairs and replacements of the refrigerators, stoves and other kitchen appliances and indoor and outdoor lighting fixtures and other electrical or mechanical appliances (including all heating, ventilation and air-conditioning systems which may be located outside of, but adjacent to the unit) of any unit owner shall be at the expense of such unit owner; also each unit shall have a separate hot water heater located in the basement and its repair and replacement shall be at the expense of the unit owner it serves. If due to the negligent act or omission of a unit owner or of a member of his family or of a guest or other authorized occupant or visitor of such unit owner, damage shall be caused to the common elements or to a unit or units owned by others, and maintenance, repairs or replacements shall be required which would otherwise be a common expense, then such unit owner shall pay for such damage and such maintenance, repairs and replacements, as may be determined by the Association

13. **Association of Unit Owners.** Prior to the date of this Declaration and the recording thereof, Oak Hill Condominiums Owners Association, a non-profit and non-stock corporation was duly organized under the laws of the State of Maine. The Association shall be the governing body for all of the unit owners with respect to the administration, maintenance, repair and replacement of the Property as provided by the Act, this Declaration and the Bylaws.

October 24, 2012                                      -13-                                      Oak Hill Condominiums
                                                                                               Declaration and By-Laws

Each unit owner and/or owners shall be a regular member of the Oak Hill Condominiums Owners Association, a non-profit corporation organized under the laws of the State of Maine. Membership shall be appurtenant to the units, and the transfer of title to a unit shall automatically transfer the regular membership appurtenant to that unit to the transferee or transferees. A transfer in mortgage, however, shall not transfer membership until foreclosure or sale in lieu of foreclosure. Further, the Oak Hill Condominiums Owners Association shall be a member of the overall Oak Hill Association, an umbrella organization created to oversee the repair and maintenance of certain amenities common to various developments at the larger site from which this condominium is derived. The Oak Hill Association shall have the power to ratably assess its member Associations for this purpose.

The provisions of this Declaration and the Bylaws and the rights and obligations established thereby shall be deemed to be covenants, running with the land, so long as the Property remains subject to the provisions of the Act and shall inure to the benefit of and be binding upon each and all of the unit owners and their respective heirs, representatives, successors, assigns, purchasers, lessees, grantees, mortgagees, and insurers or guarantors of mortgages. By the recording or the acceptance of a deed conveying a unit of any interest therein, or any ownership interest in the property whatsoever, the person to whom such unit or interest is conveyed shall be deemed to accept and agree to be bound by and subject to all of the provisions of the Act, this Declaration, and the Bylaws.

In any voluntary conveyance of a unit deed (other than a conveyance by a mortgagee), it shall be the duty of the seller to furnish the buyer with a copy of this Declaration, the Association Bylaws and rules and regulations as they may from time to time be amended. The Declarant or the Association shall make available to unit owners, prospective purchasers, lenders and the holders, insurers and guarantors of the first mortgage on any unit, current copies of the Declaration, Bylaws and other rules and regulations governing the Condominiums, and other books, records and financial statements of the Association. This requirement may be satisfied by making the documents available for inspection upon request during normal business hours or under other reasonable circumstances. If copies are

October 24, 2012                                   -14-                          Oak Hill Condominiums
                                                                                 Declaration and By-Laws

requested, the Declarant or Association may, but shall not be obligated to, make them available at a reasonable charge.

14. **Notice.** The Secretary shall cause notice of all meetings of members and of all proposed actions requiring vote or approval of a specified percentage of unit owners and/or mortgagees to be sent in writing by U. S. Mail, postage prepaid, to all unit owners and all eligible mortgage holders at the address filed with the Secretary by said owners and mortgage holders not less than ten (10) days and not more than thirty (30) days prior to the proposed meeting or action. Such notice may, however, set a later deadline for any proposed action, if such longer period of time is deemed necessary to obtain the required number of written approvals. Notice of meetings shall state the time and place of the meeting and the items on the agenda, including the general nature of any proposed amendment to the declaration and bylaws, any budget changes and any proposal to remove a director or officer.

15. **Separate Taxation and Utilities.** It is understood that real estate taxes are to be separately taxed to each unit owner for his unit and his corresponding percentage of ownership in the common elements, as provided in the Act. In the event that for any year such taxes are not separately taxed to each unit owner, but are taxed on the Property as a whole, then each unit owner shall pay his proportionate share thereof in accordance with his respective percentage of ownership interest in the common elements.

Each unit owner shall pay for his own telephone, sewer, water, electricity and other utilities which are separately metered or billed to each user by the respective utility company. Utilities which are not separately metered or billed shall be treated as part of the common expenses.

16. **Insurance and Related Matters.**

A. The Board of Directors shall obtain insurance on the units and unit fixtures and the common elements against loss or damage by fire and such other hazards as are covered under Standard Extended Coverage Provisions and all other perils customarily covered for similar types of projects, including those covered by the standard "all risk" endorsement for 100% of the current replacement cost of the units, unit fixtures, common elements and fixtures, excepting land, foundations, excavations or other items that are usually excluded from insurance coverage. Such policies shall provide such coverage and contain all endorsements required by the guidelines promulgated by the Federal

National Mortgage Association (FNMA) and the Federal Home Loan Mortgage Corporation (FHLMC), as the same may be amended from time to time. Such insurance shall be written by an insurance carrier that meets FNMA rating requirements. The maximum deductible amount shall be the lesser of that permitted under state law or under FNMA and FHLMC guidelines. Such insurance coverage shall be written in the name of, losses under such policies shall be adjusted by, and proceeds of such insurance shall be payable to, the Condominium Association as trustee, or such other insurance trustee as may be appointed by separate agreement, for each of the unit owners in their respective percentages of the ownership interest in the common areas as established in this Declaration. The Association shall be attorney-in-fact for each unit owner for losses due to total or partial condemnation, destruction or liquidation. In such case, the proceeds from insurance or any other payment or award shall be applied by the Association for the reconstruction of the building, or shall be otherwise disposed of in a reasonable and equitable basis in accordance with the provisions of this Declaration and the Act and Fannie Mae guidelines; and the policies shall contain the standard mortgage clause and shall specifically name either the FNMA or its mortgage servicers for all mortgages held by the FNMA on the condominium, providing, however, the rights of the mortgagee of any unit under any standard mortgage clause endorsement to such policies shall be subject to the provisions in the Act with respect to the application of insurance proceeds to the reconstruction of the building. The policies shall require the insurer to notify in writing the Board of Directors and each first mortgage holder named in the mortgage clause at least twenty (20) days before it cancels or substantially changes the Property's coverage.

B.  The Board of Directors shall obtain a "master" or "blanket" policy of flood insurance as a common expense of the Association, covering any portion of the building and any other property located within a special flood hazard area, as defined by the Federal Emergency Management Agency. Such policy should be equal to the lesser of 100% of the insurable value of the facilities or the maximum coverage available under the National Flood Insurance program.

C.  The Board shall obtain comprehensive public liability insurance in such amounts as it shall deem desirable, insuring each unit owner and the Association, Board of Directors

October 24, 2012                                    -16-                          Oak Hill Condominiums
                                                                                  Declaration and By-Laws

Bk 3439 Pg294 #8853

and Managing Agent, if any, from liability in connection with the common elements. Such policy shall provide coverage of at least $1,000,000.00 for bodily injury and property damage for any single occurrence resulting from the operation, maintenance or use of the common elements, and coverage for any legal liability resulting from law suits related to employment contracts in which the owners' association is a party. Such policy shall by its terms or by specific endorsement preclude an insurer's denial of a unit owner's claim on the grounds of negligent acts by the Association or other unit owners. Such policy should waive any right of subrogation against individual unit owners and should provide that it shall not be prejudiced by acts or omissions of individual unit owners that are not under the control of the Association. Such policy shall be primary even if a unit owner has other insurance that covers the loss. Such policy shall provide for at least twenty (20) days written notice to the Board of Directors and to each holder of a first mortgage on any unit before the insurer can cancel or substantially modify it. Also, the Board shall have authority to purchase worker's compensation insurance and insurance to indemnify the Directors and Officers for losses in managing the Association's affairs. The premiums for all the aforementioned insurance coverage shall be common expenses.

D. Each unit owner, at his own cost, shall be responsible for his own insurance on the contents of his own unit and his additions and improvements thereto and decorations and furnishings, personal property therein and stored elsewhere on the property. Each unit owner shall obtain and maintain general liability insurance in such amounts as required by the Association and shall provide a certificate of insurance to the Board of Directors for each term of coverage at least two weeks prior to the expiration of the current one.

E. The Board of Directors shall obtain fidelity bond coverage for anyone who either handles or is responsible for funds held or administered by the Association. Such fidelity bonds shall name the Association as an obligee and shall be written in an amount equal to the greater of at least one hundred fifty (150%) percent of the estimated annual operating expense for the condominiums, including reserves or the maximum amount of funds that will be in the custody of the Association or its management agent at any time the bond is in force and shall otherwise comply with Fannie Mae guidelines.

October 24, 2012

-17-

Oak Hill Condominiums
Declaration and By-Laws

Bk 3439 Pg295 #8853

F. The Association shall maintain all insurance and bond coverage required by FNMA and FHLMC for the sale of first mortgages of units on the secondary mortgage market, and this section shall be interpreted and applied so as to accomplish that purpose.

G. The Association may appoint an insurance trustee to act on behalf of the unit owners.

17. **Mortgage, Reserve Fund, Management and Lease Provisions.**

A. The unit owner who mortgages his unit shall notify the Board of Directors of the name and address of his mortgagee and shall, upon request, file a conformed copy of the mortgage with the Board of Directors.

B. The Board of Directors, whenever so requested in writing by a mortgagee of a unit, shall promptly report to it any then unpaid common charges due from, or any other default by, the owner of the mortgaged unit.

C. The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other violation of the provisions of this Declaration, the Bylaws or Rules and Regulations, shall send a copy of such notice within thirty (30) days after the occurrence of such default to each holder of a mortgage covering such unit whose name and address has previously been furnished to the Board of Directors.

D. Each mortgagee of a unit shall be permitted to examine the books, accounts and records of the condominiums at reasonable times on business days and to require annual reports and other financial data of the Corporation. If no audited financial statement is available, any holder of a mortgage on any unit shall be allowed to have an audited statement prepared at its own expense.

E. Notwithstanding anything to the contrary elsewhere contained in this Declaration or the Bylaws, the following provisions shall govern:

(1) Any first mortgagee of a unit in the condominiums will, upon request, be entitled to inspect the books and records of the condominiums or Association during normal business hours.

(2) No provision of this Declaration or of the Bylaws shall be deemed or construed to give a unit owner, or any other party, priority over any rights of first mortgagees of units pursuant to their mortgages in the case of a distribution to condominium unit owners of insurance proceeds or condemnation awards for losses to or a taking of condominium units and/or common elements.

October 24, 2012                         -18-                         Oak Hill Condominiums
                                                                     Declaration and By-Laws

(3) A holder, insurer or guarantor of a mortgage on a unit shall be entitled to prompt written notification from the Board of Directors of (i) any default by the mortgagor of such unit in the performance of such mortgagor's obligations under this Declaration and/or the Bylaws which is not cured within thirty (30) days, (ii) any event of substantial destruction to, or condemnation or governmental taking of, such unit or any portion of the common elements appurtenant thereto, (iii) any lapse or modification of insurance or fidelity bond coverage, (iv) any proposed amendment under Section 19 of this Declaration and (v) if such holder, insurer or guarantor of a mortgage on a unit is an eligible mortgage holder, any proposed action of which any eligible mortgage holder is entitled to notice under §1602-119(b) of the Act.

(4) Any first mortgagee of a unit who obtains title to the unit pursuant to the remedies provided in the mortgage, or through foreclosure of the mortgage, or through deed through foreclosure of the mortgage, or through deed (or assignment) in lieu of foreclosure, shall take the property free of any claims for unpaid assessments or charges against such unit which accrue prior to the acquisition of title to such unit by the mortgagees, but such expenses or assessments shall become common expenses collectible from all of the unit owners including one who obtains title accordingly.

F. An adequate reserve fund for maintenance, repairs and replacement of those common elements which must be replaced on a periodic basis shall be established and shall be funded by regular monthly payments rather than by special assessments, and a working capital fund shall be maintained by the Association equal to at least two months' assessments for each existing unit as calculated according to Article VI of the Bylaws for the operation and maintenance of the common elements.  Payment of the two month's assessment for the working capital fund shall be made at the time of closing on a unit, shall be maintained in a segregated fund and shall not constitute prepayment of regular assessments.  Such working capital fund amounts as have been collected from unit purchasers as a working capital shall be paid over to the Association by the Declarant within sixty (60) days after conveyance of the first unit.

G. Any management contract, employment contract or lease of parking or recreational areas and any contract entered into by Declarant which may become binding on the Association shall provide that such contract or lease may be terminated by either party

October 24, 2012

-19-

Oak Hill Condominiums
Declaration and By-Laws

without cause and without payment of a termination fee on not more than ninety (90) days' written notice, the term of any such contract shall not exceed three years, and the Association may terminate said agreement for cause upon thirty (30) days' written notice without payment of a termination fee.

H. No unit owner shall be permitted to lease his unit for transient or hotel purposes and no unit owner may lease less than his entire unit. Any lease agreement shall be required to provide that the terms of the lease shall be subject in all respects to the provisions of the Declaration, Bylaws and all Rules and Regulations that may be adopted by the Board of Directors, and that failure by the lessee to comply with the terms of such documents shall be a default under such lease. All leases shall be in writing and shall contain a minimum initial term of six (6) months. A copy of the lease of any Unit shall be delivered to the Board of Directors within seven (7) days of its execution, provided, however, that such copy need not disclose the total rent nor monthly rent amount of such lease.

18. **Procedure for Resolving Disputes.** Matters of dispute or disagreement between unit owners or with respect to interpretation of application of the provisions of this Declaration or the Bylaws shall be determined by the Board of Directors consistent with the Act, which determination shall be final and binding on all unit owners.

All claims, disputes and other matters in controversy between the Declarant, on the one hand, and the Association or any unit owners, on the other hand, arising out of or relating to this Declaration, the Bylaws or the deed to any unit, or the breach thereof, or the Property and any warranties with respect thereto, except for claims which have been waived by the acceptance of a deed, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

Notice of the demand for arbitration shall be filed in writing with the other parties and with the American Arbitration Association or similar non-judicial dispute resolution process. The demand for arbitration shall be made within a reasonable time after the claim, dispute or

other matter in controversy has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based upon such claim, dispute or other matter in controversy would be barred by the applicable statute of limitations or other principles of law and equity. The Association shall institute judicial proceedings before any items of construction can be altered or demolished.

19. **Method of Amending Declaration.** Except to the extent expressly permitted or required by the Act, this Declaration may be amended by a vote or by written approval of the unit owners of units to which sixty-seven percent (67%) of the votes in the Association are allocated and written approval from eligible mortgage holders, their insurers or guarantors, as defined in the Act, representing fifty-one percent (51%) of the votes allocated to units that are subject to mortgages held by eligible holders.

Notwithstanding the foregoing, except to the extent expressly permitted or required by the Act, the unanimous consent of all unit owners and the written approval of eligible mortgage holders or their insurers or guarantors representing sixty-seven percent (67%) of the votes allocated to units that are subject to mortgages held by eligible holders shall be required for any amendment that would:

A. Seek to terminate the legal status of the Property for reasons other than substantial destruction or condemnation of the property, and any such termination shall be as provided in Section 1602-118 of the Act;

B. Change the pro rata interest, obligations or voting rights of any unit, change the boundaries of any unit or the uses to which any unit is restricted;

C. By act or omission seek to abandon, partition, subdivide, encumber, sell or transfer the common elements. The granting of easements for public utilities or the transfer of the roadways to the Town for public purposes consistent with the intended use of the common elements by the Association shall not be deemed a transfer within the meaning of this clause;

D. Use hazard insurance proceeds from losses to any condominium property (whether to units or to common elements) for other than repair, replacement or reconstruction of such improvements, except as provided by this Declaration or the Act in case of substantial destruction of the condominium; or

October 24, 2012                                        -21-                                        Oak Hill Condominiums
                                                                                                    Declaration and By-Laws

E. Create or increase special Declarant rights. The approval of an eligible mortgage holder may be assumed when such holder fails to submit a response to any written proposal for an amendment within 30 days after receipt of proper notice of the proposal, provided such notice was delivered by certified or registered mail, return receipt requested.

20. **No Obligation to Complete**. Nothing contained in this Declaration or the Plats and Plans do, or shall be deemed to impose upon the Declarant, or any successor Declarant, any liability or obligation to build, construct or provide any Buildings, amenities or other improvements to the property except to the extent required by the Act.

21. **Name and Address**. The name of the Condominium is Oak Hill Condominium as shown on the survey, located off of Granite Hill Drive, Topsham, Maine 04086.

22. **Interpretation; Severability**. In the event of any conflict or discrepancy between this Declaration, the original Declaration, Bylaws and the Plats and Plans, this Declaration shall govern. If any provision of this Declaration, the Bylaws or the rules and regulations be in conflict with any applicable laws, including the Maine Condominium Act, then such laws shall govern and such invalid provision shall be of no force and effect, but the validity of the remainder of this Declaration, the Bylaws and rules and regulations shall not be affected thereby and shall remain in full force and effect as if such invalid provision had not been included.

The captions herein are inserted for convenience and reference and do not limit, alter or define the terms of this Declaration.

23. **Remedies; Waiver**. Except as provided in Section 17 hereof, all rights, remedies and privileges granted to the Declarant, the Association or a unit owner pursuant to the terms of this Declaration, the Bylaws and the rules and regulations shall be deemed to be cumulative to any other right or remedy under said documents or afforded by law or equity, and may be exercised concurrently, independently or successively. Any forbearance in exercising any right or remedy hereunder or otherwise available by applicable law shall not be a waiver of or preclude the exercise of any such right or remedy.

24. **Termination**. Any termination of the condominiums shall be conducted in accordance with Section 1602-118 of the Maine Condominium Act.

October 24, 2012

-22-

Oak Hill Condominiums
Declaration and By-Laws

**IN WITNESS WHEREOF**, KASPRZAK HOMES, INC. has caused this instrument to be executed by its President, Stephen M. Kasprzak, this 24ᵗʰ day of    October, 2012.

**KASPRZAK HOMES, INC.**

**WITNESS:**

By:

Stephen M. Kasprzak
Its President

STATE OF MAINE
County of Sagadahoc, ss.

October 24, 2012

Personally appeared the above named Stephen M. Kasprzak in his capacity as President of Kasprzak Homes, Inc. and acknowledged the foregoing instrument to be his free act and deed in his said capacity and the free act and deed of said Kasprzak Homes, Inc.

Before me,

Notary Public
Print Name: Gaye C. Littlefield
Commission Expires: 9/10/2015

*** NOT A TRUE COPY NOT A TRUE COPY NOT A TRUE COPY ***

October 24, 2012                    -23-                    Oak Hill Condominiums
Declaration and By-Laws

## APPENDIX I

A certain lot or parcel of land situated in the Town of Topsham, the County of Sagadahoc, State of Maine, and being all those premises shown as Oak Hill Condominiums on a site and subdivision plan of Oak Hill Condominiums prepared by Sebago Technics, Inc. and dated January 31, 2005, revised January 21, 2009, duly recorded on March 27, 2009 in the Sagadahoc County Registry of Deeds in Plan Book 46, Page 1, subject to various conditions, restrictions and easements shown thereon and with the benefit of certain rights reserved by Grantor and its predecessors over and through River Ridge Condominiums, and being more particularly described as follows:

A certain lot or parcel of land southerly of Winter Street, so called, but not adjoining said street and lying between the northerly side of Middle Street extension and Granite Hill Drive within the River View Condominiums. Said parcel being located in the Town of Topsham, County of Sagadahoc, State of Maine and being more particularly bounded and described as follows:

BEGINNING at a 5/8" rebar at the southwesterly corner of River Ridge Condominiums on the easterly sideline of land now or formerly of Donald and Barbara Russell as described in a deed recorded in said Registry in Book 12, Page 28;

Thence S 29°-13'-21" W, 1533.42 feet by and along the easterly sideline of said Russell to a point to be marked by an iron pin on the Northerly sideline of a 40' wide right-of-way known as Middle Street Extension;

Thence S 44°-10'-56" E, 344.34 feet by and along the northerly sideline of said Middle Street Extension to a point to be marked with an iron pin at the southwesterly corner of land now or formerly of Dorothy A. and Ronald A. Riendeau as described in a deed recorded in said Registry in Book 552, Page 100;

Thence N 29°-13'-21" E, 604.48 feet by and along the westerly sideline of said Riendeau to a point to be marked with a 5/8" rebar at the northwesterly corner of said Riendeau;

Thence S 42°-13'-22" E, 310.93 feet by and along the northerly sideline of said Riendeau to a point to be marked with an iron pin at the northeasterly corner of said Riendeau;

Thence S 29°-06'-47" W, 45.82 feet by and along the easterly sideline of said Riendeau to a point to be marked with an iron pin at the northwesterly terminus of North Street, so called;

Thence S 42°-55'-52" E, 40.01 feet by and along the northerly sideline of said North Street to a point marked with an iron at the northeasterly terminus of said North Street and the northwesterly corner of land now or formerly of Jean C. Caron and Amy L. Portell as described in a deed recorded in said Registry in Book 2205, Page 325;

Thence continuing S 45°-04'-58" E, 29.16 feet by and along the northerly sideline of said Caron and Portell to an iron with "Buffer" cap;

Thence continuing S 45°-04'-58" E, 20.04 feet by and along the northerly sideline of said Caron and Portell to an iron with "Buffer" cap;

Thence continuing S 45°-04'-58" E, 200.25 feet by and along the northerly sideline of said Caron and Portell to a point marked with an iron at the southwesterly corner of land now or formerly of David L. and Patricia LeClerc as described in a deed recorded in said Registry in Book 1557, Page 57;

Thence N 53°-05'-33" E, 168.92 feet by and along the westerly sideline of said LeClerc to an angle point marked with an iron at other land of said LeClerc;

Thence N 29°-13'-31" E, 153.48 feet by and along the westerly sideline of said LeClerc to a point marked with an iron at the northwesterly corner of said LeClerc;

Thence S 60°-46'-29" E, 127.29 feet by and along the northerly sideline of said LeClerc to a point of curvature marked by an iron,

Thence generally southeasterly by a curve turning to the right with a delta angle of 89°-40'-10", and having a radius of 25.00 feet, and an arc length of 39.13 feet to the westerly sideline of High Street, so called marked by an iron;

Thence N 28°-53'-41" E, 100.00 feet by and along the westerly sideline of said High Street to an iron at the southeasterly corner of land now or formerly of Joseph D. and Cynthia C. Bernier as described in a deed recorded in said Registry in Book 2001, Page 304;

Thence generally southwesterly by a curve turning to the right with a delta angle of 90°-19'-50", and having a radius of 25.00 feet, and an arc length of 39.41 feet to a point of tangency on the southerly sideline of said Bernier marked by an iron;

Thence N 60°-46'-29" W, 108.71 feet by and along the southerly sideline of said Bernier to a point at the southwesterly corner of said Bernier;

Thence N 29°-13'-31" E, 197.95 feet by and along the westerly sideline of said Bernier to an iron at the southeasterly corner of land now or formerly of Brunswick Topsham Water District;

Thence N 60°-59'-04" W, 284.00 feet by and along the southerly sideline of said Water District to an iron at the southwesterly corner of said Water District;

Thence N 27°-57'-32" E, 425.73 feet by and along the westerly sideline of said Water District to an iron at the southwesterly corner of said Water District;

Thence S 60°-59'-04" E, 188.96 feet by and along the northerly sideline of said Water District to an iron at the southwesterly corner of land now or formerly of Clifford E. and Pauline Farr as described in a deed recorded in said Registry in Book 1732, Page 312:

Thence N 28°-56-51" E, 346.85 feet by and along the westerly sideline of said Farr to an iron at a corner of said Farr;

Thence N 77°-10'-49" E, 278.58 feet by and along the northwesterly sideline of said Farr to an angle point marked by an iron;

Thence S 60°-22'-04" E, 200.20 feet by and along the northerly sideline of said Farr to a point on the westerly sideline of land now or formerly of Jane Menard witnessed by an iron;

October 24, 2012                                    -25-                          Oak Hill Condominiums
                                                                                 Declaration and By-Laws

Thence N 29°-00'-56" E, 246.28 feet by and along the westerly sideline of said Menard and the westerly sideline of land now or formerly of Doris Bolduc described in a deed recorded in said Registry in Book 436, Page 240 to a point marked by an iron at the southeasterly corner of land now or formerly of Rachel T. Callahan described in a deed recorded in said Registry in Book 1096, Page 144;

Thence N 61°-00'-11" W, 169.99 feet by and along the southerly sideline of said Callahan to a point marked by an iron on the easterly sideline of a turnaround on Abenaki Drive as shown on a plan recorded in said Registry in Plan Book 7 Page 3;

Thence S 29°-00'-56" W, 50.00 feet by and along the easterly sideline of said turnaround to a corner point marked by an iron;

Thence N 60°-59'-04" W, 30.00 feet by and along the southerly sideline of said turnaround to a corner point on the easterly side of said Abenaki Drive marked by an iron;

Thence S 29°-00'-56" W, 30.00 feet by and along the easterly sideline of said Abenaki Drive to a point at the terminus thereof, marked by an iron;

Thence N 60°-59'-04" W, 50.00 feet by and along the southerly terminus of said Abenaki Drive to a corner point marked by an iron;

Thence N 29°-01'-43" E, 181.18 feet by and along the westerly sideline of said Abenaki Drive to a point at the southeasterly corner of land now or formerly of Robert L. and Susan L. Fickett as described in a deed recorded in said Registry in Book 1522, Page 140, to be marked by an iron;

Thence N 60°-58'-17" W, 114.05 feet by and along the southerly sideline of said Fickett to a point on the easterly sideline of land now or formerly of Willis F. and Jean B. Morse as described in a deed recorded in said Registry in Book 2304, Page 102, to be marked by an iron

Thence S 25°-11'-20" W, 74.59 feet by and along the easterly sideline of said Morse to a point at the southeasterly corner of said Morse and the northeasterly corner of land now or formerly of Andrew M. and Darlene R. Kristzman as described in a deed recorded in said Registry in Book 1636, Page 160 to be marked by an iron;

Thence S 38°-04'-58" W, 310.96 feet by and along the easterly sideline of said Kritzman to a point at the southeasterly corner thereof at land now or formerly of Hubert V. Bailey as described in a deed recorded in said Registry in Book 523, Page 277 to be marked by an iron;

Thence N 42°-10'-50" W, 178.77 feet by and along the southerly sideline of said Bailey to a point at the southeasterly corner of said River Ridge Condominiums to be marked by an iron;

Thence S 64°-32'-33" W, 580.85 feet by and along the southeasterly sideline of said River Ridge Condominiums to a corner point at the most southerly corner thereof;

Thence N 36°-26'-34" W, 257.96 feet by and along the southerly sideline of said River Ridge Condominiums to an angle point to be marked by an iron;

Thence N 29°-59'-07" W, 165.63 feet by and along the southeasterly sideline of said River Ridge Condominiums to the Point of Beginning.

October 24, 2012
-26-
Oak Hill Condominiums
Declaration and By-Laws

Said Parcel is subject to and benefitted by a 20" water main that traverses the property from the westerly sideline of the Brunswick Topsham Water District lot to and through the River Ridge Condominiums lot.

Said lot is further subject to an Army Corp of Engineers Tier One Permit recorded at the SCRD in Book 1739, Page 297.

Said lot is further subject to a Maine Department of Environmental Protection Permit recorded at the SCRD in Book 1739, Page 298.

Said lot is further subject to and benefitted by the easements, buffers, right-of-ways and conditions shown on the Overall Site & Subdivision plan of Oak Hill Condominiums and also conveying herewith all rights reserved to extend road and utilities from the premises shown on the Plan of River Ridge Condominiums to benefit the above-described premises.

Said lot is further benefitted by a drainage easement from Dorothy A & Ronald A. Riendeau to Kasprzak Land Holdings and recorded at the SCRD in Book 3197, Page 64 and subject to a proposed right of way running southerly to Riendeau land as shown on said Plan.

Bearings herein are reference to magnetic north 1959.

There is hereby excepted and reserved to Kasprzak Landholdings, Inc., its successors and assigns, the right and easement to use the above areas for pedestrian and vehicular ingress and egress, and for the installation, maintenance, repair and replacement of any and all utilities that might be useful, desirable, or customary in connection with the full development and use of the other lands of Kasprzak Landholdings, Inc. (now or hereafter acquired) together with all those premises shown on the Condominium Plans as the roadway or driveways called Granite Hill Drive, Ruby Lane, Beryl Loop, Amethyst Drive, and Mica Court, as shown on the overall Site and Subdivision Plan and, a certain fifty foot (50') right of way running northerly to land of Russell as more fully shown on said Plan. The within right and easement shall, also, include the right to enter into, connect with and use any such utility lines, conduits, chases or other facilities as may be located therein, together with the full rights to make use of such areas for the forgoing pedestrian and utility purposes.

Meaning and intending to convey, and hereby conveying 29.44 acres of land, more or less, and being the same premises conveyed to Kasprzak Homes, Inc., by deed dated October 23, 2012 and recorded in the Sagadahoc County Registry of Deeds in Book 3439, Page 178.

Bk 3439 Pg305 #8853

# APPENDIX II

| Units | Fractional Interest In Common Elements and Common Expense Liability | Votes in the Association |
|-------|------------------------------------------------------------------|-------------------------|
| 1-68 inclusive | 1/68 | 1 each |



October 24, 2012

-28-

Oak Hill Condominiums
Declaration and By-Laws

# BYLAWS OF
# OAK HILL CONDOMINIUMS OWNERS ASSOCIATION

### ARTICLE I
### Name, Location, and Fiscal Year

**Section 1. Name.** The name of the corporation is OAK HILL CONDOMINIUMS OWNERS ASSOCIATION (the "Corporation").

**Section 2. Location.** The principal office of the corporation shall be located at Topsham, Maine.

**Section 3. Fiscal Year.** The fiscal year of the corporation shall, unless otherwise decided by the Executive Board, end December 31.

### ARTICLE II
### Purposes

**Section 1. Purposes.** The purposes of said corporation are to act on behalf of its members collectively as their governing body with respect to the administration, maintenance, repair and replacement of certain property which will be submitted to the provisions of Maine Condominium Act, Title 33, Chapter 31, Section 1601-101 et seq. and to be known as Oak Hill Condominiums Owners Association and as such to own and acquire any real estate or interest or rights therein or appurtenances thereto and any and all personal property in connection therewith as may be incidental or necessary to such purpose.

### ARTICLE III
### Members

**Section 1. Membership.** The owner or owners of record from time to time of each unit of the Condominiums, shall constitute one member of the Association, and each such member shall have the fraction of common interest, common expenses liabilities and voting rights in the corporation that are set forth in Appendix II of the Declaration.

October 24, 2012

Oak Hill Condominiums
Declaration and By-Laws

**Section 2. Termination of Membership.** The membership of each unit owner shall terminate when he ceases to be a unit owner, and upon the sale, transfer or other disposition of his ownership interest in the property his membership in the corporation shall automatically be transferred to the new unit owner succeeding to such ownership interest.

**Section 3. Meetings and Notice.** An annual meeting of the members shall be held on the third Wednesday in May in each year, commencing the first year after the turnover date, at 7:00 p.m. Special meetings of the members may be called by the President, the Executive Board or upon a petition signed by fifty (50) percent of the members. Written notice of any meeting shall be given to each member by the Secretary not less than ten (10) days nor more than thirty (30) days before the meeting by mailing it postage prepaid to the member's mailing address or to any other mailing address designated in writing by the member. The notice shall specify the time and place of the meeting and the items on the agenda.

**Section 4. Quorum.** A quorum for any meeting shall be constituted by persons entitled to cast 51.5% percent (35 of 68) of the votes for election of the Executive Board, attending in person or represented by proxy.

**Section 5. Turnover Date.** The Declarant reserves the right, until the Turnover Date, to appoint and remove officers and directors of the corporation. The Turnover Date shall be the date on which the Declarant relinquishes all rights to appoint officers and directors as set forth in paragraph 7, section G of the Declaration. The Declarant may voluntarily surrender the right to appoint officers and directors, in which event it may require, for the duration of the period of Declarant control, that specified actions of the Association or Executive Board, as described in a recorded instrument executed by the Declarant, be approved by the Declarant before they become effective. The Declarant shall give written notice to all members and all eligible holders of mortgages not less than ten (10) days nor more than thirty (30) days prior to the Turnover Date and shall call for a Special Meeting of members on the Turnover Date to elect a Executive Board.

October 24, 2012                              -30-                    Oak Hill Condominiums
Declaration and By-Laws

Bk 3439 Pg308 #8853

## ARTICLE IV
### The Executive Board

**Section 1. Composition.** The Executive Board (herein referred to as Directors) shall consist of a number, not less than three nor more than seven, which shall be fixed for the ensuing year by the members at the annual meeting.

**Section 2. Election and Term.** The directors, except as provided in Article III, Section 5 and Sections 7 and 8 of this Article, shall be elected at the annual meeting from among the members or spouses of members or in the case of a unit owner which is a corporation, partnership, trust or estate, a designated agent thereof. Each unit shall have one (1) vote for each director at the first annual meeting of members. The term of office of each director shall be fixed at three (3) years, except that the initial directors shall serve for staggered terms so that no more than 50% will have a term expiring in any successive year. The directors shall hold office until their successors have been elected.

**Section 3. Powers.** The business of the corporation shall be managed by the Executive Board which shall have and may exercise all the powers of the corporation, except those powers reserved to the members by the Act or by these Bylaws. The Board shall have the power to engage a managing agent for the property and to fix the term, compensation and authority of the manager or managing agent. Notwithstanding the foregoing, the Board shall have no authority to approve any capital expenditure in excess of $2,000 nor to authorize the corporation to enter into any contract for a term of more than three (3) years except with the approval in writing of all of the members.

**Section 4. Meetings of Directors.** Meetings of the Executive Board may be held at any time and place upon call by the President or by a majority of the Directors, reasonable notice thereof being given to each Director. Notice that a meeting has been called may be given by the President, Secretary or Assistant Secretary, if one is appointed, or by one of the Directors. Notice of any meeting of the Executive Board may be waived in writing signed by the person or persons entitled to such notice, whether before or after the time of such meeting, and shall be

October 24, 2012                                    -31-                    Oak Hill Condominiums
                                                                          Declaration and By-Laws

equivalent to the giving of such notice, but any such notice shall be calculated to inform unit owners of the date, time and place, as well as the topics to be discussed at such meeting. Attendance of a Director at such meeting shall constitute a waiver of notice thereof, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business because such meeting is not lawfully convened. Unit owners shall have the right to attend meetings of the Board, subject to reasonable rules established by the Board.

**Section 5.  Quorum and Voting.** Attendance by a majority of directors then in office shall constitute a quorum. If a quorum exists, the directors present may take any action so long as they concur.

**Section 6.  Vacancies.** A vacancy in the Executive Board shall be filled by appointment of the Directors and shall hold office for the unexpired term of the director whose place is vacant and until his successor is elected.

**Section 7.  Removal.** A director may be removed from office only by a majority vote of the unit owners.

**Section 8.  Compensation.** Directors shall not receive compensation for their services except as provided by resolution of a majority of the members of the corporation. Directors shall be reimbursed for any out of pocket expenses incurred which are reasonable and necessary in performing their duties on behalf of the corporation.

**Section 9.  Repeal of Board Rules.** Although the Executive Board is authorized by the Declaration to promulgate reasonable rules and regulations, a petition signed by a majority of unit owners shall require the Board to reconsider any applicable rule or regulation and if the Board fails to repeal or revise the same in accord with such petition, a special meeting of the unit owners shall be called within thirty (30) days of the Board's action so that the unit owners may vote on the action requested by the petition.

# ARTICLE V
## Officers

**Section 1.** **Designation and Qualification.** The officers of the corporation shall consist of a President, a Treasurer, a Secretary and such other officers as the Executive Board may elect. The President and Treasurer shall be members, or spouses of members, or in the case of a unit owner which is a corporation, partnership, trust or estate, a designated agent thereof. The Secretary need not be a member, but shall be a resident of Maine.

**Section 2.** **Election and Term.** All officers shall be elected by the Executive Board at its first meeting following the annual meeting of the members and shall hold office until the first meeting of the Executive Board following the next annual meeting of members and until their successors are elected.

**Section 3.** **President.** The President shall be a Director and shall be the chief executive officer of the corporation. The President shall have general supervision and control of the business of the corporation subject to the direction of the Executive Board and shall also have such other powers and duties as the Executive Board may decide. The President shall preside at all meetings of the members and at all meetings of the Executive Board. If the President is absent from any meeting of the members or Executive Board, the Treasurer shall preside at such meeting. The President shall prepare, execute, certify and record amendments to the Declaration on behalf of the Association.

**Section 4.** **Treasurer.** The Treasurer shall have, subject to the direction of the members or Executive Board, general charge of the financial affairs of the corporation and shall keep full and accurate records thereof, which shall always be open to the inspection of any member or holder of a first mortgage on a unit. He shall render to the President and directors, at the regular meetings of the Executive Board, or whenever they may require it, a statement of the accounts of his transactions as Treasurer and of the financial condition of the corporation.

**Section 5.** **Secretary.** The Secretary shall record the proceedings of all meetings of the members and of the Executive Board in books kept for that purpose. Record books of members'

meetings shall be open at all reasonable times to the inspection of any member or holder of a first mortgage on a unit. The Secretary shall also keep the membership transfer books of the corporation. He shall notify the members and the directors of all meetings in accordance with the Bylaws. If the Secretary is absent from any meeting of the members or the Executive Board, a Temporary Secretary shall be chosen to exercise the duties of the Secretary at such meeting.

**Section 6. Vacancies.** A vacancy in any office may be filled by the Executive Board by the election of a successor to hold office for the unexpired term of the officer whose place is vacant and until his successor is chosen and qualified.

**Section 7. Removal.** All officers may be removed from their respective offices by the Executive Board.

**Section 8. Resignation.** Any officer may at any time resign his office by a resignation in writing delivered to the corporation at its principal office or to the President or Secretary. Such resignation shall be effective upon receipt and acceptance thereof shall not be necessary to make it effective unless it so states.

**Section 9. Compensation.** The officers shall receive no compensation for their services unless expressly provided for in a resolution adopted by the majority of the members of the corporation. The officers shall be reimbursed for out-of-pocket expenses incurred which are reasonable and necessary in performing their duties on behalf of the corporation.

## ARTICLE VI
## Assessments

**Section 1. Budget.** The Executive Board shall cause to be prepared an estimated annual budget for each fiscal year of the corporation. Such budget shall take into account the estimated common expenses and cash requirements for the year, including insurance, salaries, wages, payroll taxes, supplies, materials, parts, services, maintenance, repairs, replacements, landscaping, insurance, fuel, snow removal, trash pickup and other common expenses (as distinguished from individual mortgage payments, real estate taxes and individual telephone,

October 24, 2012                    -34-                    Oak Hill Condominiums
Declaration and By-Laws

electricity and other individual utility expenses billed or charged to the separate members on an individual or separate basis rather than a common basis). The Board shall establish and maintain an adequate reserve fund for the periodic maintenance, repair and replacement of improvements to the common areas and limited common areas. The reserve fund shall be included in the budget and maintained out of regular assessments for common expenses. To the extent that the assessments and other cash income collected during the preceding year shall be more or less than the expenditures for such preceding year, the surplus or deficit, as the case may be, shall also be taken into account in setting the budget and determining assessments for the current year so as to credit any surplus or refund any deficit.

**Section 2. Payment.** The estimated annual budget for each fiscal year shall be approved by the Executive Board, and copies thereof shall be furnished to each member and eligible mortgage holder within thirty (30) days of adoption, and in any event not later than 90 days after the beginning of such year. The Board shall set a date for a meeting of the members to consider ratification of the budget not less than six (6) nor more than thirty (30) days after mailing of the budget. Notice of said meeting shall accompany the budget. Unless at that meeting a majority of all unit owners reject the budget, the budget is ratified, whether or not a quorum is present. In the event the proposed budget is rejected, the periodic budget last ratified by the members shall be continued until such time as the members ratify a subsequent budget proposed by the Executive Board. On or before the first day of the next quarter and of each succeeding month or quarter of the year covered by the annual budget, each member shall pay, as his respective monthly assessment for the common expenses, one-twelfth (1/12) of his proportionate share of the common expenses for such year as shown by the annual budget, all as determined by the Executive Board. Such proportionate share for each member shall be in accordance with his respective ownership interest in the common areas and facilities. No member shall be relieved of his obligation to pay his assessments for common expenses by abandoning or not using his unit or the common areas and facilities.

**Section 3. Statements.** Within ninety (90) days after the end of each year covered by an annual budget, or as soon there- after as shall be practicable, the Treasurer shall cause to be furnished to each member a statement for such year so ended, showing the receipts and expenditures and such other information as he may deem desirable.

**Section 4. Separate Accounts.** The Treasurer shall cause to be kept a separate account for each member showing the respective assessments charged to and paid by such member, and the status of his account from time to time.

**Section 5. Additional Assessments.** In the event that during the course of any year, it shall appear to the Treasurer that the monthly assessments, determined in accordance with the estimated annual budget for such year, are insufficient or inadequate to cover the estimated common expenses for the remainder of such year, then the Executive Board shall prepare and approve a supplemental budget covering the estimated deficiency for the remainder of such year, and shall cause the same to be presented to the members for ratification in the same manner as the budget. Upon ratification of the supplemental budget, a supplemental assessment shall be made to each member for his proportionate share of such supplemental budget.

**Section 6. Common Expenses.** It shall be the duty of every member to pay his proportionate share of the common expenses, in the same ratio as his percentage of ownership in the common areas and facilities. If any member shall fail or refuse to make any such payment of the common expenses when due, the amount thereof together with interest at the rate established by the Association, costs and reasonable attorney's fees shall constitute a debt secured by a lien on such unit. The corporation shall have the authority and responsibility to exercise and enforce any and all rights and remedies as provided for in Maine Revised Statutes, Title 33, Chapter 31, the Declaration and these Bylaws, or otherwise available at law or in equity for the collection of all unpaid assessments.

**Section 7. Budget Expenses.** The President and/or Treasurer, subject to Board direction, shall have the authority to enter into contracts on behalf of the corporation for work and expenses provided in the budget and to make payment therefore from the funds of the corporation.

**Section 8.  Expenses Assessed Subsequent to Conveyance of Unit.**  A member may not exempt himself from liability for his shares of common expenses subsequently to be assessed by a conveyance of his unit to the corporation, except by approval of all of the other members and their first mortgagees.

**Section 9.  Availability of Documents.**  The Corporation is required to make available to unit owners, lenders and the holders, insurers and guarantors of the first mortgage on any unit current copies of the Declaration, Bylaws and any other rules and regulations governing the condominiums and other books, records and financial statements of the Association, including Executive Board minutes and such other data as required by law.  In addition thereto, the Association shall also make available to prospective purchasers current copies of the Declaration, Bylaws, other rules governing the condominiums, and the most recent annual audited financial statement, if such is prepared.  The Corporation may impose a reasonable charge for copies.

## ARTICLE VII
### Amendments

**Section 1.  Amendment of By-Laws.**  These Bylaws may be amended or modified from time to time by action or approval of members representing seventy-five (75) percent of the votes allocated to members, except that no amendment may violate the provisions of Maine Revised Statutes, Title 33, Chapter 31.

**Section 2.  Amendment of Declaration.**  The Declaration may be amended in accordance with the terms thereof.  The President and/or Treasurer of the corporation shall execute a certificate setting forth the text of the amendment, which certificate shall be attested by the Secretary and recorded in the Sagadahoc County Registry of Deeds.  Following the recordation of four certificates of amendment, the next amendment shall be evidenced by recordation of a complete revised Declaration executed in the same manner as a certificate of amendment.

October 24, 2012

Received
SAGADAHOC COUNTY MAINE
JUDITH E STEVENS
REGISTRAR

-37-

Oak Hill Condominiums
Declaration and By-Laws



d. The business activity does not increase the insurance premium paid by the Oak Hill Condominium Owners Association or otherwise negatively affect the Association's ability to obtain insurance coverage.
e. The business activity does not place an undue burden on the infrastructure of the buildings of the Oak Hill Condominium Owners Association property.
f. The business activity is consistent with the residential character of the Oak Hill Condominium Owners Association and does not constitute a nuisance or a hazardous or offensive use or threaten the security or safety of other residents of the Association.
g. The business activity does not result in a materially greater use of the common areas or Association services within the Oak Hill Condominium Owners Association.

Potential violation of all rules will be determined at the sole discretion of the Oak Hill

### 17. Seasonal Residents
When residents are off site for durations greater than 30 consecutive days, they are still responsible for the security and safety of their unit. Unit Owners must engage a "Caretaker" for their unit or make other arrangements with the approval of the Board.

### 18. Consideration for Residents
Other than work by tradespeople, constant loud noise is prohibited inside or outside of units. Noise from tradespeople is limited to between 8:00 AM and 6 PM.

### 19. Commercial Activity Within Units
Unit owners are permitted to conduct business from their units under the following circumstances:

a. The existence or operation of the business activity is not apparent or detectible by sight, sound, or smell from the exterior of the unit.
b. The business activity is legal and conforms to all zoning requirements for the Oak Hill Condominium Owners Association.
c. The business activity does not unreasonably increase vehicular traffic or parking-related issues within the Oak Hill Condominium Owners Association.
d. The business activity does not increase the insurance premium paid by the Oak Hill Condominium Owners Association or otherwise negatively affect the Association's ability to obtain insurance coverage.
e. The business activity does not place an undue burden on the infrastructure of the buildings of the Oak Hill Condominium Owners Association property.
f. The business activity is consistent with the residential character of the Oak Hill Condominium Owners Association and does not constitute a nuisance or a hazardous or offensive use or threaten the security or safety of other residents of the Association.
g. The business activity does not result in a materially greater use of the common areas or Association services within the Oak Hill Condominium Owners Association.

Potential violation of all rules will be determined at the sole discretion of the Oak Hill Condominium Board of Directors on a case-by-case basis.

### 20. Permitting Process
When an approval is required by the Declaration, Bylaws, or Rules and Regulations, the following procedures shall be followed:

Wil Sligh
Possible business from home.
May 8, 2023 at 10:44:16 AM
ctbo4631@gmail.com

→ Oak Hill property manager

EXHIBIT
C

Hello Caroline,

It has been brought to our attention that there may be a hair business starting up at your unit. This may only be rumors but I do need follow up and as. Below is from the Rules and Regs at Oak Hill. My concern is letter C below

19. Commercial Activity Within Units
Unit owners are permitted to conduct business from their units under the following circumstances:

Page 7 of 8
a. The existence or operation of the business activity is not apparent or detectible by sight,
sound, or smell from the exterior of the unit.
b. The business activity is legal and conforms to all zoning requirements for the Oak Hill
Condominium Owners Association.
c. The business activity does not unreasonably increase vehicular traffic or parking-related
issues within the Oak Hill Condominium Owners Association.
d. The business activity does not increase the insurance premium paid by the Oak Hill
Condominium Owners Association or otherwise negatively affect the Association's ability to obtain insurance coverage.
e. The business activity does not place an undue burden on the infrastructure of the
buildings of the Oak Hill Condominium Owners Association property.
f. The business activity is consistent with the residential character of the Oak Hill Condominium Owners Association and does not constitute a nuisance or a hazardous or
offensive use or threaten the security or safety of other residents of the Association.
g. The business activity does not result in a materially greater use of the common

areas or

Association services within the Oak Hill Condominium Owners Association.

Best,

Wil

Wil Sligh | *Property Manager*

Property Management Services of Maine, LLC
Office: (207) 289-2145, Ext 719

Wil@propertymanagementservicesmaine.com

Caroline Thibeault
Re: Possible business from home.
May 16, 2023 at 4:51:44 PM
wil@propertymanagementservicesmaine.com
ctbo4631@gmail.com

Hi Wil,

I apologize for the tardiness of this email! I haven't checked them in over a week.

The outside of my unit will look the same if I work from home as it does now, no sign or advertisement of any type.
No noise change, or stinky smells.

My guests will use my driveway to park. I'll have one appointment based guest at a time. Some days could be 3 guests, others could be 5 or 6.

The building I'm working out of sold. My son's needs require that he comes with me to work, but this situation has changed with the sale.

If I'm not allowed to work from home, and I need to have support staff,
how many alternating shifts and/or different vehicles are allowed to come to my home to take him to and from various community outings? I'm not feeling good about potential cars coming to my home, for any reason, and the wonder it might create. I'm sending along an email from I received from Anita Jean 3 years ago to shed light on it. The first line was about a chair and mirror set up in my basement that I brought from my old house. Caroline Thibeault

8:01

<ct004051@gmail.com>

Subject: Re: Possible business from home.

Hello Caroline,
thanks for the information. You are following the rules.

Best,
Wil

Wil Sligh I *Property Manager*
Property Management Services of Maine, LLC
Office: (207) 289-2145, Ext 719
Wil@propertymanagementservicesmaine.com



Property Management Services of Maine, LLC

Pepperell Center • 40 Main Street
Bldg. #13 Suite ... • Biddeford, ME 04005-5191
Off ... (207) 289-2145 • (800) 475-4906
www.propertymanagementservicesmaine.com

This electronic transmission may be privileged and contains confidential information. It is not intended, nor may it be received, by any unauthorized persons. If you have received this transmission in error, please destroy without copying it and notify the sender by calling sender at (207) 289-2 or replying to the sender of this email.



Diana Nathanson
Drummond Woodsum

Dear Diana,

I am reaching out to you for guidance with a difficult issue we are dealing with at the Oak Hill Condominium Owners Association.

By way of background, a resident recently contacted the Board about a neighbor who is planning to operate a hair salon from her unit. While the facts are not entirely clear, we understand that the women wishing to operate the hair salon finds the space she is currently renting unworkable because of construction at the location. In addition, she feels that working from her unit would make it easier for her to care for her adult son who is autistic. The neighbor asked whether conducting a business such as a hair salon is permissible under the rules of our Association.

The Declaration under which Oak Hill was established states in section 10(A):

A. Each unit in the building is intended to serve as a self-contained living unit and shall be subject to the rules and regulations and Bylaws of the Association. No unit shall be used for other than residential purposes. Rules and regulations consistent with this Declaration may be promulgated by the Board of Directors in order to ensure the peace and security of each resident, and each member shall be notified in writing of the rules and regulations thus promulgated.

Additionally, section 10(H):

H. No commercial activity of any nature shall be permitted on the Property.

However, in December, 2020, the Board of Directors approved a rule as follows:

19. Commercial Activity Within Units
Unit owners are permitted to conduct business from their units under the following circumstances:
a. The existence or operation of the business activity is not apparent or detectible by sight, sound, or smell from the exterior of the unit.
b. The business activity is legal and conforms to all zoning requirements for the Oak Hill Condominium Owners Association.
c. The business activity does not unreasonably increase vehicular traffic or parking-related issues within the Oak Hill Condominium Owners Association.
d. The business activity does not increase the insurance premium paid by the Oak Hill Condominium Owners Association or otherwise negatively affect the Association's ability to obtain insurance coverage.
e. The business activity does not place an undue burden on the infrastructure of the

buildings of the Oak Hill Condominium Owners Association property.
f. The business activity is consistent with the residential character of the Oak Hill
Condominium Owners Association and does not constitute a nuisance or a hazardous or
offensive use or threaten the security or safety of other residents of the Association.
g. The business activity does not result in a materially greater use of the common areas or
Association services within the Oak Hill Condominium Owners Association.
Potential violation of all rules will be determined at the sole discretion of the Oak Hill
Condominium Board of Directors on a case-by-case basis.

The Board developed this rule under the belief that the wording in Section 10(A) gave it the
authority to promulgate rules related to the use of units. Our goal was to ensure that residents
who work from home would be able to continue to do so. The resident who wishes to conduct
her business from her home has stated that she has reviewed the rule and plans to comply with
every element of it.

In light of the above, we are seeking answers to the following questions:

1. Is there a conflict between the Declaration and the rule with respect to engaging in
commercial activity within units, and if so, under the Maine Condominium Act, does the
Declaration control in the event of such conflict?
2. Assuming the answer to both parts of the preceding question is yes, would the operation
of the hair salon violate the Declaration?
3. On a related subject, would the Declaration prohibit providing services (such as
psychological counseling or investment advice) remotely if the services were provided
entirely by way of Zoom and/or telephone and did not involve (or only rarely involved)
visits to Oak Hill by those receiving the services? (We ask this question because we have
residents who fall within this category and because it has been suggested that the Board
could reasonably conclude that in these situations the commercial activity is not really
occurring "on the Property" as that term is used in section 10(H) of the Declaration.)
4. Would we be correct in concluding that a person who works remotely from her unit for a
private or public entity and does not interact in person with others on condominium
property in connection with her employment would not be violating our Declaration?

Thank you for your assistance. This matter is proving quite decisive in our community. Should
you have any questions, please feel free to contact me at 207-485-1477. It is possible that the
Board may wish to meet with you in person after you have had the opportunity to consider this
matter but before you have provided a written response.

Sincerely,
Nancy Weingarten, Oak Hill Board Member

EXHIBIT

E

# DrummondWoodsum
### ATTORNEYS AT LAW

**MEMORANDUM**

| | |
|---|---|
| **TO:** | Nancy Weingarten |
| **FROM:** | Daina J. Nathanson |
| **DATE:** | June 1, 2023 |
| **RE:** | **Oak Hill Condominium Association** |

## MEMORANDUM

This Memorandum addresses the various questions raised by the governing Board of Directors (the "Board") of the Oak Hill Condominium Association (the "Association") regarding a unit owner's desire to establish a hair salon in her unit at Oak Hill Condominium ("Oak Hill"). The various sections of the Maine Condominium Act (the "Act"), the Declaration of Oak Hill (the "Declaration"), and the Topsham Zoning Ordinance (the "Ordinance") discussed below may be found in **Exhibit A** attached hereto. The questions raised are as follows:

1. **Is there a conflict between the Declaration and the Rule with respect to engaging in commercial activity within units, and if so, under the Maine Condominium Act, does the Declaration control in the event of such conflict?**

Sections 1602-103 and 1603-102 of the Maine Condominium Act (the "Act") make it clear that any rules and regulations imposed by the Board <u>are subject to</u> the provisions of the Act and that, in the event of a conflict, the Act controls over provisions of the Declaration and the Declaration controls over provisions of the Bylaws and rules and regulations.

Therefore the Oak Hill Declaration controls over any rules and regulations that may be enacted, and all such rules and regulations must be consistent with the Declaration. Section 10A of the Declaration makes it clear the Board may promulgate rules and regulations **consistent with the Declaration**.

The Declaration also makes it clear in Section 10A that "[n]o unit shall be used for **other than residential purposes**" and in Section 10H that **[n]o commercial activity of any nature** shall be permitted on the Property. Therefore, the rule enacted by the Board specifically allowing commercial activities within the units (the "Rule") is inconsistent with these provisions, arguably violates the Declaration, and is therefore certainly subject to attack by any unit owner as being outside the authority of the Board granted under the aforementioned provisions of the Act and the Declaration.

June 1, 2023
Page 2

2. **Assuming the answer to both parts of the preceding question is yes, would the operation of the hair salon violate the Declaration?**

As stated above, all commercial activity within a unit, and use of a unit for something other than residential purposes, violates the Declaration. All unit owners are subject to these prohibitions and restrictions. Since Section 10 makes it clear that "[e]ach unit owner is required to <u>comply strictly</u> with the covenants, conditions and restrictions of the Declaration. Furthermore, Section 13 of the Declaration indicates that a unit owner who accepts a deed to the unit takes subject to, and is bound by, all covenants and restriction set forth in the Declaration.

Notwithstanding the fact that the Rule may be subject to attack by a unit owner as being beyond the scope of the authority of the Board to enact, the Board may nevertheless decide to keep the Rule in place for now, especially since amending the Declaration to address these issues is an incredibly time consuming and difficult task. (See Section 17E(3) of the Declaration requiring that mortgage holders be notified of any proposed amendments and Section 19 regarding the affirmative votes needed from unit owners and mortgage holders to amend the Declaration).

3. **On a related subject, would the Declaration prohibit providing services (such as psychological counseling or investment advice) remotely if the services were provided entirely by way of Zoom and/or telephone and did not involve (or only rarely involved) visits to Oak Hill by those receiving the services?**

As indicated above, all "commercial activity" is prohibited under the Declaration. Unfortunately, the Declaration does not define the term "commercial activity", so we do not know the scope of the term. We do not know whether the drafters of the Declaration intended to include any and all actions that may have a business or commercial component. Also, there appears to be no case law on point which tells us with certainty whether the prohibition on "commercial activity" set forth in the Declaration would automatically prohibit any and all business or commercial actions of a unit owner, including, by way of example, phone calls in a unit with business clients. The best we can do is to use applicable case law regarding accessory uses and what constitutes an "incidental and subordinate use" of a property as a guide to determine whether some activities are merely incidental and subordinate to the use of a unit as a residence. These cases are instructive in our determination of the scope of "commercial activity" and can serve as a guide for the Board in its analysis of whether certain activities are (i) simply customarily incidental to a unit owner's occupation and use of his or her residence or (ii) instead constitute commercial activity that violates the clear terms of the Declaration (and, if the Board is keeping the Rule in place, is subject to, and must satisfy the criteria and requirements of the Rule).

The cases often focus on what burdens a particular use places on those residing in the area (parking, traffic, noise, other nuisance factors, etc.). In the case called <u>Town of Shapleigh v. Shikles</u>, 427 A.2d 460 (Me. 1981), the Maine Supreme Judicial Court

June 1, 2023
Page 3

established factors that it considered relevant for determining whether a use of a property
is accessory within the terms of a zoning ordinance. In the Shapleigh case, the
municipalities land use ordinance defined "accessory uses" as those uses "clearly
incidental and subordinate to a principal building or use allowed in the district in which it
is located...." The factors discussed by the Court can be considered here to help determine
whether a proposed use is accessory and "clearly incidental and subordinate" to the
residential use of a unit. If it is not accessory and "clearly incidental and subordinate" to
the residential use of a unit, then it is a commercial activity and violates the Declaration
(and, again, if the Board is keeping the Rule, must satisfy all of the requirements of the
Rule to continue).

The Shapleigh Court explained that "the essence of an accessory use or structure by
definition admits to a use or structure which is dependent on or pertains to a principal use
or main structure, having a reasonable relationship with the primary use or structure and
by custom being commonly, habitually and by long practice established as reasonably
associated with the primary use or structure. It is obvious that factors, which will
determine whether a use or structure is accessory within the terms of a zoning ordinance,
will include the size of the land area involved, the nature of the primary use, the use made
of the adjacent lots by neighbors, the economic structure of the area and whether similar
uses or structures exist in the neighborhood on an accessory basis." The Shapleigh Court
noted that the application of the "accessory use concept" to any particular situation "may
present and depend upon questions of fact".

When one considers the facts in this matter, one can discern the clear and significant
difference between (i) talking on the telephone and/or participating in a Zoom meeting
with a colleague or client completely within the confines of a unit and (ii) having
customers arrive regularly on a daily basis to obtain goods (hair products) and services
(haircuts) that are rendered within a unit, using facilities and fixtures of the unit (sinks)
and common area elements of the property (parking spaces), and possibly increasing the
use and disposal of hazardous materials at the Condominium development (hair dyes,
hair perm solutions etc.).

Engaging in phone calls or Zoom meetings, writing papers, preparing financial
documents, doing art work and other similar activities within one's home are arguably
customary activities that one practices in his or her home. People have regularly and
consistently brought work home and engaged in these activities for years. Such activities
are "commonly, habitually and by long practice established as reasonably associated with
the primary use" of a dwelling. One might sit on his or her couch and organize work
papers while watching television. One might listen to music and sew a furniture slip
cover for a client in his or her second bedroom. Such activities do not involve any
burden on the neighborhood. They do not increase traffic at the site, do not change the
nature and purpose of the property, and do not change the quality and character of the
existing dwelling unit. Such activities do not make the unit different than other units and
do not affect the neighborhood. No customers and other invitees enter the unit, resulting
in the preservation of the primary use of the unit as a residence for its occupants.

June 1, 2023
Page 4

In contrast, hair salons are not customarily incidental to the use of residential properties. They involve people who do not reside in the development regularly entering the property. Such activities involve increased traffic and some resulting noise, movement and activity in the exterior of the unit.

Therefore, when considering the Shapleigh Court factors and their relationship to the facts concerning the proposed and ongoing activities of the unit owners at Oak Hill, it is clear that the proposed hair salon is a commercial activity that violates the Declaration[1] (and, if the Board is keeping the Rule, is subject to the requirements of the Rule). In contrast, it is reasonable to conclude that a unit owner who sits at his or her kitchen table or at a desk in the guest bedroom and participates in conference calls and Zoom meetings and engages in work activities within the four walls of his or her unit (preparing tax returns, having Zoom sessions with counseling patients, researching investment opportunities, sewing furniture slip covers for customers, etc.) without any customers or clients ever entering the unit or the Oak Hill development is engaging in a use of the property that is subordinate and incidental to the use of the property as a residence. As a result, such use arguably falls within "residential purposes" and does not constitute the commercial activity that is prohibited by the Declaration.

4. **Would we be correct in concluding that a person who works remotely from her unit for a private or public entity and does not interact in person with others on condominium property in connection with her employment would not be violating our Declaration?**

As discussed above, if certain activities are incidental and subordinate to the use of a unit as a residence, then arguably they are not prohibited under the Declaration and they instead fall within and are consistent with the mandated use of the units for residential purposes. Such incidental and subordinate uses do not result in increased traffic, do not alter or disturb the neighborhood in any way, have no impact on parking and the common areas, and do not effect insurance premiums and the risk associated with increased vehicular traffic and increased invitees on the Condominium property. Therefore, one can reasonably conclude that such remote work by a unit owner without any in-person interaction with business contacts does not violate the Declaration.

---

[1] It should be noted that the operation of a hair salon may violate other provisions of the Declaration, in addition to the provisions that prohibit such commercial activity. For example, customers regularly entering the common areas and roads of the Condominium arguably violate the provision set forth in Section 10B of the Declaration which provides that "[t]he common elements shall be used only for access, ingress and egress to and from the respective units by the members, their lessees, guests, household help and **other authorized visitors** and for outdoor recreational use incidental to the residential use of the respective units". Since commercial activity is prohibited by the Declaration, customers entering the Condominium property to obtain services or to purchase goods are arguably not "authorized visitors" and are, therefore, not entitled to use the common elements. Likewise, there is a possibility that customers travelling on and visiting the Condominium property may cause an increase in the Condominium's insurance rates. If it does, then Section 10E of the Declaration will be violated. That Section states that "[e]ach member….shall not do or allow anything to be done in his unit which may increase the rate or cause the cancellation of insurance on other units or on the common elements."

June 1, 2023
Page 5

## Home Occupations and the Applicable Provisions of the Zoning Ordinance.

Finally, this Memorandum briefly discusses below the related issue of "Home Occupations" for zoning purposes (as opposed to Condominium governance purposes).

The Topsham Zoning Ordinance allows for certain "home occupations" in various zoning districts. The term "home occupation" is defined as "[a]n occupation or profession which is carried on in a dwelling unit or structure accessory to a dwelling unit and which is clearly incidental and secondary to the use of the dwelling for residential purposes and which does not change the character thereof". There are two levels of "home occupations", namely "minor" and "major", but the definition above covers both. Each level of home occupation has separate standards which must be met in order to obtain the applicable home occupation permit required.

The concept of a "home occupation" under the Zoning Ordinance clearly incorporates the "incidental and secondary" concept discussed above. However, like the Rule that the Association enacted, the "home occupation" ordinance contemplates and permits certain activities and situations that are commercial in nature, such as some commercial traffic, some use of exterior space and parking areas for business purposes, etc. Such activities and situations pertaining to commercial factors would therefore arguably violate the prohibition on "commercial activity of any nature" set forth in the Declaration. For example, a "Minor Home Occupation" under the Zoning Ordinance allows for the display of a commercial sign at the site, the outside storage and display of materials and products as long as they are appropriately screened from neighbors, and a certain amount of traffic and customers visiting the dwelling to conduct business. A "Major Home Occupation" allows for those things and also permits the presence in the dwelling of additional employees of who do not reside in the dwelling unit.

The Condominium property is located in the R1 (Urban Residential) Zone. The Table of Use Regulations of the Ordinance permits "Minor Home Occupations" in the R1 (Urban Residential) Zone. In contrast, however, "Major Home Occupations" and "Service Businesses" are NOT permitted in the R1 Zone. I note that a "beauty salon" specifically falls within the definition of "Service Business" and is specifically prohibited within the R1 Zone. If the beauty salon planned by the unit owner meets all the requirements imposed by the Ordinance for a Minor Home Occupation, will it be allowed despite the general prohibition on beauty salons and other "Service Businesses" in the R1 Zone? The unit owner will want to discuss this issue with the Topsham Code Enforcement Office.

Please do not hesitate to contact me to discuss these issues.

June 1, 2023
Page 6

## EXHIBIT A

## APPLICABLE SECTIONS OF THE MAINE CONDOMINIUM ACT

## 1602-103. Construction and validity of declaration and bylaws

(a) All provisions of the declaration and bylaws are severable. [PL 1981, c. 699 (NEW).]

(b) Neither the rule against perpetuities nor the provisions of section 116, as it or its equivalent may be amended from time to time, may be applied to defeat any provision of the declaration, bylaws or rules and regulations adopted pursuant to section 1603-102, subsection (a), paragraph (1). [PL 2017, c. 402, Pt. B, §3 (AMD); PL 2019, c. 417, Pt. B, §14 (AFF).]

(c) In the event of a conflict between the provisions of the declaration and the bylaws, the declaration prevails except to the extent the declaration is inconsistent with this Act. [PL 1981, c. 699 (NEW).]

(d) Title to a unit and common elements is not rendered unmarketable or otherwise affected by reason of an insubstantial failure of the declaration to comply with this Act. Whether a substantial failure impairs marketability is not affected by this Act. [PL 1

## 1603-102. Powers of unit owners' association

(a) **Subject to the provisions of the declaration**, the association may:

(1) Adopt and amend bylaws and rules and regulations; [PL 1981, c. 699 (NEW).]

(2) Adopt and amend budgets for revenues, expenditures and reserves and collect assessments for common expenses from unit owners; [PL 1981, c. 699 (NEW).]

(3) Hire and terminate managing agents and other employees, agents and independent contractors; [PL 1981, c. 699 (NEW).]

(4) Institute, defend or intervene in litigation or administrative proceedings in its own name on behalf of itself or 2 or more unit owners on matters affecting the condominium; [PL 1981, c. 699 (NEW).]

(5) Make contracts and incur liabilities; [PL 1981, c. 699 (NEW).]

(6) Regulate the use, maintenance, repair, replacement and modification of common elements; [PL 1981, c. 699 (NEW).]

(7) Cause additional improvements to be made as a part of the common elements; [PL 1981, c. 699 (NEW).]

(8) Acquire, hold, encumber and convey in its own name any right, title or interest to real or personal property, provided that common elements may be conveyed or subjected to a security interest only pursuant to section 1603-112; [PL 1981, c. 699 (NEW).]

(9) Grant easements, leases, licenses and concessions through or over the common elements; [PL 1981, c. 699 (NEW).]

(10) Impose and receive any payments, fees or charges for the use, rental or operation of the common elements other than limited common elements described in section 1602-102, paragraphs (2) and (4) and services provided to unit owners; [PL 1981, c. 699 (NEW).]

June 1, 2023
Page 7

(11) Impose charges for late payment of assessments and, after notice and an opportunity to be heard, levy reasonable fines for violations of the declaration, bylaws and rules and regulations of the association; [PL 1981, c. 699 (NEW).]

(12) Impose reasonable charges for the preparation and recordation of amendments to the declaration, resale certificates required by section 1604-108 or statements of unpaid assessments; [PL 1981, c. 699 (NEW).]

(13) Provide for the indemnification of its officers and executive board and maintain directors' and officers' liability insurance; [PL 1981, c. 699 (NEW).]

(14) Assign its right to future income, including the right to receive assessments, but only if approval of a majority of unit owners is obtained; [PL 2011, c. 368, §1 (AMD).]

(15) Exercise any other powers conferred by the declaration or bylaws; [PL 1981, c. 699 (NEW).]

(16) Exercise all other powers that may be exercised in this State by legal entities of the same type as the association; [PL 2011, c. 368, §2 (AMD).]

(17) Exercise any other powers necessary and proper for the governance and operation of the association; and [PL 2011, c. 368, §3 (AMD).]

(18) Suspend any right or privilege of a unit owner that fails to pay an assessment, but may not:

(A) Deny a unit owner or other occupant access to the unit owner's unit; or

(B) Withhold services provided to a unit or a unit owner by the association if the effect of withholding the service would be to endanger the health, safety or property of any person.

[PL 2011, c. 368, §4 (NEW).]

(b) Notwithstanding subsection (a), the declaration may not impose limitations on the power of the association to deal with the declarant that are more restrictive than the limitations imposed on the power of the association to deal with other persons except as permitted by this Act. A provision requiring arbitration of disputes between the declarant and the association or between the declarant and unit owners does not violate this section. [PL 1981, c. 699 (NEW).]
SECTION HISTORY
PL 1981, c.

## APPLICABLE SECTIONS OF THE DECLARATION

10. Restrictions on Use and Occupancy. Each unit owner shall comply strictly with the Bylaws and with the administrative rules and regulations adopted by the Board and with the covenants, conditions and restrictions set forth in this Declaration or in the deed to his unit. Failure to so comply shall be grounds for an action to recover damages or for injunctive relief or both maintainable by the Manager or Board of Directors on behalf of the Association of unit owners, or, in a proper case, by an aggrieved unit owner.

A. Each unit in the building is intended to serve as a self-contained living unit and shall be subject to the rules and regulations and Bylaws of the Association. No unit shall be used for other than residential purposes. Rules and regulations consistent with this

June 1, 2023
Page 8

Declaration may be promulgated by the Board of Directors in order to ensure the peace and security of each resident, and each member shall be notified in writing of the rules and regulations thus promulgated.

B. The common elements shall be used only for access, ingress and egress to and from the respective units by the members, their lessees, guests, household help and **other authorized visitors** and for outdoor recreational use incidental to the residential use of the respective units. The use, maintenance and operation of the common elements shall not be obstructed, damaged or unreasonably interfered with by any member. The Board of Directors may adopt rules and regulations that restrict the nature and location of recreational activities upon the common elements.

C. The Association and its authorized employees and representatives shall have access to and from the unit and limited common element as may be necessary for the repair, maintenance, replacement, alteration, care or protection of the common elements and utilities or any portion thereof. In the case of emergency repairs, such right of access shall be immediate and may be exercised without notice to the unit owner. Otherwise, the unit owner shall be entitled to reasonable notice of the time and purpose of any entry pursuant to this paragraph.

D. No unit owner shall do any work which may jeopardize the soundness or safety of the property, reduce the value thereof or impair any easement, rights, appurtenances or other hereditament consisting of common elements without the unanimous consent of all other unit owners. If said work is to his unit alone, then to the extent it effects the soundness or safety of the abutting unit, the prior written consent of the abutter shall be required.

E. Each member shall maintain his unit in good condition and in good order and repair at his own expense and shall not do or allow anything to be done in his unit which may increase the rate or cause the cancellation of insurance on other units or on the common elements. In the event that a member shall fail to so maintain his unit the Association shall have the right to undertake repairs and maintenance necessary to ensure that such unit is in good condition and in good order, and assess the member the costs of such repair and/or maintenance.

F. Trash and garbage and other waste shall be kept only in sanitary containers and shall be disposed of in a clean and sanitary manner in accordance with rules and regulations to be promulgated by the Board of Directors.

G. Household pets shall be allowed in such numbers as the Board of Directors determines will not create a nuisance to unit owners. The Board of Directors may adopt regulations with respect to the number, size and type of allowable household pets. Such regulations shall become effective when written notice thereof is delivered or mailed to the members and shall operate prospectively as to all pets subsequently brought into the Property. No animals shall be permitted in any common element unless accompanied by and under the direct supervision of a unit owner or member of unit owner's household.

H. No commercial activity **of any nature** shall be permitted on the Property.

June 1, 2023
Page 9

I. The parking spaces are to be used only for the parking of motor vehicles owned for personal use. No commercial vehicles, trailers, boats or trucks with a gross weight over 6,000 pounds shall be permitted in the parking spaces except service vehicles, moving vans or the like at the property on business. No mechanical repairs of vehicles shall be performed and no stripped or junk vehicles and no recreational vehicles or boats shall be placed or maintained on any part of the common elements or limited common elements.

J. The Association shall have the right to grant permits, licenses and easements over the common areas for all purposes necessary for the proper operation of the project.

K. The Association, at any regular or special meeting of members, may adopt additional rules and regulations governing the use of the common elements.

13. Association of Unit Owners. Prior to the date of this Declaration and the recording thereof, Oak Hill Condominiums Owners Association, a non-profit and non-stock corporation was duly organized under the laws of the State of Maine. The Association shall be the governing body for all of the unit owners with respect to the administration, maintenance, repair and replacement of the Property as provided by the Act, this Declaration and the Bylaws.

Each unit owner and/or owners shall be a regular member of the Oak Hill Condominiums Owners Association, a non-profit corporation organized under the laws of the State of Maine. Membership shall be appurtenant to the units, and the transfer of title to a unit shall automatically transfer the regular membership appurtenant to that unit to the transferee or transferees. A transfer in mortgage, however, shall not transfer membership until foreclosure or sale in lieu of foreclosure. Further, the Oak Hill Condominiums Owners Association shall be a member of the overall Oak Hill Association, an umbrella organization created to oversee the repair and maintenance of certain amenities common to various developments at the larger site from which this condominium is derived. The Oak Hill Association shall have the power to ratably assess its member Associations for this purpose. The provisions of this Declaration and the Bylaws and the rights and obligations established thereby shall be deemed to be covenants, running with the land, so long as the Property remains subject to the provisions of the Act and shall inure to the benefit of and be binding upon each and all of the unit owners and their respective heirs, representatives, successors, assigns, purchasers, lessees, grantees, mortgagees, and insurers or guarantors of mortgages. By the recording or the acceptance of a deed conveying a unit of any interest therein, or any ownership interest in the property whatsoever, the person to whom such unit or interest is conveyed shall be deemed to accept and agree to be bound by and subject to all of the provisions of the Act, this Declaration, and the Bylaws. In any voluntary conveyance of a unit deed (other than a conveyance by a mortgagee), it shall be the duty of the seller to furnish the buyer with a copy of this Declaration, the Association Bylaws and rules and regulations as they may from time to time be amended.
The Declarant or the Association shall make available to unit owners, prospective purchasers, lenders and the holders, insurers and guarantors of the first mortgage on any unit, current copies of the Declaration, Bylaws and other rules and regulations governing the Condominiums, and other books, records and financial statements of the Association. This requirement may be satisfied by making the documents available for inspection upon request during normal business hours or under

June 1, 2023
Page 10

other reasonable circumstances. If copies are requested, the Declarant or Association may, but shall not be obligated to, make them available at a reasonable charge.

17. Mortgage, Reserve Fund, Management and Lease Provisions.

A. The unit owner who mortgages his unit shall notify the Board of Directors of the name and address of his mortgagee and shall, upon request, file a conformed copy of the mortgage with the Board of Directors.

B. The Board of Directors, whenever so requested in writing by a mortgagee of a unit, shall promptly report to it any then unpaid common charges due from, or any other default by, the owner of the mortgaged unit.

C. The Board of Directors, when giving notice to a unit owner of a default in paying common charges or other violation of the provisions of this Declaration, the Bylaws or Rules and Regulations, shall send a copy of such notice within thirty (30) days after the occurrence of such default to each holder of a mortgage covering such unit whose name and address has previously been furnished to the Board of Directors.

D. Each mortgagee of a unit shall be permitted to examine the books, accounts and records of the condominiums at reasonable times on business days and to require annual reports and other financial data of the Corporation. If no audited financial statement is available, any holder of a mortgage on any unit shall be allowed to have an audited statement prepared at its own expense.

E. Notwithstanding anything to the contrary elsewhere contained in this Declaration or the Bylaws, the following provisions shall govern:

(1) Any first mortgagee of a unit in the condominiums will, upon request, be entitled to inspect the books and records of the condominiums or Association during normal business hours.

(2) No provision of this Declaration or of the Bylaws shall be deemed or construed to give a unit owner, or any other party, priority over any rights of first mortgagees of units pursuant to their mortgages in the case of a distribution to condominium unit owners of insurance proceeds or condemnation awards for losses to or a taking of condominium units and/or common elements.

(3) A holder, insurer or guarantor of a mortgage on a unit shall be entitled to prompt written notification from the Board of Directors of (i) any default by the mortgagor of such unit in the performance of such mortgagor's obligations under this Declaration and/or the Bylaws which is not cured within thirty (30) days, (ii) any event of substantial destruction to, or condemnation or governmental taking of, such unit or any portion of the common elements appurtenant thereto, (iii) any lapse or modification of insurance or fidelity bond coverage, (iv) any proposed amendment under Section 19 of this Declaration and (v) if such holder, insurer or guarantor of a mortgage on a unit is an eligible mortgage holder, any proposed action of which any eligible mortgage holder is entitled to notice under §1602-119(b) of the Act.

(4) Any first mortgagee of a unit who obtains title to the unit pursuant to the remedies provided in the mortgage, or through foreclosure of the mortgage, or through deed through foreclosure of the mortgage, or through deed (or assignment) in lieu of foreclosure, shall take the property free of any claims for unpaid assessments or charges against such unit which accrue prior to the acquisition of title to such unit by the mortgagees, but such expenses or assessments shall become common expenses collectible from all of the unit owners including one who obtains title accordingly.

F. An adequate reserve fund for maintenance, repairs and replacement of those common elements which must be replaced on a periodic basis shall be established and shall be funded by regular monthly payments rather than by special assessments, and a working capital fund shall be

June 1, 2023
Page 11

maintained by the Association equal to at least two months' assessments for each existing unit as calculated according to Article VI of the Bylaws for the operation and maintenance of the common elements. Payment of the two month's assessment for the working capital fund shall be made at the time of closing on a unit, shall be maintained in a segregated fund and shall not constitute prepayment of regular assessments. Such working capital fund amounts as have been collected from unit purchasers as a working capital shall be paid over to the Association by the Declarant within sixty (60) days after conveyance of the first unit.

G. Any management contract, employment contract or lease of parking or recreational areas and any contract entered into by Declarant which may become binding on the Association shall provide that such contract or lease may be terminated by either party without cause and without payment of a termination fee on not more than ninety (90) days' written notice, the term of any such contract shall not exceed three years, and the Association may terminate said agreement for cause upon thirty (30) days' written notice

without payment of a termination fee.

H. No unit owner shall be permitted to lease his unit for transient or hotel purposes and no unit owner may lease less than his entire unit. Any lease agreement shall be required to provide that the terms of the lease shall be subject in all respects to the provisions of the Declaration, Bylaws and all Rules and Regulations that may be adopted by the Board of Directors, and that failure by the lessee to comply with the terms of such documents shall be a default under such lease. All leases shall be in writing and shall contain a minimum initial term of six (6) months. A copy of the lease of any Unit shall be delivered to the Board of Directors within seven (7) days of its execution, provided, however, that such copy need not disclose the total rent nor monthly rent amount of such lease.

19. Method of Amending Declaration. Except to the extent expressly permitted or required by the Act, this Declaration may be amended by a vote or by written approval of the unit owners of units to which sixty-seven percent (67%) of the votes in the Association are allocated and written approval from eligible mortgage holders, their insurers or guarantors, as defined in the Act, representing fifty-one percent (51%) of the votes allocated to units that are subject to mortgages held by eligible holders.

Notwithstanding the foregoing, except to the extent expressly permitted or required by the Act, the unanimous consent of all unit owners and the written approval of eligible mortgage holders or their insurers or guarantors representing sixty-seven percent (67%) of the votes allocated to units that are subject to mortgages held by eligible holders shall be required for any amendment that would:

A. Seek to terminate the legal status of the Property for reasons other than substantial destruction or condemnation of the property, and any such termination shall be as provided in Section 1602-118 of the Act;

B. Change the pro rata interest, obligations or voting rights of any unit, change the boundaries of any unit or the uses to which any unit is restricted;

C. By act or omission seek to abandon, partition, subdivide, encumber, sell or transfer the common elements. The granting of easements for public utilities or the transfer of the roadways to the Town for public purposes consistent with the intended use of the common elements by the Association shall not be deemed a transfer within the meaning of this clause;

D. Use hazard insurance proceeds from losses to any condominium property (whether to units or to common elements) for other than repair, replacement or reconstruction of such improvements,

June 1, 2023
Page 12

except as provided by this Declaration or the Act in case of substantial destruction of the condominium; or

E. Create or increase special Declarant rights. The approval of an eligible mortgage holder may be assumed when such holder fails to submit a response to any written proposal for an amendment within 30 days after receipt of proper notice of the proposal, provided such notice was delivered by certified or registered mail, return receipt requested.

## APPLICABLE SECTIONS OF THE TOPSHAM ZONING ORDINANCE

Home occupations are Permitted in the R1 Zone and Major Home Occupations are Not Permitted. Service Businesses are also not permitted.

## SERVICE BUSINESS

A business that provides services to the public for compensation, either on or off the premises. Uses include, but are not limited to, beauty salons, building, electrical, plumbing and landscape contracting, business and educational services, financial services, catering, cleaning services, locksmith, photocopying, repair and restoration services, bicycle repair shop, tailoring, typing and word processing. Motor vehicle service and repair is not included and is defined separately. [Amended 5-17-2000 STM, Art. 15]

## HOME OCCUPATION

An occupation or profession which is carried on in a dwelling unit or structure accessory to a dwelling unit and which is **clearly incidental and secondary** to the use of the dwelling for residential purposes and which does not change the character thereof. The term "home occupation" shall include both professional and personal services.

Home occupations and major home occupations must comply with the following standards:

**A.**

Standards for home occupations. A home occupation shall be permitted if it complies with all of the requirements of this subsection:

**(1)**

The use of a dwelling unit for a home occupation shall clearly be incidental and subordinate to its use for residential purposes.

**(2)**

A home occupation shall be carried on by residents of the dwelling unit.

**(3)**

A home occupation may not alter the residential character of the structure, neighborhood or change the character of the lot from its principal use as a residence.

**(4)**

June 1, 2023
Page 13

The home occupation shall be carried on wholly within the principal or accessory structures. The outside storage or display of materials or products shall be screened from view from the abutting properties and street.

**(5)**

The performance standards in Article **VII** of this chapter shall apply. If additional parking spaces are provided, they shall be located to the rear or side yard of the principal structure but not within the yard setbacks.

**(6)**

One nonilluminated sign, no larger than four square feet, may be erected on the premises. Only one sign will be permitted per property regardless of the number of permitted home occupations.

**(7)**

The sale of products shall be limited to those which are crafted, assembled or substantially altered on the premises, to catalog items ordered off the premises by customers and to items which are accessory and incidental to a service which is provided on the premises.

**(8)**

A home occupation shall not involve the use of heavy commercial vehicles for delivery from or to the premises.

**(9)**

A home occupation shall not create greater traffic than normal for the area it is located in or generate more than 20 vehicle trips per day.

**B.**

Standards for major home occupations. A major home occupation shall be permitted if it complies with all of the requirements of this subsection:

**(1)**

The use of a dwelling unit for a major home occupation shall clearly be incidental and subordinate to its use for residential purposes. A major home occupation shall not involve motor vehicle or heavy equipment service or repair. Only one major home occupation may be operated in conjunction with any dwelling unit.

**(2)**

The primary vehicle access to a major home occupation may not be from an internal street within a residential subdivision.

**(3)**

A major home occupation shall be carried on by a resident(s) of the dwelling unit. Not more than two people who do not reside on the premises may work on the premises where the home occupation is operated at any time. The major home occupation may have other employees who do not regularly work on the premises. These outside employees shall not be on the premises more than two hours per week and no more than five outside employees may be on the premises at any time.

June 1, 2023
Page 14

**(4)**

A major home occupation may not alter the residential character of the structure or neighborhood or change the character of the lot from its principal use as a residence.

**(5)**

The major home occupation shall be carried on wholly within the principal building or accessory structures. The outside storage or display of materials or products shall be screened from view from the abutting properties and street.

**(6)**

The performance standards in Article **VII** of this chapter shall apply.

**(7)**

If people who do not reside on the premises work in the major home occupation, off-street parking must be provided for the maximum number of nonresident workers expected to be on the premises at any time excluding outside employees who are not regularly on the premises. If additional parking spaces are provided to serve the major home occupation, they shall not be located within any required yard setbacks and must be screened from abutting residential properties by a landscaped buffer at least 10 feet in width and/or a solid fence at least four feet high in accordance with § **225-29A(1)**.

**(8)**

One nonilluminated sign may be erected on the premises. The sign may be no larger than eight square feet except in the MV District where the maximum size is four square feet.

**(9)**

The sale of products shall be limited to those which are crafted, assembled or substantially altered on the premises, to catalog/internet items ordered off the premises by customers, and to items which are accessory and incidental to a service which is provided on the premises.

**(10)**

A major home occupation shall not generate more than 25 vehicle trips per day unless the primary vehicle access for the home occupation is from a street functionally classified as an arterial or collector or from a local road with a preexisting traffic volume of more than 1,000 vehicles per day.




**EXHIBIT F**

From: Tom Lister tlister@topshammaine.com
Subject: RE: Minor home use
Date: September 14, 2023 at 5.23 PM
To: Caroline Thibeault ctbo4631@gmail.com

Hi Caroline,

Under the Town ordinance you do fit as a minor Home Occupation, sounds like the association has it's own rules with its own classifications. I met with a few of the association members not too long ago and explained your business did fit under zoning. I'm sorry to hear they voted you down, maybe you could work out a compromise.


Tom

Tom Lister
Code Enforcement Officer
Town of Topsham
100 Main Street
Topsham, ME 04086
(207) 725-1724
tlister@topshammaine.com

**Fees** can be dropped off at our office, mailed to the Town Hall attention codes office, dropped in the tax collection box located in the Town Hall parking lot, or processed online using the Miscellaneous Payments section at https://topsham.androgov.com/


Per 1 MRSA § 402(3), correspondence to/from municipal offices/officials (with limited exceptions) is a public record and available for review by any interested party.


**From:** Caroline Thibeault <ctbo4631@gmail.com>
**Sent:** Wednesday, September 13, 2023 12:11 PM
**To:** Tom Lister <tlister@topshammaine.com>
**Subject:** Minor home use

**WARNING:**This is an external email that originated outside of our email system. DO NOT CLICK links or open attachments unless you recognize the sender and know that the content is safe!


Hi Tom,

    This is Caroline Thibeault ( Marchetti) again.
We talked a couple of months ago about the hair studio I wanted to put in my condo. You had said I would be a minor home use, that it would be like others in the community that had a home office in their unit. The Oak Hill Association voted it down, explaining that I wasn't a minor home use and that it would be incidental to the residential use of the unit. I did send them an email before the final vote explaining our conversation, but I was hoping a confirmation from you would be helpful.


EXHIBIT
G

# Oak Hill Condominium Owners Association
## Board of Directors Meeting
## 4:00 PM Wednesday, July 19, 2023, via ZOOM Call

### MINUTES APPROVED 9/18/23

### I.  Call to Order

Meeting called to order at 4:00 PM by Nancy Weingarten

Present: Nancy Weingarten (President), Mary Elizabeth Knox (Treasurer), Margaret Zillioux (Secretary), Art Raymond, Paula McKenna, and Wil Sligh (Property Manager)

### II.  Agenda Changes - None

### III.  Approval of Minutes from April 19, 2023 and June 21, 2023

*Motion:* To Approve Minutes from April 19, 2023:

| | |
|---|---|
| *Motion made by:* Art Raymond | *Motion seconded by:* Paula McKenna |
| *In Favor:* 5    *Opposed:* 0 | *Abstained:* 0    *Motion Passed* |

*Motion:* To Approve Minutes from June 21, 2023:

| | |
|---|---|
| *Motion made by:* Paula McKenna | *Motion seconded by:* Art Raymond |
| *In Favor:* 5    *Opposed:* 0 | *Abstained:* 0    *Motion Passed* |

### IV.  Board Members & Property Manager Reports:

A.  President's Report (Nancy Weingarten)

Nancy thanked Debbie and Dennis Dionne for the wonderful Garden Potluck they hosted earlier this month. It was an enjoyable community gathering and Nancy and the Ukulele group had great fun playing for everyone.

The Board is doing a revision of the **Resources Packet** (formerly known as the Welcome Packet). The Board would like to thank Deb Nowak for spending quite a bit of time updating the Resources Packet. We hope to have the updated materials out for new and current residents within the next couple of weeks.

The Board was informed that the new owners who are under contract to purchase 43 Tourmaline Drive plan to be using Pods as they move in towards the end of this month. The Pods will be parked in the driveway and in front of the unit, likely for 4-5 days. The Board has taken steps to ensure that the driveway and road is not damaged while the Pods are sitting there. The neighbors abutting and near 43 Tourmaline have already been informed.

B.  Treasurer's Report (Nancy Weingarten)

As departing Treasurer, Nancy gave the Year-End Report.  Income for the year was as projected. Nancy noted that overall, Oak Hill Owners have paid their Association

1

Dues in a timely manner. Expenses for the year were slightly below budget. This was a good year for the budget.

C. Property Manager's Report (Wil Sligh)

Wil noted and was grateful to observe that rather than simply emailing a maintenance request to him or a Board member, residents seem to be using the preferred method of using the portal more frequently to submit their requests. Open tasks are beginning to be resolved and closed tasks are increasing, which indicates that good progress is being made in resolving the maintenance requests. Wil projects that homeowners and the Board will be pleased to see that the tasks which are the responsibility of the HOA are being addressed in a timelier manner. Communication will be clearer, and needs addressed more promptly. Wil has been receiving questions about what building and maintenance issues are the responsibility of the individual owners versus which are HOA responsibilities. Property Services Management can recommend a contractor if the issue falls into the Homeowners Responsibility category.

Wil recently made an on-site visit with Board Members Art Raymond and Paula McKenna which was helpful as Board members often identify issues that Wil is not aware of.

Wil also encouraged members to use *Auto Pay* on the Portal when paying their Association Dues. Nancy echoed that *Auto Pay* is useful but by no means an expectation or requirement. Mailed checks for Association Dues sometimes arrive late which unfortunately then incurs late fees for the resident.

D. Groundskeeping Report (Art Raymond)

Art showed a copy of the Maintenance Responsibilities list which is on the Portal. It can be found under Documents -> Declarations/Bylaws/Rules & Regulations -> MAINTENANCE RESPONSIBILITES. We have been getting quite a lot of requests that are in fact homeowner responsibilities and not the responsibility of the HOA. The Board encourages everyone to look at this list to familiarize yourself with what maintenance needs are the responsibility of individual homeowners vs. the HOA.

Art was happy to report that the most recent bill from the Brunswick & Topsham Water District was less than last year's usage by about $500.00. This decrease is partially lower due to the rain we have seen this summer, but possibly also due to cutting back the sprinklers from running six to five days a week.

Nancy again thanked Art and Paula for all the time they have been spending in the community assisting homeowners with maintenance issues that arise. Their diligent and time consuming work is very much appreciated.

1. Gardening Committee Report (Barbara Piccirillo)

The Gardening Committee appreciates that residents are more frequently filling out an ***Owner Request Form*** when inquiring to have a foundation plant removed or have a problem with and/or wish to add plants or bushes to the foundation gardens. (See **REQUESTS** listed on the left-hand side of the Portal home page.)

## V.    New Business

A.  Work Orders and List of Permits Issued & Permits Requested – **None**

B.  Building Committee Membership (Art Raymond)
We have received some interest from several residents to join the committee. This new committee should be assembled and up and running by the end of the month.

C.  Plan for Addressing Possible Changes to Rule # 6 - **Holiday Decorations and Lighting**
Nancy noted that the issue of Holiday Decorations and Lighting was raised at the Annual Meeting with homeowner stated requests to consider making changes to the rule. The Board plans to develop a survey to send out to the community asking everyone's opinion about what should be included in such a rule change. The plan is to have the survey out to the community within the next month or two.

## VI.    Old Business

A.  Ventilation Plan (Paula McKenna)
Paula noted that the Board is taking steps to determine how many bathroom vents will need inspecting for proper attachment and outside venting. They sent an email to the entire community asking to hear from those owners who have already inspected their vents in their attics. Once that information is collected the next step will be to determine how many units will need to be inspected and what the cost of that will be for those inspections. The community will be updated as this process unfolds.

Nancy noted that we likely won't be able to fix everyone's units this year, but for now the Board needs to understand the extent of the problem and begin the process of addressing those in need of fixing.

B.  Hair Studio Request
Nancy read her **Statement Regarding Hair Studio Proposal** to ensure she included everything important to address before voting on a decision. Her statement is attached to the Minutes below.

Board member Paula McKenna wished to note that previously everyone received a copy of the budget for the HOA. In it she noted that our insurance premium for last year was $32,400. As our insurance agent stated during the Board's research on the issue of the Hair Studio, changing from a Residential to a Mixed-Use Association would likely increase our cost to a higher premium which would also most likely

3

result in increasing condo fees or even potentially resulting in a special assessment being made if the premium were to increase quite substantially.

*Motion:* To prohibit the establishment of a hair studio on the Oak Hill Properties.
*Motion made by:* Paula McKenna        *Motion seconded by:* Mary Elizabeth Knox
*In Favor:* 5        *Opposed:* 0        *Abstained:* 0        *Motion Passed*


**VII.    Owner Questions and Comments** – None


**VIII.    Executive Session** – None


**IX.    Date of Next Regular Board of Directors Meeting:**
No August 2023 meeting scheduled unless necessary.
Next scheduled meeting to be on September 20, 2023
Future Meetings: October 18, November 15, December 20


**X.    Adjournment**
Nancy called for the meeting to adjourn.
*In Favor:* 5        *Opposed:* 0        *Abstained:* 0        *Motion Passed*

Meeting adjourned at 4:25 PM.


Respectfully submitted,
Margaret Zillioux, Board Secretary
July 20, 2023


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**Nancy Weingarten**
**Statement Regarding Hair Studio Proposal for July Board of Director's Meeting**
**July 19, 2023**

The Board is called upon today to decide whether one of our residents may operate a hair studio in her unit.

As I stated at our last meeting, our responsibility to decide this matter is set forth in section 18 of the Oak Hill Declaration, which states that " (m)atters ...with respect to.... application of the provisions of this Declaration or the Bylaws shall be determined by the Board of Directors...."

Complicating this matter is the fact that the operation of a business at Oak Hill is addressed by both our Declaration and by our Rules in language that might be seen as inconsistent in some respects as to what is permitted and what is not. That said, based upon advice our attorney and my own reading of the Maine Condominium Act, I think it is clear that in the event of a conflict between the documents, the Declaration takes precedence. This means that even if the

4

proposal meets all of the requirements laid out in our Rules (and I am not saying that it does), we still must decide whether it is permitted by the Declaration.

At the June Board meeting, we explained that based on information available before the formal proposal was submitted, our conclusion was that a hair salon would violate the Declaration. We decided not to vote at that time so that we could review the proposal submitted the evening before the meeting. We also wanted time to review any comments submitted by community members. We asked both our attorney and insurance broker to review the proposal. Our attorney concluded that her legal analysis did not change, and our insurance broker concluded that the hair studio would still be an increased exposure and would still have an effect on the community's insurance.

Three sections of the Declaration apply to the proposal. Section 10A states that "(n)o unit shall be used for other than residential purposes." Section 10E states that a member "shall not allow anything to be done in his unit which may increase the rate or cause the cancellation of insurance on other units or on the common elements." Section 10H states that " (n)o commercial activity of any nature shall be permitted on the Property." Since the last of these provisions seems to me to be most directly relevant, I base my decision on that section.

To violate section 10H, the conduct in question must have two components. First, it must constitute "commercial activity", and second, it must occur "on the property".

As to the first element, like the Association's attorney, I find it impossible to conclude that operating a hair studio, other than perhaps on a very occasional basis, in which the services are provided for a fee is not "commercial activity ".

As to the second element, the proposal for the hair studio makes clear that it would be operated "on the property". In this regard, I would likely reach a different conclusion with respect to a business in which services are provided remotely, with the recipients of the services never or only very infrequently coming to Oak Hill, but that is clearly not the case here.

My conclusion is consistent with the analysis provided by the attorney for our Association. To quote from that analysis:

"(H)air salons are not customarily incidental to the use of residential properties. They involve people who do not reside in the development regularly entering the property. Such activities involve increased traffic and some resulting noise, movement and activity in the exterior of the unit. Therefore...it is clear that the proposed hair salon is a commercial activity that violates the Declaration."

Our insurance broker has been clear that the operation of a hair studio with regular clients or customers coming to the community would likely result in higher insurance rates and might jeopardize the Association's master policy as a whole. This provides a separate ground for concluding that the hair studio is not permitted under our governing documents.

This has been a very difficult matter for the Board and the decision I feel required to make as a Board member is not necessarily the decision I would make as a community member, as I recognize that, as many of you have pointed out, the person making the request is dealing with

5

a very challenging personal situation. That said, those of us on the Board have a fiduciary duty to adhere to the laws and contracts that govern the operation of our condominium, even if, as community members, we are not entirely happy with the result.

And to those who would have us ignore the Declaration, as a document that was not developed by the current residents, or to interpret it in a manner that is simply not consistent with what it says, I would reply that we cannot do that if we are to remain true to our role as fiduciaries.

Before I call for a motion, let me offer a personal observation, not as a Board member but as someone privileged to reside here. I know there are strong feelings on this issue. I do not see it as a battle between good and evil but rather as a disagreement between people with honestly held views. However this is resolved, I trust and hope we will remain a community characterized by mutual respect. The worst outcome would be to let the divisiveness that has come to characterize our times invade our community.

**EXHIBIT**

A

## Meredith Scott

| | |
|---|---|
| **From:** | Nancy Weingarten <nancyw2714@gmail.com> |
| **Sent:** | Thursday, August 17, 2023 11:19 AM |
| **To:** | Caroline Thibeault |
| **Cc:** | Nancy Weingarten; Oak Hill Board |
| **Subject:** | Follow up questions |

Hi Caroline,

Thank you for responding to my email. So that we are clear in our understanding, I ask for clarification on the following questions:

You stated that you have always cut the hair of family and friends in your home. Does that mean you are not being compensated for the services you provide to family and friends?

Are you stating that you do not provide services in your unit to other individuals for which you are paid?

Are you stating that a noticeable increase in vehicular traffic to the unit you reside in is due to services being provided to your son? We are trying to understand the flow of traffic in your neighborhood. Therefore can you tell me approximately how many different service providers come each day?

As we previously indicated, the Board is concerned that if you are being compensated for services you provide in your unit, it is a violation of the Oak Hill Declaration, which may result in an increase in the Oak Hill insurance premium or cancellation of our policy. Please understand that it is the Board's responsibility to follow up on this insurance issue, and your responses to these questions will help determine whether further action is needed. Please respond in the next few days.
Nancy



---

# BYLAWS OF
# OAK HILL CONDOMINIUMS OWNERS ASSOCIATION

### ARTICLE I
### Name, Location, and Fiscal Year

**Section 1. Name.** The name of the corporation is OAK HILL CONDOMINIUMS OWNERS ASSOCIATION (the "Corporation").

**Section 2. Location.** The principal office of the corporation shall be located at Topsham, Maine.

**Section 3. Fiscal Year.** The fiscal year of the corporation shall, unless otherwise decided by the Executive Board, end June 30.

### ARTICLE II
### Purposes

**Section 1. Purposes.** The purposes of said corporation are to act on behalf of its members collectively as their governing body with respect to the administration, maintenance, repair and replacement of certain property which will be submitted to the provisions of Maine Condominium Act, Title 33, Chapter 31, Section 1601-101 et seq. and to be known as Oak Hill Condominiums Owners Association and as such to own and acquire any real estate or interest or rights therein or appurtenances thereto and any and all personal property in connection therewith as may be incidental or necessary to such purpose.

### ARTICLE III
### Members

**Section 1. Membership.** The owner or owners of record from time to time of each unit of the Condominiums, shall constitute one member of the Association, and each such member shall have the fraction of common interest, common expenses liabilities and voting rights in the corporation that are set forth in Appendix II of the Declaration.

**Section 2. <u>Termination of Membership</u>.** The membership of each unit owner shall terminate when he ceases to be a unit owner, and upon the sale, transfer or other disposition of his ownership interest in the property his membership in the corporation shall automatically be transferred to the new unit owner succeeding to such ownership interest.

**Section 3. <u>Meetings and Notice</u>.** An annual meeting of the members shall be held in the third week in May each year, commencing the first year after the turnover date, at a time to be determined. Special meetings of the members may be called by the President, the Executive Board or upon a petition signed by fifty (50) percent of the members. Written notice of any meeting shall be given to each member by the Secretary not less than ten (10) days nor more than sixty (60) days before the meeting by mailing it postage prepaid to the member's mailing address or to any other mailing address designated in writing by the member or sent by electronic means to any other address, including an e-mail address, specifically designated by the unit owner. The notice shall specify the time and place of the meeting and the items on the agenda.

**Section 4. <u>Quorum</u>.** A quorum for any meeting shall be constituted by persons entitled to cast 51.5% percent (35 of 68) of the votes for election of the Executive Board, attending in person or represented by proxy.

**Section 5. <u>Turnover Date</u>.** The Declarant reserves the right, until the Turnover Date, to appoint and remove officers and directors of the corporation. The Turnover Date shall be the date on which the Declarant relinquishes all rights to appoint officers and directors as set forth in paragraph 7, section G of the Declaration. The Declarant may voluntarily surrender the right to appoint officers and directors, in which event it may require, for the duration of the period of Declarant control, that specified actions of the Association or Executive Board, as described in a recorded instrument executed by the Declarant, be approved by the Declarant before they become effective. The Declarant shall give written notice to all members and all eligible holders of mortgages not less than ten (10) days nor more than thirty (30) days prior to the TurnoverDate and shall call for a Special Meeting of members on the Turnover Date to elect a Executive Board.

## ARTICLE IV
## The Executive Board

**Section 1. Composition.** The Executive Board (herein referred to as Directors) shall consist of a number, not less than three nor more than seven, which shall be fixed for the ensuing year by the members at the annual meeting.

**Section 2. Election and Term.** The directors, except as provided in Article III, Section 5 and Sections 6 and 7 of this Article, shall be elected at the annual meeting from among the members or spouses of members or in the case of a unit owner which is a corporation, partnership, trust or estate, a designated agent thereof. Each unit shall have one (1) vote for each director at the first annual meeting of members. The term of office of each director shall be fixed at three (3) years, except that the initial directors shall serve for staggered terms so that no more than 50% will have a term expiring in any successive year. The directors shall hold office until their successors have been elected.

**Section 3. Powers.** The business of the corporation shall be managed by the Executive Board which shall have and may exercise all the powers of the corporation, except those powers reserved to the members by the Act or by these Bylaws. The Board shall have the power to engage a managing agent for the property and to fix the term, compensation and authority of the manager or managing agent. Notwithstanding the foregoing, the Board shall have no authority to approve any capital expenditure in excess of $2,000 nor to authorize the corporation to enter into any contract for a term of more than three (3) years except with the approval in writing of all of the members.

**Section 4. Meetings of Directors.** Meetings of the Executive Board may be held at any time and place upon call by the President or by a majority of the Directors, reasonable notice thereof being given to each Director. Notice that a meeting has been called may be given by the President, Secretary or Assistant Secretary, if one is appointed, or by one of the Directors. Notice of any meeting of the Executive Board may be waived in writing signed by the person or persons entitled to such notice, whether before or after the time of such meeting, and shall be

equivalent to the giving of such notice, but any such notice shall be calculated to inform unit owners of the date, time and place, as well as the topics to be discussed at such meeting. Attendance of a Director at such meeting shall constitute a waiver of notice thereof, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business because such meeting is not lawfully convened. Unit owners shall have the right to attend meetings of the Board, subject to reasonable rules established by the Board.

**Section 5. <u>Quorum and Voting</u>.** Attendance by a majority of directors then in office shall constitute a quorum. If a quorum exists, the directors present may take any action so long as they concur.

**Section 6. <u>Vacancies</u>.** A vacancy in the Executive Board shall be filled by appointment of the Directors and shall hold office for the unexpired term of the director whose place is vacant and until his successor is elected.

**Section 7. <u>Removal</u>.** A director may be removed from office only by a majority vote of the unit owners.

**Section 8. <u>Compensation</u>.** Directors shall not receive compensation for their services except as provided by resolution of a majority of the members of the corporation. Directors shall be reimbursed for any out of pocket expenses incurred which are reasonable and necessary in performing their duties on behalf of the corporation.

**<u>Section 9. Repeal of Board Rules.</u>** Although the Executive Board is authorized by the Declaration to promulgate reasonable rules and regulations, a petition signed by a majority of unit owners shall require the Board to reconsider any applicable rule or regulation and if the Board fails to repeal or revise the same in accord with such petition, a special meeting of the unit owners shall be called within thirty (30) days of the Board's action so that the unit owners may vote on the action requested by the petition.

## ARTICLE V
## Officers

**Section 1. Designation and Qualification.** The officers of the corporation shall consist of a President, a Treasurer, a Secretary and such other officers as the Executive Board may elect. The President and Treasurer shall be members, or spouses of members, or in the case of a unit owner which is a corporation, partnership, trust or estate, a designated agent thereof. The Secretary need not be a member, but shall be a resident of Maine.

**Section 2. Election and Term.** All officers shall be elected by the Executive Board at its first meeting following the annual meeting of the members and shall hold office until the first meeting of the Executive Board following the next annual meeting of members and until their successors are elected.

**Section 3. President.** The President shall be a Director and shall be the chief executive officer of the corporation. The President shall have general supervision and control of the business of the corporation subject to the direction of the Executive Board and shall also have such other powers and duties as the Executive Board may decide. The President shall preside at all meetings of the members and at all meetings of the Executive Board. If the President is absent from any meeting of the members or Executive Board, the Treasurer shall preside at such meeting. The President shall prepare, execute, certify and record amendments to the Declaration on behalf of the Association.

**Section 4. Treasurer.** The Treasurer shall have, subject to the direction of the members or Executive Board, general charge of the financial affairs of the corporation and shall keep full and accurate records thereof, which shall always be open to the inspection of any member or holder of a first mortgage on a unit. He shall render to the President and directors, at the regular meetings of the Executive Board, or whenever they may require it, a statement of the accounts of his transactions as Treasurer and of the financial condition of the corporation.

**Section 5. Secretary.** The Secretary shall record the proceedings of all meetings of the members and of the Executive Board in books kept for that purpose. Record books of members'

meetings shall be open at all reasonable times to the inspection of any member or holder of a first mortgage on a unit. The Secretary shall also keep the membership transfer books of the corporation. He shall notify the members and the directors of all meetings in accordance with the Bylaws. If the Secretary is absent from any meeting of the members or the Executive Board, a Temporary Secretary shall be chosen to exercise the duties of the Secretary at such meeting.

**Section 6. Vacancies.** A vacancy in any office may be filled by the Executive Board by the election of a successor to hold office for the unexpired term of the officer whose place is vacant and until his successor is chosen and qualified.

**Section 7. Removal.** All officers may be removed from their respective offices by the Executive Board.

**Section 8. Resignation.** Any officer may at any time resign his office by a resignation in writing delivered to the corporation at its principal office or to the President or Secretary. Such resignation shall be effective upon receipt and acceptance thereof shall not be necessary to make it effective unless it so states.

**Section 9. Compensation.** The officers shall receive no compensation for their services unless expressly provided for in a resolution adopted by the majority of the members of the corporation. The officers shall be reimbursed for out-of-pocket expenses incurred which are reasonable and necessary in performing their duties on behalf of the corporation.

## ARTICLE VI
## Assessments

**Section 1. Budget.** The Executive Board shall cause to be prepared an estimated annual budget for each fiscal year of the corporation. Such budget shall take into account the estimated common expenses and cash requirements for the year, including insurance, salaries, wages, payroll taxes, supplies, materials, parts, services, maintenance, repairs, replacements, landscaping, insurance, fuel, snow removal, trash pickup and other common expenses (as distinguished from individual mortgage payments, real estate taxes and individual telephone,

electricity and other individual utility expenses billed or charged to the separate members on an individual or separate basis rather than a common basis). The Board shall establish and maintain an adequate reserve fund for the periodic maintenance, repair and replacement of improvements to the common areas and limited common areas. The reserve fund shall be included in the budget and maintained out of regular assessments for common expenses. To the extent that the assessments and other cash income collected during the preceding year shall be more or less than the expenditures for such preceding year, the surplus or deficit, as the case may be, shall also be taken into account in setting the budget and determining assessments for the current year so as to credit any surplus or refund any deficit.

**Section 2. Payment.** The estimated annual budget for each fiscal year shall be approved by the Executive Board, and copies thereof shall be furnished to each member and eligible mortgage holder within thirty (30) days of adoption, and in any event not later than 90 days after the beginning of such year. The Board shall set a date for a meeting of the members to consider ratification of the budget not less than six (6) nor more than thirty (30) days after mailing of the budget. Notice of said meeting shall accompany the budget. Unless at that meeting a majority of all unit owners reject the budget, the budget is ratified, whether or not a quorum is present. In the event the proposed budget is rejected, the periodic budget last ratified by the members shall be continued until such time as the members ratify a subsequent budget proposed by the Executive Board. On or before the first day of the next quarter and of each succeeding month or quarter of the year covered by the annual budget, each member shall pay, as his respective monthly assessment for the common expenses, one-twelfth (1/12) of his proportionate share of the common expenses for such year as shown by the annual budget, all as determined by the Executive Board. Such proportionate share for each member shall be in accordance with his respective ownership interest in the common areas and facilities. No member shall be relieved of his obligation to pay his assessments for common expenses by abandoning or not using his unitor the common areas and facilities.

**Section 3. Statements.** Within ninety (90) days after the end of each year covered by an annual budget, or as soon there-after as shall be practicable, the Treasurer shall cause to be furnished to each member a statement for such year so ended, showing the receipts and expenditures and such other information as he may deem desirable.

**Section 4. Separate Accounts.** The Treasurer shall cause to be kept a separate account for each member showing the respective assessments charged to and paid by such member, and the status of his account from time to time.

**Section 5. Additional Assessments.** In the event that during the course of any year, it shall appear to the Treasurer that the monthly assessments, determined in accordance with the estimated annual budget for such year, are insufficient or inadequate to cover the estimated common expenses for the remainder of such year, then the Executive Board shall prepare and approve a supplemental budget covering the estimated deficiency for the remainder of such year, and shall cause the same to be presented to the members for ratification in the same manner as the budget. Upon ratification of the supplemental budget, a supplemental assessment shall be made to each member for his proportionate share of such supplemental budget.

**Section 6. Common Expenses.** It shall be the duty of every member to pay his proportionate share of the common expenses, in the same ratio as his percentage of ownership in the common areas and facilities. If any member shall fail or refuse to make any such payment of the common expenses when due, the amount thereof together with interest at the rate established by the Association, costs and reasonable attorney's fees shall constitute a debt secured by a lien on such unit. The corporation shall have the authority and responsibility to exercise and enforce any and all rights and remedies as provided for in Maine Revised Statutes, Title 33, Chapter 31, the Declaration and these Bylaws, or otherwise available at law or in equity for the collection of all unpaid assessments.

**Section 7. Budget Expenses.** The President and/or Treasurer, subject to Board direction, shall have the authority to enter into contracts on behalf of the corporation for work and expenses provided in the budget and to make payment therefore from the funds of the corporation.

**Section 8. <u>Expenses Assessed Subsequent to Conveyance of Unit</u>.** A member may not exempt himself from liability for his shares of common expenses subsequently to be assessed by a conveyance of his unit to the corporation, except by approval of all of the other members and their first mortgagees.

**Section 9. <u>Availability of Documents</u>.** The Corporation is required to make available to unit owners, lenders and the holders, insurers and guarantors of the first mortgage on any unit current copies of the Declaration, Bylaws and any other rules and regulations governing the condominiums and other books, records and financial statements of the Association, including Executive Board minutes and such other data as required by law. In addition thereto, the Association shall also make available to prospective purchasers current copies of the Declaration, Bylaws, other rules governing the condominiums, and the most recent annual audited financial statement, if such is prepared. The Corporation may impose a reasonable charge for copies.

<div align="center">

**ARTICLE VII**
**<u>Amendments</u>**

</div>

**Section 1. <u>Amendment of By-Laws</u>.** These Bylaws may be amended or modified from time to time by action or approval of members representing seventy-five (75) percent of the votes allocated to members, except that no amendment may violate the provisions of Maine Revised Statutes, Title 33, Chapter 31.

**Section 2. <u>Amendment of Declaration</u>.** The Declaration may be amended in accordance with the terms thereof. The President and/or Treasurer of the corporation shall execute a certificate setting forth the text of the amendment, which certificate shall be attested by the Secretary and recorded in the Sagadahoc County Registry of Deeds. Following the recordation of four certificates of amendment, the next amendment shall be evidenced by recordation of a complete revised Declaration executed in the same manner as a certificate of amendment.



EXHIBIT

Exhibit K

J

# OAK HILL CONDOMINIUM OWNERS ASSOCIATION

# RULES
# &
# REGULATIONS

# REVISED
# JANUARY 15, 2025

**RULES AND REGULATIONS**

**TABLE OF CONTENTS**

**OAK HILL CONDOMINIUM OWNERS ASSOCIATION MISSION STATEMENT**

**VISION FOR OUR OAK HILL CONDOMINIUM COMMUNITY**

**DEFINITIONS**
1.  Unit
2.  Common Elements
3.  Limited Common Elements

**RULES AND REGULATIONS**
1.  Architectural Integrity
2.  Parking
3.  Snow Plowing and Removal
4.  Common Areas or Elements
5.  Plantings
6.  Decorations and Lighting
    a.  Decorations: Types and Placement
    b.  Decorations: Timing
    c.  Lighting: Types and Placement
    d.  Lighting: Timing
7.  Open Fires
8.  Signs
9.  Architectural Modifications
    a.  Satellite Dishes
    b.  Solar Installations
10. Pets
11. Trash/Recycling Disposal
12. Unit Electrical and Plumbing repairs/Modifications and Other Unit Interior Alterations
13. Insurance
14. Usage of Moving Containers and Moving Vehicles During a Move
    a.  Moving Containers
    b.  Moving Vehicles
15. Monthly Condominium Fees and Late Charges
16. Rental of Units
17. Resident Absences From Unit
18. Consideration for Residents
19. Business Activity Within Units
20. Permitting Process
21. Problem Resolution

Page 1 of 12

## OAK HILL CONDOMINIUM OWNERS ASSOCIATION
## MISSION STATEMENT

The Board and all members of Oak Hill Condominium Owners Association will work together to create and implement considerate, reasonable, and fiscally responsible policies. The intent of these policies is to enhance the enjoyment, health, and well-being of our residents while preserving the beauty of our neighborhood and the value of our investments. We, as Oak Hill residents, recognize our responsibility as members of the greater community and will strive to protect and enhance the environment for ourselves and our future residents.

## VISION FOR OAK HILL CONDOMINIUM COMMUNITY

It is in this spirit of community that we address our rules and regulations as a unified neighborhood where all residents are considerate and caring of each other. We strive to make community living an equitable and positive experience for all. It is our goal as community members to respect our neighbors, and their rights, comforts, and privacy. Community members are to civilly discuss concerns and work together in a respectful way toward resolution.

If necessary and appropriate, a special waiver of any rules and regulations will be considered by the Board except for building integrity, snow plowing, fire, or other safety rules. Unit Owners should seek to obtain expressed permission from affected roof mates, abutters, and then final permission from the Board for a waiver to be granted.

**DEFINITIONS** Certain definitions are within the Public Offering Statement and the Declaration used to create the Condominium.

The words "**Oak Hill Condominium**" shall refer to the Oak Hill Owners Condominium Association. The words "unit" and "Unit Owners" shall have the meaning given to these terms in the Public Offering Statement and the Declaration.

**Unit:** The boundaries of each unit are the interior surface of the roof rafters, walls, windows, and the basement concrete floor slab.

**Common Elements:** The common elements consist of all portions of the Property other than the units.

**Limited Common Elements:** Limited Common Elements shall mean those portions of the Buildings defined as such pursuant to Sections 1602-102(2) and (4) of the Act or as identified and designated as Limited Common Elements on the Plats and Plans, as the same may be amended or supplemented from time to time. The following portions of the Buildings or the Property are hereby designated as Limited Common Elements: natural gas lines and storage tanks, satellite dishes, solar collectors, geothermal wells or other alternative energy devices and service lines, shutters, awnings, window boxes, doorsteps, stoops, balconies, porches and patios, if any, that are not part of the unit, but that are adjacent to and serve only such unit.

**RULES AND REGULATIONS**

In these Rules and Regulations, the word "Condominium" shall refer to **Oak Hill Condominiums**, a "Condominium Association," and the words "common elements," "limited common elements," "unit," and "Unit Owners" shall have the meaning given to those terms in the Declaration and Bylaws (10/25/2012) creating the Condominium.

By adoption of these Rules and Regulations, the Unit Owners do hereby appoint the Board of Directors and its agents, their duly authorized representatives, for the purposes herein set forth. Each Unit Owner agrees to save and hold harmless the Board of Directors and its agents from and against all liability in the enforcement contemplated herein, except for any willful violations of State and Local laws.

These Rules and Regulations are supplementary to the Declaration and the Bylaws of the Oak Hill Condominium Owners Association and are not intended to alter or replace the Declaration or Bylaws.

Each Unit Owner and/or lessee is personally responsible for informing their guest(s), renters, and lessees of all existing rules and regulations and for their compliance with them.

All residents are subject to the Laws, Ordinances, and Regulations of the Town of Topsham and the State of Maine. It is not the intent of these Oak Hill Condominium Rules and Regulations to duplicate or be responsible for enforcement of municipal and state laws.

1. **Architectural Integrity**
   a. Siding and Trim: To protect the integrity of our buildings, penetration or cutting of the vinyl siding, vinyl trims or roof of the units, including the front porch area, by means of a screw, nail, bracket, hook, or the like is not permitted. Alterations or modifications to the exterior of the unit, such as gutters to alleviate flooding issues or to protect heat pumps and generators; attached lighting fixtures; or exhaust fans, must be submitted to the Property Manager. The Property Manager will consider the request, and after an appropriate review, will submit the request to the Oak Hill Condominium Board of Directors for its consideration and approval.
   b. As stipulated in section 10(D) of the Declarations for the Oak Hill Condominium Owners Association, any proposed alteration or modification to the interior of the unit that might affect the structure of any component of the building, regardless of whether it is visible, must be submitted to the Property Manager. The Property Manager will consider the request, and after an appropriate review, will submit the request to the Oak Hill Condominium Board of Directors for its consideration and approval.

2. **Parking**
   a. There is no overnight parking permitted on Association streets. Refer to the Oak Hill Condominium Declaration and By-laws section 10. I. Overnight parking on town-owned roads is governed by the town.
   b. Overflow parking shall not be used as storage for unused vehicles.

Page 3 of 12

3. **Snow Plowing and Removal**
   It is important to understand the snow clearing process and follow these simple procedures
   with your vehicle (s):
   a.  Unit Owners shall prepare for winter by removing items in driveways, walks, and
       porches that block snow removal.
   b.  Roads must be open for snow plowing and emergency vehicles. No vehicle shall be left
       unattended on the roads during snow events.
   c.  Unit Owners are responsible for moving vehicles during a snowstorm. Many Oak Hill
       driveways are shared. Out of consideration for neighbors and to expedite the plowing of
       driveways and overflow parking areas during a snow event, Unit Owners are required to
       park their vehicles in their garage or overflow parking areas. Once driveways are
       plowed, vehicles are to be returned to the driveways or garages to allow the plowing of
       overflow areas. If the plowing contractor is called to return, the full charge will be billed
       to the owner.

4. **Common Areas or Elements**
   Unit Owners shall obtain permission from the Board of Directors before altering common areas
   or elements.

5. **Plantings**   .
   Refer to the Oak Hill Garden Committee Guidelines for information about gardening and grounds
   at Oak Hill.

6. **Decorations and Lighting**
   This Rule governs all outdoor decorations and lighting and is in concert with Rule 1.
   Architectural Integrity and the Gardening Guidelines. Please refer to these for additional
   information.

   <u>Decorations</u>: Refers to all exterior decorations other than lighting
   <u>Lighting</u>: Refers specifically to exterior lighting and not to other types of decorations

   a.  <u>**Decorations: Types and Placement\***</u>
       1)  Decorations, including seasonal holiday decorations, are permitted <u>only</u> on porches,
           patios, beneath exterior garage lights, and in front gardens in accordance with Rule 1.
           Architectural Integrity and the Gardening Guidelines. Front door wreaths may be
           displayed so long as they appear fresh and in good condition. Small seasonal, holiday
           and sports flags placed in the front gardens are considered decorations.
       2)  Religious decorations are restricted to the Unit Owner's front porch, back porch, or
           back patio.
       3)  The American flag may be displayed on a flag post or flagpole in accordance with the
           U.S. Flag Code. Official State of Maine and US military service flags (Air Force,
           Army, Coast Guard, Marines, Navy) may also be flown.

           The addition of a flagpole or flag post holder must be approved by the Board of
           Directors prior to installation through the Owner Request Form submitted through the
           PMSM portal and be in accordance with Rule 1. Architectural Integrity. Vinyl siding
           penetration is forbidden. Any installation must be removed prior to the sale of the unit

and the PVC trim replaced prior to the sale of the unit unless the Purchaser accepts, in writing, the responsibility of maintaining and, ultimately, replacing the flagpole or flag post holder.

4) As stated in the Gardening Guidelines: "Any flowers displayed on the front porch must be hung without penetrating vinyl siding or vinyl railings. Hanging baskets may be hung from the bottom of the PVC trim directly above the railing in accordance with Rule 1. Architectural Integrity of the Rules and Regulations. When a unit is sold, either the holes in the PVC trim must be repaired or the new Unit Owner must accept ownership and responsibility for the repair and maintenance of these holes and trim."

5) Plastic flowers and inflatables are not permitted. Decorations may not include music or sound effects of any kind.

6) Decorations and/or lighting shall not be placed on or attached to roofs, roof lines, and fences. Any damages incurred requiring repair or replacement are the responsibility of the Unit Owner.

7) No decorations may be placed anywhere in the common areas. This includes in lawns, on trees, or within rocky landscaping adjacent to end units and elsewhere except as specified in the Gardening Guidelines. Unit owners may make a request to the Gardening Committee to add seasonal planters/hanging plants or other decorations next to mailboxes, the Little Library, or the area around utility boxes with the understanding that it is to be maintained by the petitioner and requested in writing on an annual basis and must adhere to these rules and the Gardening Guidelines.

b. **Decorations: Timing**

Late Fall/Winter holiday decorations may be **displayed** no earlier than October 15 and must be **removed** no later than the following January 15. Decorations for other holidays may be **displayed** no earlier than two weeks before the holiday and must be **removed** within one week after the holiday and are subject to the guidelines above.

c. **Lighting: Types and Placement\***

Steady glowing lights are permitted only on porches, patios, and in front gardens. Lighting is to be steady glowing and not blinking, fading, falling, flickering or otherwise non-steady.

Lighting shall not be placed on or attached to roofs, roof lines, or fences. Damages incurred requiring repair or replacement are the responsibility of the Unit Owner.

Lighting should be low wattage (not more than the equivalent of 60 incandescent wattage) and are allowed to be on only between the hours of 9 AM and 10 PM, with the exception of garage and porch lights, which may be left on. String-along lights should be no larger than C7.

Steady glowing ground solar lights that edge gardens and walkways are permitted. Steady glowing low wattage lights may be used on pergolas between the hours of 9 AM and 10 PM.

Page 5 of 12

No other lights are allowed on any exterior part if the building or grounds other than the lights original to the unit, except for late fall/holiday lights and ground solar lights discussed in this rule.

d. **Lighting: Timing**
Although the Association in no way wishes to restrict unit owners from celebrating a holiday, the dates for displaying outdoor holiday lights is restricted to the late fall/winter holiday season beginning October 15 and ending no later than January 15.

No other lights are allowed at any time during the year other than the lights original to the unit except as allowed in this rule.

Fines for noncompliance shall start at $25 per day and increase to $50 per day after seven days. Potential violations of this rule will be at the sole discretion of the Board on a case-by-case basis.

\* **Note:** Suction cups are recommended for front glass doors. Siding clips are recommended for siding. Example: NACETURE Vinyl siding Hooks for Hanging (20 Pack) Siding Cups for Hanging Outdoor Decorations for Patio, Heavy Duty Outdoor Light Wreath Hangers for Fall Porch Décor Christmas Decorations https://a.co/d/fj94cAk

7. **Open Fires**
Cook grills (propane & charcoal) or propane fire pits are permitted. Open fires, chimineas, and other wood burning equipment are prohibited.

8. **Signs**
   a. Unit Owners may not display any signs, including "For Sale" and "For Rent" signs, in windows of any unit, or attached to any building, or placed in common or limited common elements. In accordance with Title 33, Chapter 31, section 1603-106 (c) a Unit Owner may display a sign in their window that supports or opposes a candidate for public office or a referendum question during the period from 6 weeks prior and one week after the date that a primary or general election or special election is held.
   b. In the event of an open house, a sign may be placed in the limited common element of the Unit Owner and additional signs directing the public to the unit for sale may be placed in the common elements. These signs cannot be put up prior to two (2) hours before the open house and must be removed immediately after the open house ends.
   c. Garage and/or Yard Sales signs are permitted only as part of a community wide event.

9. **Architectural Modifications**
   a. **Satellite Dishes**
      1) All proposed installations of satellite dishes and related apparatus must be submitted to the Property Manager. The Property Manager will consider the request, and after an appropriate review, will submit the request to the Oak Hill Condominium Board of Directors for its consideration and approval prior to installation.
      2) Satellite Dishes shall not be placed at the front nor be visible from the front of the building unless that is the only way to receive a signal.
      3) Any damage caused by the installation of the satellite mounting system must be

repaired at the Unit Owner's expense.
4) Upon the cessation of a Unit Owners' use of satellite services, the Unit Owners must immediately remove the satellite dish and return the site to its original condition.

### b. Solar Installations

1) All proposed installations of solar panels and related apparatus must be submitted to the Property Manager. All such requests must include architectural plans. The Property Manager will consider the request, and after an appropriate review, will submit the request to the Oak Hill Condominium Board of Directors for its consideration and approval prior to installation.
2) The panels must be professionally installed by persons trained to do such installations. Any damage caused by the installation of the solar panels mounting system must be repaired at the Unit Owner's expense.
3) All costs for installation, removal (either permanently or temporarily due to work on the roof), maintenance of the solar panel, and for repairs to the roof from damage caused by the solar panels, will be paid by the Unit Owner. Extra insurance costs for the solar panels must also be paid by the Unit Owner.
4) Upon the cessation of a Unit Owners' use of the solar panels, the Unit Owners must immediately remove the solar panels and return the site to its original condition.

## 10. Pets

a. Each household shall be limited to two (2) dogs unless permission from the Board of Directors is granted for more than two.
b. Animals kept by Unit Owners and guests must not interfere with the comfort, safety, or enjoyment of others. All animals allowed in front yards and streets must be leashed. Owners may train their animals to go out the back without a leash, but animals may not be left unattended.
c. It is an animal owner's responsibility to immediately pick up their animal's droppings. It is the Unit Owner's responsibility to inform any guest of these Rules and Regulations.
d. A Unit Owner shall be responsible for any damage caused by their animal, including damage to lawns, shrubbery, and any common area or element.

## 11. Trash/Recycling Disposal

All household trash and recycling will be stored inside and placed outside no earlier than the night prior to the scheduled pickup. Trash and recycling containers must be brought inside within 24 hours of pickup.

## 12. Unit Electrical and Plumbing Repairs / Modifications and Other Unit Interior Alterations

Any/all unit electrical and plumbing repairs and modifications, as well as approved unit interior alterations, shall be performed per all local and state ordinances.

In order to preserve the architectural style and uniformity of the exterior appearance of units, exterior lighting fixtures needing to be replaced must be approved by the HOA Board of Directors prior to installation.

## 13. Insurance

Unit Owners will be responsible for the deductible on the Association's Master Insurance Policy when an event takes place because of an Owner's actions or those of their guest(s) or renters.

## 14. Usage of Moving Containers and Moving Vehicles During a Move

### a. Moving Containers

With prior approval of the Board of Directors, Moving Containers, such as PODS and other temporary storage containers (collectively), may be placed on the paved portion of unit driveways or HOA-owned streets in front of the unit of those moving in or out (unless another adjacent Unit Owner has granted permission to place it in their driveway). Board approval must be obtained at least one week prior. Approval may be granted for not more than 72 hours in a 7-day period, and only during a move-in or move-out process. Moving Containers on town-owned streets must be authorized through the Town of Topsham.

The placement of Moving Containers may not interfere with the ingress and egress in the community or pose a hazard to the safe operation of vehicles within the community.

All Moving Containers must adequately protect the integrity of the paved surface with the use of lumber, mats, or other appropriate materials. Repair of damage caused by Moving Containers are at the expense of the Unit Owner that is moving in or out.

Moving Containers may not be placed upon any other Common Element, Limited Common Element, overflow parking area, or sidewalk at any time.

The Unit Owner must provide the HOA Board with the Moving Company's Certificate of Insurance and dates of when the Moving Containers will be on site. Board approval is contingent upon receipt of this information.

### b. Moving Vehicles

With prior approval of the Board of Directors, Moving Vehicles, such as moving trucks, moving vans, and other moving-related vehicles (collectively), may be parked on the paved portion of unit driveways and HOA-owned streets, as long as such parking does not interfere with ingress and egress in the community or pose a hazard to the safe operation of vehicles within the community, and for not more than 72 hours in a 7-day period, and only during a move-in or move-out process. Overnight parking on HOA-owned streets is not allowed without express permission of the Board of Directors.

Moving Vehicles may not be placed upon any other Common Element, Limited Common Element, overflow parking area, or sidewalk at any time.

Repair of damage caused by Moving Vehicles are at the expense of the Unit Owner that is moving in or out.

Requests for extension of time for parking of Moving Containers and Moving Vehicles must be made to the Board of Directors, or, if on town-owned streets, to the Town of Topsham.

**15. Monthly Condominium Fees and Late Charges**
Monthly condominium fees shall be due and payable by the FIRST of each month. On the 16th
day of the month, a $25 late fee shall be assessed against a condominium owner for every
month's condominium fee for which the owner is in arrears.

A condominium owner shall reimburse the Condominium Association for any bank charges
assessed against the Association as a result of the return of an owner's check for insufficient
funds.

**16. Rental of Units**
    a.  Owners must file a Unit Owner Leasing Registration Form with the Property Manager
before occupancy by the Renters. The Property Manager will share the form with the
Board within seven (7) business days of receipt.
    b.  No Unit Owner shall be permitted to lease or rent their unit for less than six consecutive
months, nor may any part of a unit be sublet or rented. No Unit Owner is permitted to
lease the property more than once per year.
    c.  Any lease agreement shall state that the terms of the lease are subject in all respects to the
provisions of the Declaration, Bylaws, and all Rules and Regulations adopted by the Oak
Hill Condominium Board of Directors, and that failure by the lessee to comply with the
terms of these documents shall be a default under such lease.
    d.  The Unit Owner is responsible for providing the lessee / renter with a copy of the Oak
Hill Condominium Owners Association Rules and Regulations. A copy of the lease shall
be provided to the Board of Directors within seven (7) days of execution.
    e.  The Unit Owner shall be responsible for the costs of damages and/or violations incurred
by the Unit Owner's tenant.

**17. Resident Absences From Unit**
Residents are responsible for the security and safety of their unit at all times. When residents are
away, heat must be set at a minimum of 55° Fahrenheit.

When residents are off site for durations greater than 30 consecutive days, Unit Owners must
engage a "Caretaker" for their unit or make other arrangements with the approval of the Board.

**18. Consideration for Residents**
Other than work by tradespeople, constant loud noise is prohibited inside or outside of units.
Noise from tradespeople is limited to between 8:00 AM and 6 PM.

**19. Business Activity Within Units**
Unit Owners and their permissible occupants are permitted to engage in only those particular
business activities from their units that are purely customarily incidental and subordinate to a Unit
Owner's ownership, occupation and use of his or her unit as a residence (the "Activity"), and which
satisfy the following requirements:

    a. The existence or operation of the Activity is not apparent or detectible by sight, sound,
or smell from the exterior of the unit.

b. The Activity is legal under applicable federal, state and local laws, ordinances, rules and regulations.

c. The Activity complies with all state and municipal zoning ordinances, rules, and regulations that are applicable to both the Oak Hill Condominium development and that particular Activity.

d. The Activity does not generate or result in any employees, customers, or clients visiting the unit or traveling on, parking in, or otherwise using the limited common elements and/or common elements of the Oak Hill Condominium development.

e. The Activity does not increase the insurance premium paid by the Oak Hill Condominium Owners Association or otherwise adversely affect the Association's ability to obtain and/or maintain insurance coverage.

f. The Activity does not place an undue burden on the infrastructure of any buildings or any units of the Oak Hill Condominium development.

g. The Activity is consistent with the residential character of the Oak Hill Condominium and does not constitute a nuisance or a hazardous or offensive use or threaten the security or safety of other residents of the Oak Hill Condominium.

h. The Activity does not result in a materially greater use of, or burden on, the common areas of the condominium property or the services provided by or caused to be provided by the Oak Hill Condominium Owners Association.

## VIOLATIONS, FINES, RIGHTS AND REMEDIES

Any business activities that do not satisfy the criteria set forth in the Rule shall constitute commercial activity which is prohibited by the Declaration. Any violation of the Declaration provisions prohibiting commercial activity will be determined by the Board in its sole discretion on a case-by-case basis. Such violations of the Declaration shall be addressed using the procedures set forth in Rule 21. Violations that are not resolved shall be subject to the fines and the lien rights set forth in Rule 21. Furthermore, since engaging in commercial activity is a clear violation of the Declaration, the Board may also assess a daily fine in a reasonable amount determined by the Board for each day that the violation continues, all in accordance with 33 MRS Section 1603-102(a)(11) of the Maine Condominium Act. Should the Board at its' discretion determine that the violation has not been satisfactorily resolved after ninety (90) days, the daily fines will be doubled indefinitely. In addition to the assessment of such daily fines, the Board may exercise all other available rights and remedies including, without limitation, actions to recover damages and/or injunctive relief and the enforcement of the statutory lien on the applicable unit provided by 33 MRS Section 1603-116(a) of the Maine Condominium Act as security for the payment of such daily fines.

## 20. Permitting Process

When an approval is required by the Declaration, Bylaws, or Rules and Regulations, the following procedures shall be followed:

a. The applicant shall provide to the Property Manager a letter of application describing the

Page 10 of 12

proposed actions or requested variances. The application should clearly describe the scope and schedule of the proposed action and explain the reasons and logic for choosing the submitted design. If possible, simple plans or elevation sketches should accompany the letter of application.

b. The application letter is due at least two weeks before the next regularly scheduled Board meeting. Applications submitted later than this deadline will be considered at the following regularly scheduled Board meeting.

c. When considering the application, the Board will hear verbal testimony from the applicant and from other Association members. The Board will then vote to approve or disapprove the proposed actions/variances and will forward a letter of finding to the applicant. All application determinations by the Board are final.

## 21. Problem Resolution

If possible, every effort should be made to resolve an issue between neighbors one on one. The Board understands this is not always possible. If necessary, owners should first complete the owner complaint form found on PMSM portal and submit it to the Property Manager.

Within ten (10) business days from receipt of the report, a representative of the Property Manager will contact the person(s) alleged to be in noncompliance. All attempts will be made to resolve the matter during this discussion if, in fact, non-compliance was found to exist in the opinion of the Property Manager. The results of this discussion will be communicated in writing to the person who submitted the report and to the Board of Directors.

- If a resolution cannot be agreed upon, the person found to be in noncompliance may request a hearing with the Board of Directors. Within a reasonable period of time, not to exceed 30 days after the hearing, the Board of Directors will render a decision in writing to the person in noncompliance as to whether a noncompliance was found to exist and what that person needs to do to correct the noncompliance.

- If the person does not correct the noncompliance within ten (10) business days of receiving such notification in section 20.c. above, the following process shall be followed:

  1) Unless there is an agreement between the Board and Unit Owner to extend this time, the Board will issue daily fines in the amount of $75.00 per day. Should the non-compliance continue for 90 days, daily fines will be doubled indefinitely.

Page 11 of 12

The Association shall have a lien on any unit for the fines imposed hereunder and not timely paid by the applicable unit owner, in accordance with Sections 1603-102(11) and 1603-116(a), and may record such lien in the Sagadahoc County Registry of Deeds. Repeated incidents of the same alleged non-compliance issues are to follow this same procedure as outlined in Section 21-Problem Resolution (above).

The Association shall have a lien on any unit for the fines imposed hereunder and not timely paid by the applicable unit owner, in accordance with Sections 1603-102

(11) and 1603-116(a), and may record such lien in the Sagadahoc County Registry of Deeds

Repeated incidents of the same alleged noncompliance issues are to follow this same notification procedure as outlined in section 21a above.

EXHIBIT K



# BRANN & ISAACSON
## ATTORNEYS AND COUNSELORS AT LAW

DANIEL A. NUZZI I Partner
dnuzzi@brannlaw.com

October 30, 2023

**Via Email**

Julia G. Pitney, Esq.
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, ME  04101-2480

RE:    Caroline Thibeault/Oak Hill Condominiums

Dear Julia:

As you know, my firm represents Caroline Thibeault, a resident of the Oak Hill Condominiums. I am writing in hopes that the Association's Board will reconsider its strenuous opposition to Ms. Thibeault's request to provide limited haircutting services in her home. We are happy to engage in the required dialogue to explore how Ms. Thibeault's request can be accommodated.

At the outset, I want to clarify the very limited operations my client envisions. Caroline certainly does not intend to operate a commercial, full service "beauty salon" in her home. She has no employees, nor does she intend to have any employees. She does not have or intend to have any exterior signage indicating the presence of a business. Further, she does not intend to solicit or allow "walk-ins;" instead, any clients would be by appointment only keeping to a small, controlled schedule. Moreover, Caroline would be agreeable to scheduling clients in such a way that they will not overlap with each other and no customer will be waiting during another's appointment. She would also be agreeable to limiting hours. This all is to ensure that at any given time, no more than one visitor would be at her condo, which will minimize any added traffic or presence of nonresidents in the community. Caroline would be more than willing to impose these guidelines, and other reasonable requests from the Board, in order to respect her neighbors and maintain the residential character of the Oak Hill community. It is not her desire to do otherwise.

I have reviewed the correspondence the Association Chair, Nancy Weingarten, sent me on October 15, via email. My client has also provided to me a legal memorandum prepared by

# BRANN &°ISAACSON
## ATTORNEYS AND COUNSELORS AT LAW

Julia G. Pitney, Esq.
October 30, 2023
Page 2

Drummond Woodsum (the "Drummond Memorandum"), evidently at the request of the Board, addressing whether the Board can permit her to operate a home business in her condominium.

In Ms. Weingarten's email, she stated that the decision to refuse Ms. Thibeault's request was "not a policy decision by the Board but rather a legal judgment dictated by several provisions of the Oak Hill Declaration." Ms. Weingarten further stated that the Board would not offer "a detailed explanation here" but that section 10(H) of the Declaration states that "(n)o commercial activity of any nature shall be permitted on the property."

While section 10(H) of the declaration appears to prohibit any commercial activity, as the Drummond Memorandum acknowledges, "the Declaration does not define 'commercial activity,' so we do not know the scope of the term." And as the Memorandum further acknowledges, read broadly, the restriction could reach activities such as phone calls in a unit with business clients. I suspect that all of us would agree that such an interpretation defies common sense, yet it plainly is within the literal meaning of the Declaration. The Memorandum suggests that a commonsense approach to navigate this quandary is to interpret "Commercial Activity" as not including uses that are "subordinate and incidental" to the residential use of the property. The basis for this conclusion appears to be a single case, *Shapleigh v. Shikles*, 427 A.2d 460 (Me. 1981), addressing zoning law and the distinction between accessory and principal uses.

It is not at all clear that such attenuated authority has much bearing on the interpretation of the Declaration at issue here. Indeed, as the Drummond Memorandum acknowledges, "there appears to be no case law on point which tells us with certainty whether the prohibition on 'commercial activity' set forth in the Declaration would automatically prohibit any and all business or commercial actions of a unit owner." Assuming, however, that the "subordinate and incidental" test offered in the Drummond Memorandum does apply, my client's proposed activity falls well within that test. It is our understanding that a Topsham code enforcement official has informed Caroline that the activity she proposes to do constitutes a "minor home occupation" under the Topsham Zoning Ordinance. By definition, a minor home occupation is one which is "incidental and secondary to the use of the dwelling for residential purposes." This mirrors the test proposed by the Drummond Memorandum, and therefore is entirely consistent with that permitted under the Declarations. If my client's proposed activity is "incidental and secondary,"



# BRANN & ISAACSON
## ATTORNEYS AND COUNSELORS AT LAW

Julia G. Pitney, Esq.
October 30, 2023
Page 3

under the local zoning ordinance, and that very same test is being used, as the Drummond Memorandum posits, the Board simply cannot disagree with that conclusion.[1]

Underscoring this point is the fact that we understand numerous other unit owners or occupants run businesses, or otherwise conduct commercial activity, out of their unit. These include but are not limited to, the following:

- A caterer who prepares and cooks catered meals in her home and has customers come to pick them up at her home.

- A seamstress who works on garments dropped off and picked up from clients - causing multiple trips.

- A seller of stained glass pieces who hosts prospective buyers and sells merchandise throughout the year out of their home.

It is difficult to see how the above uses are incidental and secondary, while a simple hair-cutting operation is not. The traffic burden is similar if not greater with the above uses, for example. To conclude that my client's operation crosses the line while the above do not is unjustified. Moreover, permitting my client's operation to proceed, considering its low impact in comparison to other ongoing activities permitted, certainly does not create any hardship or undue burden on the Board or the condominium generally.

While Ms. Weingarten acknowledges "Ms. Thibeault has a very challenging personal situation, one that we would like to accommodate to the extent possible," she disregards the law and gives nothing more than lip service to the desire to accommodate Caroline's needs. Indeed, she concludes, saying "That said, we have a fiduciary obligation to do what is legally required." What is legally required, however, is not to stand blindly on an overly formalistic and improper reading of the Declarations, and the Board's selective enforcement of the same, but to engage in

---

[1] The Drummond Memorandum suggests that "beauty salons" are *per se* prohibited in the zone where Oak Hill is located. Be that as it may, my client does not intend to operate a "beauty salon." That term contemplates a larger scale operation, offering multiple cosmetic services including, but not necessarily limited to, skin care, manicures and pedicures, as well as hair-related services. Moreover, the concept of a "beauty salon" connotes multiple services simultaneously, often with walk-in services, multiple rooms or stations, and multiple employees. My client offers only hair dressing, she is the only one to do it, she takes no walk-ins, and uses only a single room of her unit which she also uses for other purposes.



**BRANN & ISAACSON**
ATTORNEYS AND COUNSELORS AT LAW

Julia G. Pitney, Esq.
October 30, 2023
Page 4

the legally required interactive dialogue with our client to come up with an accommodation that we submit will present no undue burden or hardship whatsoever to the Board of the Association.

As you may not be aware, Ms. Thibeault's adult son, who lives with her, suffers from a severe disability (autism spectrum disorder and related anxiety/behavioral issues) that require routine, constant monitoring, and my client's near-constant presence with him. Working in the home with him nearby is how my client will be able to manage his care, and to carry on supporting her small family. Whatever force the Declaration has, it is subordinate to state and federal law. Following the law here does not require, and indeed does not permit, not blindly following a strained reading of the Declarations.

Both state and federal law prohibit discrimination on the basis of disability in the provision of housing, and require that providers of housing offer reasonable accommodations when requested in order to ensure that disabled residents individuals are fully able to enjoy the benefits of their residence. For example, under the Maine Human Rights Act, 5 M.R.S. § 4582-A(2), it is unlawful for any person who "manage[s] a housing accommodation" to "refuse to make reasonable accommodations in rules, policies, practices or services when those accommodations are necessary to give a person with physical or mental disability equal opportunity to use and enjoy the housing." Federal law creates a similar requirement. *See* 42 U.S.C. § 3604 *et seq.* The First Circuit has explicitly noted that purported restrictions on property use in either state or local law, or governing documents such as a master deed or declaration, cannot be used to avoid federal anti-discrimination laws and must yield to such laws. *See Astralis Condominium Ass'n v. Secretary of Housing and Urban Development*, 620 F.3d 62, 70 (1st Cir. 2010) ("To say that private agreements under a state's condominium statute are capable of trumping federal anti-discrimination law verges on the ridiculous.").

Allowing my client to cut hair from home allows her disabled son, also a resident of the Oak Hill community, to receive the care he needs and help his mother manage his disability. And allowing her to do so, as his care giver and sole provider, is more than a reasonable request under the circumstances. As noted above, other unit owners operate customer-facing businesses and my client's operation will not cause any financial or other strain on the Association's resources. While our position is that the Declaration does not prohibit her activity, if the Board sticks by its position that it does, please consider this letter a formal request that, as a disability accommodation under the Maine Human Rights Act and Fair Housing Act, the Board explicitly decline to enforce the purported ban on commercial activity as to my client. My client is ready and willing to discuss reasonable parameters and limitations on this activity with the Board, so as to reach an agreed-upon reasonable accommodation. Please note, however, that should the

# BRANN & ISAACSON
## ATTORNEYS AND COUNSELORS AT LAW

Julia G. Pitney, Esq.
October 30, 2023
Page 5

Board attempt to enforce this rule <u>without</u> a good-faith interactive process to discuss an accommodation, such an attempt would flatly violate the MHRA and FHA, exposing the Board to compensatory and punitive damage liability, as well as liability for my client's attorneys' fees.

To summarize our position: as the Drummond Memorandum acknowledges, interpreting the Declaration's restriction on commercial activity literally would have the effect of banning common and innocuous home behaviors, so a literal interpretation cannot be correct. And if the Board follows the "subordinate and incidental" rule suggested by the Drummond Memorandum, my client's proposed activity plainly meets that criteria, as confirmed by the Code Enforcement office of Topsham, which has determined that this activity is a "minor home occupation," a status which incorporates the very same test.

While my client disputes that her proposed activity violates the Declaration, she requests that if the Board continues to disagree, it decline to enforce the Declaration as it believes it is written, as a reasonable accommodation to support her son's disability care needs. She remains willing and able to discuss, in an interactive process, specific limitations that might ease the Board's concerns. And while she is hopeful that this matter can be resolved informally, without the need for litigation, she will not hesitate to enforce her and her son's rights in Court if forced to do so.

I look forward to discussing a resolution with you.

Very truly yours,

BRANN & ISAACSON

Daniel A. Nuzzi

DAN/jl



# BRANN & ISAACSON
### ATTORNEYS AND COUNSELORS AT LAW

Julia G. Pitney, Esq.
October 30, 2023
Page 5

Board attempt to enforce this rule <u>without</u> a good-faith interactive process to discuss an accommodation, such an attempt would flatly violate the MHRA and FHA, exposing the Board to compensatory and punitive damage liability, as well as liability for my client's attorneys' fees.

To summarize our position: as the Drummond Memorandum acknowledges, interpreting the Declaration's restriction on commercial activity literally would have the effect of banning common and innocuous home behaviors, so a literal interpretation cannot be correct. And if the Board follows the "subordinate and incidental" rule suggested by the Drummond Memorandum, my client's proposed activity plainly meets that criteria, as confirmed by the Code Enforcement office of Topsham, which has determined that this activity is a "minor home occupation," a status which incorporates the very same test.

While my client disputes that her proposed activity violates the Declaration, she requests that if the Board continues to disagree, it decline to enforce the Declaration as it believes it is written, as a reasonable accommodation to support her son's disability care needs. She remains willing and able to discuss, in an interactive process, specific limitations  that might ease the Board's concerns. And while she is hopeful that this matter can be resolved informally, without the need for litigation, she will not hesitate to enforce her and her son's rights in Court if forced to do so.

I look forward to discussing a resolution with you.

Very truly yours,

BRANN & ISAACSON

Daniel A. Nuzzi

DAN/jl

EXHIBIT

**OAK HILL CONDOMINIUM ASSOCIATION**
Topsham, Maine

**NOTICE OF VIOLATION**

December 4, 2023

Sent via US mail and certified mail:

Diane Marchetti
The Highlands
Box 609
Topsham, ME 04086

Sent via US mail and certified mail:

Caroline Thibeault
17 Ruby Lane #1
Topsham, ME 04086

Re: Oak Hill Condominium – Notice of Violation

Dear Diane and Caroline,

This Notice of Violation is being sent on behalf of the Oak Hill Condominium Owners Association (hereinafter the "Association") to you, Diane, as the owner of 17 Ruby Lane #1 in the Oak Hill Condominium (hereinafter the "Unit") and to you, Caroline, as the primary occupant of the Unit.

As you are both aware, all unit owners are subject to the provisions, conditions, limitations, prohibitions and restrictions set forth in the Declaration of Condominium dated October 24, 2012 and recorded in the Sagadahoc County Registry of Deeds in Book 3439, Page 278 (hereinafter, the "Declaration"). Specifically, Section 10 of the Declaration makes it clear that "[e]ach unit owner is required to comply strictly with the covenants, conditions and restrictions of the Declaration". Furthermore, Section 13 of the Declaration indicates that a unit owner who accepts a deed to the unit takes subject to, and is bound by, all covenants and restrictions set forth in the Declaration.

The Association has reason to believe that Caroline continues to operate a commercial hair studio or hair dressing business within the Unit (the "Business") in direct violation of (1) Section 10A of the Declaration which provides that "[n]o unit shall be used for other than residential purposes" and (2) Section 10(H) of the Declaration, which states that [n]o commercial activity of any nature shall be permitted on the Property.

We have previously notified both of you that Caroline's business operations in the Unit violate the Declaration. Specifically, the Board informed Caroline on August 11, 2023 about complaints from other unit owners; requested additional information from Caroline about her activities within the unit via e-mail on August 17, 2023 (to which Caroline did not respond); notified Diane in writing on August 19, 2023 about the commercial activities occurring in the unit and the resulting violations of the Declaration; held a public meeting on September 17, 2023 to discuss the issues and to give you and community members a forum to communicate thoughts and suggestions regarding the issue; and met again with Caroline and her community advocate on October 10, 2023 to discuss various possible options for ceasing the Declaration violations and amicably resolving this matter.

We also understand that Caroline is operating her Business in the Unit without the applicable license required under State law, which makes the Business illegal (in addition to being in violation of additional, separate provisions of the Declaration and Rules). We are therefore sending both of you this written Notice of Violation in accordance with Rule 21(d)(1). Both of you are hereby notified that you are in violation of the various provisions of the Declaration referenced above and that you have five (5) business days, namely, until **December 11, 2023**, to cure the violations by ceasing all operations of the Business in the Unit.

If the Business or other commercial operations continue in the Unit beyond **December 11, 2023**, the Association will exercise all of its available rights and remedies including the imposition of a daily monetary fine in the amount of $75 per day of continued violation, as permitted in Rule 19, and the enforcement of payment for said fines by a statutory lien on the Unit, as provided in 33 M.R.S. §1603-116(a).

Very truly yours,

Nancy Weingarten,
President of the Board of the Oak Hill Condominium Association

cc: Dan Nuzzi, Esq. via email

EXHIBIT

M

| | |
|---|---|
| **From:** | "hankschwartz38@gmail.com" <hankschwartz38@gmail.com> |
| **Sent:** | Sun 1/14/2024 4:34 PM |
| **To:** | "PFR, OPORcomplaints" <OPORcomplaints.PFR@maine.gov> |
| **CC:** | "Lugner, Marilyn A" <Marilyn.A.Lugner@maine.gov> |
| **Subject:** | Professional Licensing Complaint email - check to see if this is your complaint |

EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.

1) Please check to see if this is your complaint.
2) They may need to be contacted and asked to fill out
   the correct form. (i.e. Manufactured Housing)

*************************************************************
Licensing Board: Cosmetologists

Date: Sun Jan 14 16:34:45 2024

Licensee Information:

Ms. caroline Thibeault
17 Ruby Lane
Topsham, ME 04086

Phone: 207-751-9120

License number: CO10833

---

Complaint text: My wife and I live in a condo on Ruby Lane, Topsham,Maine. We are disappointed in an ongoing situation on our street which is against the rules of our Condo Association and not exceptable. The daughter of an owner of a condo on our street has set up, and is running a private hair salon business in said condo. Everyone in this condo community has signed (when we bought our unit) an ageeement that no business is allowed in any condo unit. We have car after car driving down our private street to her business, cars parking in our overflow lots and parking in an area not designated as a parking area. She did not close her business during the lockdown during the horrible time of the Lewiston shooting spree. Even the food markets were closed for three days but not the hair salon. As an association we are paying a lawyer to try to this situation, but it seems to be a long term situation with mounting expenses that could unnecessarily cause all our insurance rates to
increase. This situation could and is compromising our investments in the peaceful community in which we formally lived. Plus several of the condos on our street experienced vandalism (reported to the police) a few weeks after the home business was started. All affected were identified as against the business. By whom we don't know.
We want the business to stop.(please) Thank you for any help you can give us in this matter. .....Henry Schwartz and Judith Redwine (my wife)

---

Complainant:
Mr Henry F Schwartz
1 Ruby Lane
Topsham, ME 04086

United States

Daytime phone: 207-721-8477
Evening phone: 207-721-8377
Fax:

Email: hankschwartz38@gmail.com

**From:**       "leonep.umd@gmail.com" <leonep.umd@gmail.com>
**Sent:**       Wed 12/20/2023 12:50 PM
**To:**         "PFR, OPORcomplaints" <OPORcomplaints.PFR@maine.gov>
**CC:**         "Lugner, Marilyn A" <Marilyn.A.Lugner@maine.gov>
**Subject:**    Professional Licensing Complaint email - check to see if this is your complaint

EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.

1) Please check to see if this is your complaint.
2) They may need to be contacted and asked to fill out
   the correct form. (i.e. Manufactured Housing)

**************************************************************

Licensing Board: Cosmetologists

Date: Wed Dec 20 12:50:17 2023

Licensee Information:

Ms. Caroline Thibeault
17 Ruby Lane
Topsham, ME  04086

Phone:

License number: CO10833

---

Complaint text: I would like to lodge a complaint against the operator of a hair salon in my residential community and would like the bureau to review the application and operation that was recently approved.
My wife and I purchased a condominium in Topsham in June 2023 and moved into 39 Tourmaline Dr., Topsham, 04086 in August 2023. Prior to our move and when considering purchasing the condo, we were apprised of the rules and covenants governing the Oak Hill Condominium Association – the community to which we moved. We were aware of the prohibition against operating a commercial establishment in our condo and we agreed implicitly to abide by the condominium association rules, by-laws, and regulations.
Caroline Thibeault, a licensed cosmetologist (license # CO10833) is a tenant of the condominium unit at 17 Ruby Lane, Topsham, Maine. She is also the daughter of the owner of the unit at 17 Ruby Lane. Earlier this year, she asked the board of directors of the Oak Hill Condominium Owners Association to allow her to operate a hair salon at the 17 Ruby Lane location. The board of directors carefully reviewed this request and had its attorneys research the covenants, by-laws, and rules & regulations of the association to see if such a commercial activity was allowable in the Oak Hill community. After a thorough process researching and discussing the request with the homeowners' lawyers it was determined that the Hair Salon was not an allowable use in the association.
Although she was denied a permit, Caroline Thibeault opened a hair salon and has been operating a commercial business out of the 17 Ruby Lane location for several months. In fact, she recently received a license from the bureau of licensure to operate out of the 17 Ruby Lane address. The bureau of licensure needs to be aware of this activity and the fact that a commercial activity is being operated against the decision of the association's board of directors and against most of the wishes of the community. The community also is curious how this license could be awarded to a condominium that has so many limitations and interferes with the adjacent units.
The operation of a hair salon in a residential community that has covenants, by-laws, rules, and regulations against operating a commercial business in the community raises several questions. Does this unit meet the requirements for a license to operate out of one's home as described in the rules and regulations for cosmetologists? Please investigate the application submitted for this license and the operation of this hair salon and determine whether or not it complies with licensing requirements.

Complainant:
Mr Peter  Leone
39 TOURMALINE DR
TOPSHAM ME 04086

United States

**From:** "Tmhews@yahoo.com" <Tmhews@yahoo.com>
**Sent:** Wed 12/27/2023 10:54 AM
**To:** "PFR, OPORcomplaints" <OPORcomplaints.PFR@maine.gov>
**CC:** "Lugner, Marilyn A" <Marilyn.A.Lugner@maine.gov>
**Subject:** Professional Licensing Complaint email - check to see if this is your complaint

EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.

1) Please check to see if this is your complaint.
2) They may need to be contacted and asked to fill out the correct form. (i.e. Manufactured Housing)

*************************************************************

Licensing Board: Cosmetologists

Date: Wed Dec 27 10:54:51 2023

Licensee Information:

Ms. Caroline Thibeault
17 Ruby Lane
Topsham, ME 04086

Phone: 207-751-9120

License number: CO10833

---

Complaint text: To whom it may concern,

Please consider this as a complaint against the operator of the license referenced below and a request to the bureau for further review.â€☐

Caroline Thibeault, a licensed cosmetologist, license # CO10833 and tenant of the condominium unit at 17 Ruby Lane, Topsham, Maine and daughter of the owner of the unit at 17 Ruby Lane asked the board of directors of the Oak Hill Condominium Owners Association of Topsham, Maine to allow her to operate a hair salon at the 17 Ruby Lane location. The board of directors took a very open process and researched the covenants, by-laws, and rules & regulations of the association to see if such a commercial activity was allowable in the residential community. After a very long and thorough process researching and discussing the request with the homeowners lawyers it was determined that the Hair Salon was not an allowable use in the association.

Regardless of the denial of a permit, Caroline Thibeault opened a hair salon and has been operating a commercial business out of the 17 Ruby Lane location. In fact, she recently received a license from the bureau of licensure to operate out of the 17 Ruby Lane address. The bureau of licensure needs to be aware of the activity and the fact that a commercial activity is being operated against the decision of the association's board of directors and against most of the wishes of the community. The community also is curious how this license could be awarded to a condominium that has so many limitations and interferes with the adjacent units. Does this unit meet the requirements for a license to operate out of one's home as described in the rules and regulations for cosmetologists? These are important questions that need discovery.

Complainant:
Mr Todd Hews
7 Ruby Lane
Topsham, ME 04086

United States

Daytime phone: 207-242-2926
Evening phone: 207-242-2926
Fax:

Email: Tmhews@yahoo.com

**From:** "rolandguerette@gmail.com" <rolandguerette@gmail.com>
**Sent:** Thu 1/18/2024 5:45 PM
**To:** "PFR, OPORcomplaints" <OPORcomplaints.PFR@maine.gov>
**CC:** "Lugner, Marilyn A" <Marilyn.A.Lugner@maine.gov>
**Subject:** Professional Licensing Complaint email - check to see if this is your complaint

EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.

1) Please check to see if this is your complaint.
2) They may need to be contacted and asked to fill out
   the correct form. (i.e. Manufactured Housing)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Licensing Board: Barbers

Date: Thu Jan 18 17:45:47 2024

Licensee Information:

Ms. Caroline Thibeault
17 Ruby Lane
Topsham, ME 04086

Phone: 207-751-9520

License number: CO10833

---

Complaint text: In 2023, Ms. Thibeault transitioned from working in a
busy commercial hair salon in Brunswick, ME to a home based salon in her condo in Topsham. I have noticed an ever increasing number of clients driving into our neighborhood on an almost daily basis. I assume she is working full time and she has stated as much. I am concerned about the safety of our neighborhood residents, many of whom are elderly. I would expect that home based professional service businesses must meet certain safety requirements for the benefit of their clients, e.g. separate egress, bathroom facilities, dedicated parking etc. Her condo has not been modified from the time it was solely a residence, nor is there parking. Noting that she has violated licensing requirements in the past (public information on Maine.gov), I am concerned that she is not in compliance with Maine regulations and would hope the appropriate state agency would investigate.

---

Complainant:
Mr Roland Guerette
33 Beryl Loop
Topsham, ME 04086

United States

Daytime phone: 207-274-4812
Evening phone:
Fax:

Email: rolandguerette@gmail.com

From:        "anita.jean1@icloud.com" <anita.jean1@icloud.com>
Sent:        Thu 12/14/2023 3:09 PM
To:        "PFR, OPORcomplaints" <OPORcomplaints.PFR@maine.gov>
CC:        "Lugner, Marilyn A" <Marilyn.A.Lugner@maine.gov>
Subject:        Professional Licensing Complaint email - check to see if this is your complaint

EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.

1) Please check to see if this is your complaint.
2) They may need to be contacted and asked to fill out
   the correct form. (i.e. Manufactured Housing)

*****************************************************************

Licensing Board: Board Unknown

Date: Thu Dec 14 15:09:20 2023

Licensee Information:

Caroline M Thibeault
17 Ruby Ln
Topsham, ME 04086

Phone: 207-751-9120

License number: Barber cosmetology

---

Complaint text: My neighbor Caroline Thibeault asked the Oak Hill Condominium Board for permission to open her hair studio. During the July 19 meeting the board voted unanimously 5 to 0 that she could not open her hair studio in accordance to the Association rules of no commercial business allowed.
Approximately 10 days later she decided that she would open no matter what the board ruled.
She has no public entrance as the customers come in the front door in her living room and in the dining room and finally in her sunroom which her studio is located. She does say that the customers go around the side of the condo to go in the sliding door of the sunroom. That is not a main entrance and has no walkway from the front of the condo to that sunroom entrance.
Caroline seems to think that if she only has one customer at a time that does not constitute a commercial business.
She has 4 to 5 customers a day times four days a week.
The other problem has to do with having the shared driveway. It's happened that a customer has parked in her neighbors driveway. It's a condo that one garage belongs to her condo and the other garage (side by side belongs to the inside condo and she wants them to park in her driveway. So this is a shared driveway between two different condos. Unfortunately, there are times that a customer comes in with a large pick up truck and if her car is already in the driveway, they park at the end of the dead end street, which the inside condo owner has a problem backing out of her own driveway. This should not be tolerated in a condo environment.
In closing I will tell you that this case is being handled by attorneys at this point.

---

Complainant:
Mrs Anita J Jean
11 Ruby Ln
Topsham, ME 04086

United States

Daytime phone: 207-7294111
Evening phone: 207-729-4111
Fax:

Email: anita.jean1@icloud.com

From: amary@gwi.net" <amary@gwi.net>
Sent: Sun 12/17/2023 6:21 PM
To: "PFR, OPORcomplaints" <OPORcomplaints.PFR@maine.gov>
CC: "Lugner, Marilyn A" <Marilyn.A.Lugner@maine.gov>
Subject: Professional Licensing Complaint email - check to see if this is your complaint

EXTERNAL: This email originated from outside of the State of Maine Mail System. Do not click links or open attachments unless you recognize the sender and know the content is safe.

1) Please check to see if this is your complaint.
2) They may need to be contacted and asked to fill out
   the correct form. (i.e. Manufactured Housing)

**************************************************************
Licensing Board: Cosmetologists

Date: Sun Dec 17 18:21:03 2023

Licensee Information:

Ms. Caroline Thibeault
17 Ruby Lane
Tops;ham, ME 04086

Phone: 207-751-9120

License number: CO10833

Complaint text:    At the June 21st, 2023, Board of Directors meeting of the Oak Hill Condominium Owners Association the residents were notified that the Board had very recently received from the above licensee an application to operate a hair salon within the unit, owned by her mother, she was occupying at 17 Ruby Lane. Due to the late arrival of the application, the Board tabled a decision on the application to the next Board meeting in July, 2023, to allow further examination of the request.
     After a thorough review of the Oak Hill Condominium Declaration and By Laws, consultation with our insurance agent and on the advice of legal counsel, the decision of the Board that the operation of a hair salon was not a permitted business within the Association was presented to the licensee and the residents at the July 19th, 2023, board meeting. In spite of this denial of the application, the licensee continued to operate the hair salon. The associated increase in vehicle traffic on our dead end street disrupted our once quiet neighborhood and frequently resulted in customer vehicles blocking other residents driveway access and strangers knocking on our doors looking for the hair salon.
     At the October 18th, 2023, board meeting, the Board announced to the residents that, in view of the fact that the licensee had continued to operate the hair salon in violation of the Board's decision, a daily fine of $75.00 would be assessed for as long as operation of the hair salon continued.
     As of this date, we continue to be subjected to wayward customers and increased vehicle traffic caused by the business. The situation will only deteriorate with the advent of winter weather and the necessity to have unimpeded access to the road and driveways for snow removal. Litigation has already cost all the residents thousands of dollars and the situation has remained unchanged. We would appreciate your revocation of this license to operate a hair salon within our Association.
     Thank you for your consideration in this matter.

Complainant:
Mr Arthur & Charlotte  Mary
5 Ruby Ln.
Topsham, ME 04086

United States

Daytime phone: 2077211053
Evening phone: 2077211053
Fax:

Email: amary@gwi.net

**Exhibit N**



# DrummondWoodsum

**ATTORNEYS AT LAW**

**Julia G. Pitney**
Admitted in ME

207.253.0549
jpitney@dwmlaw.com

84 Marginal Way, Suite 600
Portland, Maine 04101-2480
207.772.1941  Main
207.772.3627  Fax

*Via Email Only*
January 12, 2024

Daniel A. Nuzzi
Brann & Isaacson
136 Commercial Street, Suite 402
Portland, ME 04101
dnuzzi@brannlaw.com

RE:    Caroline Thibeault/Oak Hill Condominium

Dear Dan,

I am in receipt of your correspondence dated January 5, 2023. You have made a request for an accommodation on behalf of Ms. Thibeault and asserted that she is being discriminated against in violation of Maine and Federal housing laws.

Regarding the request for reasonable accommodation: in your correspondence, you have requested on behalf of Ms. Thibeault, that the Oak Hill Condominium Association ("Association") "grant her an exception to 10(A) and (H) of the Association's Declaration ("Declaration"), as a reasonable accommodation, so that she may provide limited haircutting services in her home." For the reasons I will detail herein, the Association denies this request.

The Maine Human Rights Act ("MHRA") makes it unlawful for any owner, lessee, sublessee, managing agent or other person having the right to sell, rent, lease or manage a housing accommodation or any of their agents to refuse to make reasonable accommodations in rules, policies, practices or services when those accommodations are necessary to give a person with physical or mental disability equal opportunity to use and enjoy the housing 5 M.R.S. §4582-A(2) (federal housing laws track similarly, *see* 42 U.S.C.A. § 3604).

To establish a prima-facie case of failure to accommodate in a context of housing discrimination, the individual requesting the accommodation ("Complainant") must demonstrate that she has a physical or mental disability as defined by the MHRA; that the Housing agent knew or reasonably should have known of Complainant's disability; Complainant requested a particular accommodation; the requested accommodation is necessary to afford Complainant an equal opportunity to use and enjoy the housing; the requested accommodation is reasonable on its face, meaning it is both efficacious and proportional to the costs to implement it; and respondent refused to make the quested accommodation. *See* 5 MRS §4582-A(2); *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*, 620 F.3d 62, 67 (1st Cir. 2010). If the Complainant makes this showing Respondent can defeat the claim by showing that the proposed accommodation was unreasonable, meaning it imposes undue financial or administrative burdens or requires a fundamental alternation in the nature of the program. *See Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002).

January 12, 2024
Page 2

First, there is no suggestion in your correspondence or otherwise communicated to the Association that Ms. Thibeault is an individual with a physical or mental disability. Likewise, there is no allegation that granting Ms. Thibeault's request would afford her an equal opportunity to use/enjoy her housing that she is currently not receiving on account of a disability that she has. Even if Ms. Thibeault could somehow hurdle the first prongs of the analysis, the requested accommodation is not reasonable on its face because to grant it would require a fundamental alteration to the nature of the housing, i.e., it would necessitate a change to the fundamental nature of the housing which is currently residential only by allowing for a commercial use, which is expressly prohibited in the Association's Declaration and rules.

The Association denies the allegation that it is permitting other residents to use their units for commercial purposes akin to the use that Ms. Thibeault is requesting she be allowed to continue and that she is therefore being treated disparately. Indeed, Ms. Thibeault's request goes far beyond an occasional non-residential use of one's unit; rather, she is requesting permission to continue the operation of a licensed "level 1 establishment" for providing hair salon services out of her home. This is an outward facing business that maintains set and regular business hours with multiple business invitees coming in and out of her unit on a regular basis. As the business which Ms. Thibeault is conducting is subject to state licensure, accordingly, it has numerous specific requirements for continued lawful operation which would require significant changes to the residential character of her unit in order to comply with those licensure requirements; those changes include but are not limited to: a separate entrance (see Maine Department of Professional and Financial Regulation Office of Professional and Occupational Regulation - Barbering and Cosmetology Licensing Program regulation 26.136), exterior signage (26.171), and a public restroom that is directly accessible from the establishment without entering the living quarters (26.021). You have provided a copy of Ms. Thibeault's establishment license but no evidence of how she has satisfied the aforementioned requirements for lawful operation of a Level 1 establishment. Neither Ms. Thibeault nor the owner of the unit have sought permission from the Association to make major physical changes to the unit in which Ms. Thibeault resides and/or whether the State licensing board has completed the requisite inspection of the establishment yet and either found it in compliance with the Level 1 Establishment laws and regulations as is or provided any sort of permission to deviate from the State's promulgated requirements for lawful operation.

In addition, Ms. Thibeault's operation of a hair salon creates significant liability exposure for the Association (and, for that matter, the owner of the unit). You indicated that she has obtained business insurance but have not provided evidence of how that insurance would protect or indemnify the Association from claims brought by her business invitees.

In short, even if Ms. Thibeault were able to meet the initial requirements necessary to shift the burden to the Association to demonstrate that the requested accommodation was not reasonable (and to be clear, I do not see how she has), there is no scenario in which an administrative agency or court would determine that the accommodation she seeks is "reasonable" in light of the reasons I've outlined above.

In response to the argument that denying Ms. Thibeault's request to operate a hair salon in the residential condominium unit she rents equates to discrimination against her based on her

January 12, 2024
Page 3

familial status or her association with her adult son who suffers from disabilities: you asserted that other unit owners are being allowed by the Association to run a catering business, run a tailoring business, and a stained glass business from their units and that the Association's allowing these businesses to operate and not Ms. Thibeault's "apparently stems from her association with her adult son who suffers from disabilities, as well as her familial status." As a preliminary matter, and in response to this allegation, the Association Board has inquired of the individuals they believe you are implicating and have been told that none of these individuals are operating any such business from their units, nor has any one sought the Association's approval to run such a business from their unit.

More importantly, notably missing from your correspondence is any argument or evidence that action taken by the Association in enforcing its explicit rules prohibiting the commercial use of a residential condo unit (much less the operation of an established, outward facing, hair salon), or the treatment of Ms. Thibeault versus that of any other owner in the Association has been *because of* or in any way related to the fact that Ms. Thibeault has a son or that Ms. Thibeault is associated with her adult son who has disabilities. Indeed, you stated that she cannot be denied privileges *due to* her familial status and association with adult son and certainly, she has not been. As you note, housing practices are discriminatory when they are "because of the protected class status of an owner, tenant, or a person associated with them." Here, there is no allegation or factual basis to conclude that the Association has taken any adverse action because of Ms. Thibeault's familial status or because of her association with her son. And that is because it does not exist. Rather, after extensive discussion with Ms. Thibeault on multiple occasions over the last few months, the Association has determined that Ms. Thibeault's operation of a hair salon in the residential condo unit she rents is an unequivocal and significant violation of the Association's Declaration and Rules.

Absent a revision to the Declaration by unanimous vote of the owners that would allow Ms. Thibeault to operate her salon in the residential unit she rents, the continued operation of the hair salon constitutes a violation of the Association Declaration and Rules and a fine has been and will continue to be imposed on the owner of the unit until such time that the violation stops.

Sincerely,

*Julia G. Pitney*

Julia G. Pitney

cc: Board Members, Oak Hill Condominium Homeowners Association (via email only)



11:53

Photo ∨                    Done

**RG**  From: roland guerette ⟩
To: ⭐ Paula ⟩
Today, 6:26AM

# Re: Special Assessment

Sent from my iPhone

On Jan 18, 2024, at 10:08 PM, P J <jp...@...com> wrote:

Hi Roland,

May I ask why you resent Margaret's Board email out to the entire community again? Maybe you weren't aware she sendt it to all of us earlier



**EXHIBIT**

$\rho$

| | |
|---|---|
| **STATE OF MAINE** | **MAINE SUPERIOR COURT** |
| **SAGADAHOC, SS** | **LOCATION: WEST BATH** |
| | **DOCKET NO:** |

**OAK HILL CONDOMINIUMS,**

      **Plaintiff**

v.                                                 **COMPLAINT FOR**
                                                 **FORECLOSURE AND SALE**

**DIANE MARCHETTI,**

      **Defendant**                              **TITLE TO REAL ESTATE IS INVOLVED**

<u>**17 Ruby Lane-Unit 1, Topsham, Sagadahoc County, Maine**</u>
<u>**Declaration of Condominium Recorded in the**</u>
<u>**Sagadahoc County Registry of Deeds at Book 3439 Page 278**</u>

      **NOW COMES** the Plaintiff Oak Hill Condominiums, by and through its attorney, and complains against the Defendant as follows:

## PARTIES

    1.      Plaintiff is a Condominium unit owners association established pursuant to 33 M.R.S.A., Chapter 31, for owners of all units within Oak Hill Condominiums, and, further, is a Maine non-profit corporation, with a principal place of business in Topsham, in the County of Sagadahoc, and the State of Maine.

    2.      Defendant is the record owner of Unit 1 in Oak Hill Condominiums in Topsham, Maine, by virtue of a Deed of Sale by Personal Representative (Testate) from Wendy M. DesAutels, Personal Representative of the Estate Martha S. Meacham (Testate), dated September 30, 2019, and recorded in the Sagadahoc County Registry of Deeds at Book 2019R, Page 06725.

## FACTS

    3.      All units in Oak Hill Condominiums, including said Unit 1, were conveyed subject to the terms, conditions, and restrictions contained and described in the Declaration of Oak Hill Condominiums, dated October 24, 2012, and recorded in the Sagadahoc County Registry of Deeds at Book 3439, Page 278, which Declaration provides for the payment of certain fees, charges, and

assessment by owners of units in the Oak Hill Condominiums.

4.      This is an action for foreclosure and sale concerning real estate located in Topsham, County of Sagadahoc, and State of Maine, and more particularly described in the legal description in the above-referenced Deed recorded in said Registry of Deeds at Book 2019R, Page 06725.

5.      In accordance with 33 M.R.S.A. §1603-116, the Plaintiff has a statutory lien for all common charges and assessments, Rule Violation Fines, and penalties against such unit, which may be foreclosed in a like manner as a mortgage on real estate.

6.      Defendant is presently in default, having failed to make payment of common charges and assessments, Rule Violation Fines, and legal fees due under the Declaration. As a result, thereof, Defendant has breached a condition of the Declaration of Oak Hill Condominiums.

7.      In addition to sending periodic statements of account to the Defendant, on or about November 22, 2024, the Plaintiff caused formal notice of such default and demand for payment to be sent to the Defendant by certified mail-return receipt requested, with a copy by first class mail.

8.      The Defendant failed to respond to the notice of default and demand for payment of said common charges and assessments and Rule Violation Fines and has failed to cease use of the unit contrary to the Declaration and Bylaws and so to cure said default.

9.      Section 10 of the Declaration makes it clear that "[e]ach unit owner is required to comply strictly with the covenants, conditions and restrictions of the Declaration".

10.     Section 13 of the Declaration indicates that a unit owner who accepts a deed to the unit takes it subject to, and is bound by, all covenants and restrictions set forth in the Declaration.

11.     Defendant continues to operate, or allow to operate, a commercial hair studio or hair dressing business (hereinafter "the business") within the unit in direct violation of (1) Section 10(A) of the Declaration which provides that "[n]o unit shall be used for other than residential purposes" and (2) Section 10(H) of the Declaration, which states that "[n]o commercial activity of any nature shall be permitted on the Property.

12.     Defendant has violated Rule 19 of the Oak Hill Condominium Owners Association - Rules and Regulations, which Rule 19 provides as follows:

## 19.    Business Activity Within Units

Unit Owners and their permissible occupants are permitted to engage in only those particular business activities from their units that are purely customarily incidental and subordinate to a Unit Owner's ownership, occupation and use of his or her unit as a residence (the "Activity"), and which satisfy the following requirements:

a. The existence or operation of the Activity is not apparent or detectible by sight, sound, or smell from the exterior of the unit.

b. The Activity is legal under applicable federal, state and local laws, ordinances, rules and regulations.

c. The Activity complies with all state and municipal zoning ordinances, rules, and regulations that are applicable to both the Oak Hill Condominium development and that particular Activity.

d. The Activity does not generate or result in any employees, customers, or clients visiting the unit or traveling on, parking in, or otherwise using the limited common elements and/or common elements of the Oak Hill Condominium development.

e. The Activity does not increase the insurance premium paid by the Oak Hill Condominium Owners Association or otherwise adversely affect the Association's ability to obtain and/or maintain insurance coverage.

f. The Activity does not place an undue burden on the infrastructure of any buildings or any units of the Oak Hill Condominium development.

g. The Activity is consistent with the residential character of the Oak Hill Condominium and does not constitute a nuisance or a hazardous or offensive use or threaten the security or safety of other residents of the Oak Hill Condominium.

h. The Activity does not result in a materially greater use of, or burden on, the common areas of the condominium property or the services provided by or caused to be provided by the Oak Hill Condominium Owners Association.

## VIOLATIONS, FINES, RIGHTS AND REMEDIES

Any business activities that do not satisfy the criteria set forth in the Rule shall constitute commercial activity which is prohibited by the Declaration. Any violation of the Declaration provisions prohibiting commercial activity will be determined by the Board in its sole discretion on a case-by-case basis. Such violations of the Declaration shall be addressed using the procedures set forth in Rule 21. Violations that are not resolved shall be subject to the fines and the lien rights set forth in Rule 21. Furthermore, since engaging in commercial activity is a clear violation of the Declaration, the Board may also assess a daily fine in a reasonable amount determined by the Board for each day that the violation continues, all in accordance with 33 MRS Section 1603-102(a)(11) of the Maine Condominium Act. In addition to the assessment of such daily fines, the Board may exercise all other available rights and remedies including, without limitation, actions to recover damages and/or injunctive relief and the enforcement of the statutory lien on the applicable unit provided by 33 MRS Section 1603-116(a) of the Maine Condominium

Act as security for the payment of such daily fines.

13.   Defendant has violated Rule 16(c) which provides as follows:

**16.    Rental of Units**

"c. Any lease agreement shall state that the terms of the lease are subject in all respects to the provisions of the Declaration, Bylaws, and all Rules and Regulations adopted by the Oak Hill Condominium Board of Directors, and that failure by the lessee to comply with the terms of these documents shall be a default under such lease."

14.   Defendant has violated Rule 16(e) which provides as follows:

**16.    Rental of Units**

"e. The Unit Owner shall be responsible for the costs of damages and/or violations incurred by the Unit Owner's tenant."

15.   Defendant does not occupy the property as her primary residence, but instead resides at The Highlands in Topsham, Sagadahoc County, Maine. Instead, her daughter occupies the unit and, on information and belief, her daughter operates the commercial business therein.

16.   As of the November 22, 2024, demand letter, the Defendant owed Plaintiff the sum of $54,413.62 for common charges and assessments, Rule Violation Fines, and fees and costs of collection to date in accordance with the Declaration and Bylaws of Oak Hill Condominiums.

17.   In addition to the outstanding common charges, assessments, rule violation fines, and collection costs set forth above, in accordance with section 11(B) of the Declaration and article VI, section 6 of the Bylaws of Oak Hill Condominiums, the Plaintiff claims a lien against the property of the Defendant for its reasonable attorney's fees and costs, together with all common fees, assessments, and rule violation fines which are now due and payable or may become due and payable subsequent to the date hereof.

18.   By virtue of Defendant's failure to pay the common charges, assessments, and Rule Violation Fines, and failure to cease use of the unit, or allow the occupant to use the unit, contrary to the Declaration and Bylaws, and cure the default, as aforesaid, the Plaintiff hereby demands a foreclosure of said real estate.

**WHEREFORE,** the Plaintiff prays that this Honorable Court:

a) determine that there has been a default by Defendant in the non-payment of common charges, assessments, and rule violation fines, as well as continued use of the unit contrary to the Declaration and Bylaws;

b) determine the amount due on said assessments, including reasonable attorney's fees, and court costs, together with the amount due for additional common charges, assessments, and rule violation fines accruing since the date of the last assessment;

c) determine the order of priority of such other parties as may appear, together with the amounts due such parties, if any;

d) issue a judgment of foreclosure and sale in conformity with 33 M.R.S.A., Section 1603-116, and 14 M.R.S.A., Section 6322; and

e) Order exclusive possession of the real estate to Plaintiff upon the expiration of the statutory ninety (90) day period of redemption and direct the clerk to issue a Writ of Possession at the request of Plaintiff; and

f) Grant such other and further relief as this Court may deem just and proper.

Dated at Portsmouth, New Hampshire, January 22, 2025.

Respectfully submitted,
Oak Hill Condominiums,
By its Attorneys,
FLAGG LAW, PLLC

By: _____

Jonathan M. Flagg, Esq.
MAINE BAR NO. 3766

93 Middle Street
Portsmouth, NH 03801
(603) 766-6300
jflagg@flagglawfirm.com

STATE OF MAINE                          MAINE SUPERIOR COURT
SAGADAHOC, SS                           LOCATION: WEST BATH
                                        DOCKET NO:

OAK HILL CONDOMINIUMS

        Plaintiff

v.                                      CLERK'S CERTIFICATE OF
                                        FORECLOSURE AND SALE

DIANE MARCHETTI

        Defendant                   TITLE TO REAL ESTATE IS INVOLVED

**17 Ruby Lane-Unit 1, Topsham, Sagadahoc County, Maine**
**Declaration of Condominium Recorded in the**
**Sagadahoc County Registry of Deeds at Book 3439 Page 278**

Pursuant to 14 M.R.S.A 6321, I, _____, Deputy Clerk of Sagadahoc County Superior Court located in West Bath, Maine, do hereby certify that a civil action seeking a judgment of foreclosure and sale has been commenced in this Court, relative to which the following information pertains:

1.    The names of the parties are as set forth above on this certificate.

2.    The Complaint for Foreclosure and Sale is dated January 22, 2025, and was filed in this Court on _____, 2025.

3.    According to the Complaint, the real estate affected by said action is the same as that described in a Deed of Sale by Personal Representative (Testate), dated September 30, 2019, and recorded in the Sagadahoc County Registry of Deeds at Book 2019R, Page 06725.

4.    The real estate subject to the within action is located at 17 Ruby Lane-Unit #1, Topsham, Sagadahoc County, State of Maine, and is described as follows:

A unit known and designated as Unit 1, in Oak Hill Condominiums, located in the Town of Topsham, County of Sagadahoc and State of Maine, as shown on a Condominium Plat of Oak Hill Condominiums, prepared by Sebago Technics and recorded in the Sagadahoc County Registry of Deeds in Plan Book 48, Page 69 and accompanying Diagrammatic Floor Plans prepared by Joy & Hamilton Architects, Inc., recorded in said Registry of Deeds in Plan Book 48, Pages 70-74, inclusive, and specific reference is made to the Declaration of Oak Hill Condominiums created pursuant to the Maine Condominium Act of the Maine Revised Statutes, as amended, Title 33, Section 1601-101, et seq., which Declaration is dated October 24, 2012, and recorded in said Registry of Deeds in Boo 3439, Page 278, as it may be amended from time to time, to which reference is hereby made and the same is incorporated by reference herein (hereinafter called the "Declaration").

Said unit is conveyed TOGETHER WITH:

1)    The allocated interest in the common areas and facilities of the condominium described in the Declaration attributable to the unit as stated in Appendix II of the Declaration, as amended;

2)    An exclusive right to use the limited common areas appurtenant to the unit as specified in the Declaration, and shown on said Condominium Plat and Diagrammatic Floor Plans;

3)    An easement in common with the owners of other units to use any pipes, wires, ducts, flues, cables, conduits, sewer, water and other public utility lines, driveway and recreation areas, and other common areas and open space, and facilities located in any of the other units or elsewhere on the property and serving the unit;

4)    All rights and easements in common with other units' owners as described in the Declaration, including the description of property attached as Appendix I to the Declaration;

5)    All fixtures of any kind now placed, in or on said unit.

Said unit is conveyed SUBJECT TO:

1)    An easement in favor of the other units to use the pipes, wires, ducts, flues, cables, conduits, sewers, water lines and other public utility lines, driveway and recreation areas, and other common areas, open space and facilities located in the unit or elsewhere on the property and serving such other units, including specifically to the Brunswick and Topsham Water District dated October 25, 2012, and recorded in the Sagadahoc County Registry of Deeds at Book 3444, Page 11;

2)    Exclusive rights in favor of the owner of any unit to use the limited common areas appurtenant to such unit;

3)    The provisions of the Declaration and appendices thereto, by-laws and floor plans of Oak Hill Condominiums Owners Association recorded and filed simultaneously with and as pat of the Declaration, as the same may be amended or modified from time to time by instrument recorded or filed in the Sagadahoc County Registry of Deeds, which provisions, together with any amendments or modifications thereto, shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the unit, his family, servants and visitors, as if those provisions were recited and stipulated at length herein.

Meaning and intending to convey and hereby conveying the same premises as described in a Deed of Sale By Personal Representative (Testate) from Wendy M. DesAutels, Personal Representative of the Estate of Martha S. Meacham to Diane A. Marchetti dated September 30, 2019, and recorded in the Sagadahoc County Registryof Deeds at Book 2019R, Page 06725.

Dated: _____, 2025          By: _____

                                 _____, Deputy Clerk
                                 Sagadahoc County Superior Court-West Bath, ME.





# TRAFTON, MATZEN, BELLEAU & FRENETTE, LLP

James E. Belleau
jbelleau@tmbf-law.com
Bar No. 8314

April 30, 2025

<u>Via Email Only: jflagg@flagglawfirm.com</u>
Jonathan M. Flagg, Esq.
93 Middle Street
Portsmouth, NH 03801

**RE:    Caroline Thibeault – Reasonable Accommodation Request on Behalf of Noah Thibeault**

Dear Jonathan:

I am writing to request a reasonable accommodation on behalf of my client, Caroline Thibeault, and her son, Noah Thibeault. Ms. Thibeault and her son are the legal occupants of Unit 1 in Oak Hill Condominiums in Topsham, Maine. Ms. Thibeault's mother, Diane Marchetti, is the record owner of Unit 1, by virtue of a Deed of Sale by Personal Representative Wendy M. DesAutels of the Estate of Martha S. Meacham, dated September 30, 2019, and recorded in the Sagadahoc County Registry of Deeds at Book 2019R, Page 06725.

Ms. Thibeault's son lives with a severe form of autism spectrum disorder as well as related anxiety/behavioral issues, and is considered disabled under the Federal Fair Housing Act and the Maine Human Rights Act. As a result of his disability, he fully relies on Ms. Thibeault, as his mother and legal guardian, for constant supervision and support as he cannot be left on his own. Her son also suffers from Post Traumatic Stress Disorder (PTSD) from a car accident that occurred in the spring of 2024. This incident has led to long-term, severe anxiety and claustrophobia.

Under the Federal Fair Housing Act ("FHA"), discrimination based on disability includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling" 42 U.S.C. § 3604(f)(3)(B). The FHA defines a "dwelling" broadly as any building, structure, or portion thereof intended or designed for residential use by one or more families, as well as any vacant land offered for sale or lease for such use. 42 U.S.C. § 3602(b). As such, the FHA applies to a wide range of housing providers, including property owners, landlords, housing managers, condominium associations, real estate agents, and brokerages. *See Fair Housing: Know Your Rights,* Fair Housing Ctr. For Rts. & Research, at 2 (Aug. 2020); Joint Statement of the Dep't of Housing and Urban Dev. and the Dep't of Justice, *Reasonable Accommodations Under the Fair Housing Act* (May 17, 2004) ("Joint Statement"), at 3.

Reasonable accommodations are critical to ensuring individuals with disabilities can fully access and enjoy both privately owned and federally subsidized housing and the FHA imposes an affirmative duty on housing providers to accommodate the needs of disabled individuals. 42 U.S.C.A. § 3604(f)(3)(B); *see also Roe v. Housing Authority of City of Boulder,* 909 F. Supp. 814, 821 (D. Co. 1995). Importantly, the FHA preempts any conflicting state or local laws. Specifically, it provides that "any law of a State . . . that purports to require or permit any action that would be a discriminatory



**TRAFTON, MATZEN,**
**BELLEAU & FRENETTE, LLP**

April 30, 2025
RE: Caroline Thibeault – RA Request
Jonathan M. Flagg, Esq.
Pg. 2

housing practice under this subchapter shall to that extent be invalid." 42 U.S.C. § 3615. The First Circuit has affirmed that neither state nor municipal law, nor private agreements, can be used to circumvent the FHA's anti-discrimination protections. *See Astralis Condominium Ass'n v. Secretary of U.S. Dep't of Housing & Urb. Dev.*, 620 F.3d 62, 70 (1st Cir. 2010); *see also Shelley v. Kraemer*, 344 U.S. 1, 11 (1948). State law mirrors these protections. Under the Maine Human Rights Act, it is unlawful for any person who "manage[s] a housing accommodation" to "refuse to make reasonable accommodations in rules, policies, practices or services when those accommodations are necessary to give a person with physical or mental disability equal opportunity to use and enjoy the housing." 5 M.R.S.A. § 4582-A(2).

Accordingly, the Oak Hill Condominium Association's (the "Association") private Declaration and Rules and Regulations cannot override state or federal disability rights laws. They must allow for reasonable accommodations that enable Noah Thibeault to enjoy equal access to his dwelling. Additionally, a request for a reasonable accommodation may be made at any time and can be submitted by a family member on the individual's behalf. Joint Statement, at 10.

To provide context for the Ms. Thibeault's reasonable accommodation request on behalf of her son, Noah Thibeault, we present a timeline of events related to Ms. Thibeault's alleged violation of the Association's Rules and Regulations as it relates to her caretaking responsibilities for Noah Thibeault.

The former version of Rule 19 in the Association's Rules and Regulations that was in effect during the summer of 2023 addressed "Commercial Activity Within Units" and provided as follows:

Unit owners are permitted to conduct business from their units under the following circumstances:

    a. The existence or operation of the business activity is not apparent or detectible by sight, sound, or smell from the exterior of the unit.

    b. The business activity is legal and conforms to all zoning requirements for the Oak Hill Condominium Owners Association.

    c. The business activity does not unreasonably increase vehicular traffic or parking-related issues within the Oak Hill Condominium Owners Association.

    d. The business activity does not increase the insurance premium paid by the Oak Hill Condominium Owners Association or otherwise negatively affect the Association's ability to obtain insurance coverage.

    e. The business activity does not place an undue burden on the infrastructure of the buildings of the Oak Hill Condominium Owners Association property.

    f. The business activity is consistent with the residential character of the Oak Hill Condominium Owners Association and does not constitute a nuisance or a hazardous or offensive use or threaten the security or safety of other residents of the Association.

    g. The business activity does not result in a materially greater use of the common areas or Association services within the Oak Hill Condominium Owners Association.

Pursuant to Rule 19(a), Ms. Thibeault's request involved extremely limited operations. She does not have, nor will she have, employees. She uses no external signage that would indicate the presence of the business by sight, smell, or sound.

2



TRAFTON, MATZEN,
BELLEAU & FRENETTE, LLP

April 30, 2025
RE: Caroline Thibeault – RA Request
Jonathan M. Flagg, Esq.
Pg. 3

Pursuant to Rule 19(b), Ms. Thibeault obtained approval from the Town of Topsham's Code Enforcement Officer that her operation constitutes a "minor home occupation" that is "incidental and secondary to the use of the dwelling for residential purposes" and is permitted under the Topsham Zoning Ordinance. This has been established based on correspondence with the Code Enforcement Officer for the Town of Topsham who confirmed that Ms. Thibeault's activities constitute a "minor home occupation" that is by definition "incidental and secondary to the use of the dwelling for residential purposes." Ms. Thibeault only offers hair services and uses only a single room of her unit, which she also uses for other purposes.

Pursuant to Rule 19(c), Ms. Thibeault does not solicit or permit walk-in appointments, as clients are pre-scheduled on a one-person at a time basis. She would schedule clients so as to prevent any overlap and so as to only utilize one parking spot in her driveway at a time. She also agreed to limit her working hours to minimize the presence of nonresidents within the community. Her clients do not use or enter any of the common spaces of the Association. Therefore, the business activity does not unreasonably increase vehicular traffic or parking-related issues.

Pursuant to Rule 19(d), Ms. Thibeault's business activity does not increase the insurance premium paid by the Association or negatively affect its ability to obtain insurance coverage. Pursuant to Rule 19(e), the business activity also does not place an undue burden on the infrastructure of the buildings of the Association's property.

Pursuant to Rule 19(f), and as further confirmed by the Town's Code Enforcement Officer, the business activity is consistent with the residential character of the Association, and does not constitute a nuisance or a hazardous or offensive use or threaten the security or safety of other residents of the Association. The use is entirely incidental to her use of the unit for residential purposes. Again, Ms. Thibeault's hair services cannot be detected by sight, sound, or smell from outside of her unit. She does not provide walk-in appointments, only pre-scheduled appointments that occur one at a time with no overlap, and she is was (and is) willing to limit her operating hours so as to further reduce the hours in which nonresidents would be on the property.

Finally, pursuant to Rule 19(g), Ms. Thibeault's customers do not utilize or enter the common areas of the Association. They only park in Ms. Thibeault's driveway and enter her unit for appointments. Therefore, under Rule 19 as effective in June 2023, Ms. Thibeault's business activity was in complete conformity with the Association's Rules and Regulations.

Based on Ms. Thibeault's interpretation of the above rule, in the summer of 2023, she submitted a request to the Association's Board (the "Board") seeking approval to operate a small-scale commercial activity—hair services—from her unit. This request was rooted in her need to remain in close proximity to her son, who requires continuous support and supervision due to his inability to function independently because of his disability. She made this request out of respect for the Association despite there being no such requirement in the Association's Rules and Regulations.

Following this request, the Association's Property Manager contacted Ms. Thibeault to inquire whether the hair services would increase traffic within the condominium. Ms. Thibeault clarified that she only serves one client at a time, they park in her driveway, and her clients do not access any common areas. Despite this explanation, additional Association staff contacted her and posed inappropriate questions, including inquiries about the number of vehicles used by service providers



**TRAFTON, MATZEN,**
**BELLEAU & FRENETTE, LLP**

assisting her disabled son. After this informal review, the Property Manager confirmed to Ms. Thibeault that her proposed activity was in compliance with the Association's Rules and Regulations.

On June 1, 2023, Ms. Thibeault received a Memorandum from the Board's attorneys, which had been prepared at the Board's request, addressing the issue of home-based businesses. The Board's attorneys discussed the fact that Section 10(H) of the Declaration of Oak Hill Condominiums (the "Declaration"), stated that "No commercial activity of any nature shall be permitted on the Property." The Board's attorneys admitted that because the Declaration does not define the term "commercial activity," it is impossible to know the scope of the term. The Memorandum pointed out that a plain reading of the Declaration would likely result in "commercial activity" being interpreted to exclude uses that are "subordinate and incidental" to the residential uses of the property. This interpretation also appeared consistent with the conclusion made by the Town of Topsham's Code Enforcement Officer. Furthermore, the Association's Rules and Regulations explicitly provide for "Commercial Activity Within Units" further suggesting that commercial uses incidental to residential uses are unlikely to be considered "commercial activity" within the meaning likely intended by the Declaration. The Board's attorneys ultimately concluded that the existing Rules and Regulations did in fact allow for Ms. Thibeault's commercial activities.

Despite receiving approval from the Property Manager, the Board's attorneys, and the Town of Topsham's Code Enforcement Officer, the Board subsequently issued a formal denial of Ms. Thibeault's request to perform hair services in her unit. This denial occurred despite other residents of the Association conducting various in-home businesses, including real estate sales, counseling, handyman services, pet sitting, stained glass classes and sales, spice preparation and sales, seamstress services involving client visits, and a catering business that involves both food preparation and customer pickups from the unit. The Board also asserted it would not offer a detailed explanation of their reasoning for refusing Ms. Thibeault's request and instead pointed to the language in the Declaration, despite having received contrary advice from their attorneys.

Following the Board's rejection, the Board requested its attorneys to amend the Rules and Regulations to prohibit Ms. Thibeault from providing hair services in her unit. In October 2023, this amendment was adopted, which changed the requirements of Rule 19 to prohibit, "any employees, customers, or clients visiting the unit or traveling on, parking in, or otherwise using the limited common elements and/or common elements of the Oak Hill Condominium development."

Despite the Board never having provided any proof to Ms. Thibeault regarding her alleged violation of the Rules and Regulations of the Association, the Board began to assess fines against Ms. Thibeault's unit beginning on December 12, 2023. The Notice of Violation from the Board, which Ms. Thibeault received as the occupant of the unit, and her mother, as owner of the unit, on December 4, 2023, did not provide an opportunity to attend a hearing before the assessment of fines began.

The Board then began applying a new and unapproved accounting method for fines, by deducting the daily fines and late fees from Ms. Thibeault's monthly HOA dues payment. The Board claimed that Ms. Thibeault and her mother had not been making their monthly HOA payments because their monthly payments were applied to the fines instead, making them delinquent on their regular fees and causing them to be subject to the now pending foreclosure action. Ms. Thibeault, nor her mother, received any prior notice nor opportunity to be heard before the Board changed its method of accounting which caused the regular monthly HOA fees to be considered delinquent.

4



TRAFTON, MATZEN,
BELLEAU & FRENETTE, LLP

Ms. Thibeault now brings a formal request for reasonable accommodations on behalf of her son, Noah Thibeault. A "reasonable accommodation" includes a change or exception to a rule or policy, as well as a modification to the premises itself. Joint Statement, at 6. For example, a housing provider has a policy of providing only unassigned parking spaces to its residents. Joint Statement, at 6. A resident who is physically disabled and suffers from mobility problems, requests an assigned parking space as an exception to the housing provider's policy, to enable her to more easily access her unit. *Id.* The provider must then make an exception to its policy for unassigned parking spaces. *Id.*

Under the Rehabilitation Act of 1973 under the FHA, a tenant must demonstrate that the accommodation is: (1) necessary for them to have an equal opportunity to use and enjoy their dwelling and (2) reasonable. 42 U.S.C. § 3604(f)(3)(B); 24 C.F.R. § 100.204; Joint Statement, at 6. To satisfy the necessity requirement, the tenant must establish a clear connection between their disability and the requested accommodation. 24 C.F.R. § 100.204; Joint Statement, at 6. Next, for an accommodation to be considered reasonable, it must not constitute an undue financial or administrative burden, a fundamental alteration in the nature of LHA's operations, or a direct threat. Joint Statement, at 6; *Section 504: Frequently Asked Questions*, U.S. Dep't House. & Urb. Dev., https://www.hud.gov/program_offices/fair_housing_equal_opp/disabilities/sect504faq#_ Reasonable_Accommodation (last visited Jan. 23, 2025).

Here, Ms. Thibeault, on behalf of her son, respectfully requests that the Board grant a reasonable accommodation to the recently amended Rule 19 concerning commercial activity within residential units. Specifically, Ms. Thibeault seeks the following:

(1) Dismissal with prejudice of the lawsuit alleging the violation of the Association's Rules and Regulations;

(2) Waiver of all fees and associated late charges imposed in connection with that violation, and acceptance of all attempts made to pay standard monthly HOA dues; and

(3) Permission to continue offering hair services from her unit in accordance with the version of Rule 19 in effect during the summer of 2023, subject to the operational limitations detailed on Pages 2 and 3 of this letter.

This request is directly and clearly connected to the disability of Ms. Thibeault's son, Noah, who lives with severe autism and anxiety, and requires constant supervision. As his mother, guardian, and primary caregiver, Ms. Thibeault must remain with Noah at all times to ensure his safety and well-being. This obligation prevents her from working outside the home. Therefore, her request to conduct limited hair services from her residence, as permitted under the prior version of Rule 19, is a necessary accommodation tied to her son's disability.

The accommodation Ms. Thibeault seeks on her son's behalf is reasonable. It does not require the Association to adopt new rules or make significant changes to its current policies. Rather, it asks only for a return to the previously existing rule under which Ms. Thibeault was fully compliance. The recent amendment to Rule 19 appears to have been enacted in direct response to Ms. Thibeault's activities, while other residents continue to operate home-based businesses without interference.

Importantly, granting this request would not constitute a fundamental alteration of the Association's operations, nor would it impose an undue financial or administrative burden. The accommodation does not require the Association to provide any services or support and results in no additional cost or disruption. The benefit to Ms. Thibeault and her son, however, would be substantial;

5




TRAFTON, MATZEN,
BELLEAU & FRENETTE, LLP

April 30, 2025
RE: Caroline Thibeault – RA Request
Jonathan M. Flagg, Esq.
Pg. 6

it would allow her to continue caring for her son full-time, while earning a modest income using her professional skills as a licensed hairdresser. There are no viable alternatives that would allow her to both support her family and provide the full-time care her son requires.

Moreover, the proposed accommodation would not pose a direct threat to the safety or property of others in the community. Ms. Thibeault has already committed to reasonable operational limitations, including scheduled appointments only, a one-client-at-a-time policy, no use of shared common areas for clients, no external signage, and assurances that the services provided will not be visible, audible, or otherwise detectable from outside her unit.

By allowing Ms. Thibeault to continue her limited haircutting services, the Association would be fulfilling its obligation under the FHA while materially improving the quality of life and housing access for its disabled resident. If you require any additional information to support this reasonable accommodation request, please reach out to me.

Sincerely,

James E. Belleau

JEB/mam
Encl.

CC:    Caroline Thibeault (via email only)
       Mark Randall, Esq. (via email only)
       Mark Kearns, Esq. (via email only)

H:\JEB\Thibeault, Caroline M\Correspondence\RA Request 4-30-2025 FINAL.docx

6



EXHIBIT
B

| | |
|---|---|
| **From:** | Jon M Flagg |
| **To:** | Megan Madore; Jaimee Ruccolo |
| **Cc:** | mark@randalllaw.com; mak@newlaws.com; James Belleau; Meredith Scott |
| **Subject:** | RE: Caroline Thibeault |
| **Date:** | Wednesday, April 30, 2025 6:26:12 PM |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Thanks, Jim. The Association appreciates Caroline's circumstances. I do not see how Caroline cannot rent a commercial space and take her son to work with her. That would be far better for all concerned rather than turning a residential condo into a commercial space as she has done. If she were a surgeon, would the Association need to allow a surgical unit in the residential condo? If she were a mechanic, would the Association need to allow a lift in the parking lot? If she was a musician, would the Association need to allow a music studio in the residential area?

You have no doubt seen the substantial correspondence back and forth between the Association's attorney and Caroline's attorney. I don't see the advantage of debating it further here. The Association has made its position clear and Caroline has made her position clear. I think Caroline would be best served renting a commercial space which she would have to do with or without her son and she can go there to conduct her business and take her son with her if that is necessary for her needs.

**Jonathan M. Flagg, Esq.**
**Flagg Law, PLLC**
93 Middle Street
Portsmouth, NH 03801
phone: (603) 766-6300
fax: (603) 766-6301
email: jflagg@flagglawfirm.com

**From:** Megan Madore <MMadore@tmbf-law.com>
**Sent:** Wednesday, April 30, 2025 3:48 PM
**To:** Jon M Flagg <jflagg@flagglawfirm.com>
**Cc:** mark@randalllaw.com; mak@newlaws.com; James Belleau <JBelleau@tmbf-law.com>; Meredith Scott <MScott@tmbf-law.com>
**Subject:** Caroline Thibeault

Attorney Flagg,

Please find attached a reasonable accommodation request from Attorney Belleau on behalf of our client, Caroline Thibeault.

Thank you,

## Megan Madore,

Trafton, Matzen, Belleau & Frenette, LLP
Ten Minot Avenue, PO Box 470
Auburn, Maine 04212-0470
Phone: 207-784-4531
mmadore@tmbf-law.com

CONFIDENTIAL & PROPRIETARY: This email which may contain confidential or proprietary information is intended for use by the individual or entity to which it is addressed. If you are not the intended recipient, you are notified that distribution or copying this email is prohibited. If you believe you received this email in error, please notify the sender by telephone and delete your copy.



# Maine Human Rights Commission

# 51 State House Station, Augusta, ME 04333-0051

*Physical location: 19 Union Street, Augusta, ME 04330*
Phone (207) 624-6290 ▪ Fax (207) 624-8729 ▪ TTY: Maine Relay 711
*www.maine.gov/mhrc*



| | |
|---|---|
| **Kit Thomson Crossman**<br>EXECUTIVE DIRECTOR | **Barbara Archer Hirsch**<br>COMMISSION COUNSEL |

## INVESTIGATOR'S REPORT
### H25-0206, HUD No. 01-25-5951-8

September 9, 2025

**Caroline Thibeault obo [Son]¹ (Auburn)**

v.

**Oak Hill Condominiums Association        (Topsham)**

### I. Summary of Case:

On June 2, 2025, Complainant filed a Complaint with the Maine Human Rights Commission ("Commission") alleging that Respondent, a homeowners' association, discriminated against her based on Son's disability in violation of the Maine Human Rights Act ("MHRA") when it failed to grant a reasonable accommodation allowing Complainant to conduct commercial activity from her home. Respondent denied discrimination, stating that the commercial use of a condominium ("condo") in its residential community violates its rules. Based on the information gathered during the investigation, the Investigator recommends a finding that there are reasonable grounds to believe that Respondent discriminated against Complainant in housing on the basis of disability in violation of the MHRA.

### II. Summary of Investigation:

The Investigation involved reviewing the documents submitted by Complainant and Respondent and holding an Issues and Resolution Conference ("Conference") via video, during which Complainant and Respondent were interviewed.

### III. Analysis:

The MHRA provides that the Commission or its delegated investigator "shall conduct such preliminary investigation as it determines necessary to determine whether there are reasonable grounds to believe that unlawful discrimination has occurred." Title 5 Maine Revised Statutes ("M.R.S.") § 4612(1)(B). The Commission interprets the "reasonable grounds" standard to mean that there is at least an even chance of Complainant prevailing in a civil action.

---

¹ Complainant purported to file her complaint on behalf of her son ["Son"] an adult with disabilities who resides with her. Complainant did not allege that she had legal guardianship of Son, and the record is devoid of evidence supporting that Complainant has legal authority to file a charge on Son's behalf. Accordingly, her charge is being treated as a claim that she was denied a reasonable accommodation necessary because of her association with Son. Son's name has been redacted, since he is not a party to this matter, and he is referred to throughout this report as "Son".

*INVESTIGATOR'S REPORT:* H25-0206, HUD No. 01-25-5951-8

## A. **Findings of Fact**

Son has lifelong mental and developmental disabilities. Complainant lives with Son at a sixty-eight unit condominium community in Topsham, Maine (the "Premises"). Respondent is the Premises' homeowners' association ("HOA").

Son requires a consistent routine and a high level of daily support, and his disabilities cause communication difficulties, significant anxiety, and aggression. Due to a lack of support services for Son, Complainant is Son's caregiver. Complainant is also a licensed hair stylist. Complainant used to work as a hair stylist at locations off-Premises and take Son to work with her, however, this arrangement proved problematic due to the sale of the buildings where she had her workspace and disruptions caused by Son's behavioral challenges and dysregulation.

In late spring of 2023, Complainant began offering haircare services from her unit at the Premises. This arrangement provided safety and stability for Son and allowed Complainant to earn a living. At the time, Rule 19 of Respondent's Rules and Regulations specified that for "Commercial Activity Within Units":

> Unit owners are permitted to conduct business from their units under the following circumstances: (a) the existence or operation of the business activity is not apparent or detectible by sight, sound, or smell from the exterior of the unit; (b) the business activity is legal and conforms to all zoning requirements for the Oak Hill Condominium Owners Association; (c) the business does not unreasonable increase vehicular traffic or parking-related issues within the Oak Hill Condominium Owners Association; (d) the business activity does not increase the insurance premium paid by the Oak Hill Condominium Owners Association or otherwise negatively affect the Association's ability to obtain insurance coverage; (e) the business activity does not place an undue burden on the infrastructure of the buildings of the Oak Hill Condominium Owners Association property; (f) the business activity is consistent with the residential character of the Oak Hill Condominium Owners Association and does not constitute a nuisance or a hazardous or offensive use or threaten the security or safety of other residents of the Association; and (g) the business activity does not result in a materially greater use of the common areas or Association services within the Oak Hill Condominium Owners Association.

After consultation with the previous property manager of Premises, Complainant believed that the operation of her business complied with the aforementioned criteria which permitted residents to engage in home-based business activities as long as such activity did not "unreasonably increase vehicular traffic." Complainant subsequently sought explicit permission to continue to provide haircare services from her home. Complainant also confirmed that her business constituted an allowable "minor home occupation" in compliance with the town's zoning ordinances.

At a June 21, 2023, meeting, Respondent voted to table Complainant's request for further review, and on July 19, 2023, Respondent informed Complainant that it rejected her request. On October 19, 2023, Respondent amended its rules to specify that a home business was permissible only if: "The activity does not generate or result in any employees, customers, or clients visiting the unit or traveling on, parking in, or otherwise using the limited common elements and/or common elements of the Oak Hill Condominium development." Complainant viewed this amendment to Respondent's rules as selective and targeted enforcement, while Respondent viewed this addition as a clarification.

On December 12, 2023, Respondent began assessing a daily fine of $75 against the Complainant's unit for violating its rules. Respondent deducted the cost of these fines and late fees from Complainant's Homeowners'

Association payments, and Complainant became delinquent. Respondent began foreclosure proceedings. On April 30, 2025, Complainant submitted a reasonable accommodation request to the Respondent allowing her to provide limited hair services from her home and requesting dismissal of the foreclosure action and a waiver of fees and late charges. To alleviate concerns about her business altering the community's residential nature, Complainant offered to limit her business to one appointment at a time, prohibit walk-ins, direct customers to park only in her driveway, provide clear visual instructions to locate her home, and restrict her hours of operation. On May 2, 2025, Respondent denied Complainant's requests.

Complainant asserts that Respondent allows other unit owners to run businesses from their homes. Respondent acknowledges that an insurance adjuster, a therapist, and a purveyor of spices all work from home, but notes that none have a customer-facing business or clients that come to their homes. Respondent also posits that Complainant's business has caused issues with neighbors. For example, one of Complainant's clients parked in a neighbor's driveway, preventing the neighbor from leaving. Additionally, a neighbor reported that a client knocked on her door, disturbing her while she was home sick.

Respondent asserts that "[t]he HOA rules are applied evenly for all residents, regardless of whether they have children, disabled dependents or not," and that "[a]llowing a small business to operate in our residential neighborhood would be precedent setting and open the door for all other small businesses to operate on an unauthorized basis." Respondent also notes that to authorize Complainant's small business, its Declaration would need to be amended, requiring the unanimous consent of all owners. Respondent has suggested that Complainant visit her clients' homes to offer her services and offered to provide low-cost financing to remodel a workspace off-Premises, assistance moving her equipment and remodeling a space, and seed money to transition her business out into the community. Complainant highlights that none of these options would be feasible because of Son's need to stay in the controlled environment of their home.[2]

## B.  Legal Analysis

The MHRA provides that the Commission or its delegated investigator "shall conduct such preliminary investigation as it determines necessary to determine whether there are reasonable grounds to believe that unlawful discrimination has occurred." Title 5 Maine Revised Statutes ("M.R.S.") § 4612(1)(B). The Commission interprets the "reasonable grounds" standard to mean that there is at least an even chance of Complainant prevailing in a civil action.

The MHRA makes it unlawful "[f]or any owner, lessee, sublessee, managing agent or other person having the right to sell, rent, lease or manage a housing accommodation or any of their agents to refuse to make reasonable accommodations in rules, policies, practices or services when those accommodations are necessary to give a person with physical or mental disability equal opportunity to use and enjoy the housing." 5 M.R.S. § 4582-A(2).

To establish a prima-facie case of failure to accommodate, Complainant must show that:

    (1)    Son has a "physical or mental disability" as defined by the MHRA;
    (2)    Respondent knew or reasonably should have known of the disability;
    (3)    Complainant requested a particular accommodation;

---

[2] Complainant worked outside the home originally, and took Son with her to work. This became impossible between the time of her original request and her 2025 request for a reasonable accommodation, for at least two reasons. First, the building Complainant worked in was sold, and subsequent changes made bringing Son unfeasible. Second, Son's disability-related behaviors worsened after he was in an accident, and he needed the consistency and safety of being in his home environment.

3

*INVESTIGATOR'S REPORT:* H25-0206, HUD No. 01-25-5950-8

(4)     The requested accommodation is necessary to afford Complainant and Son an equal opportunity to use and enjoy the housing;

(5)     The requested accommodation is reasonable on its face, meaning it is both efficacious and proportional to the costs to implement it; and

(6)     Respondent refused to make the requested accommodation.

*See* 5 M.R.S. § 4582-A(2); *Astralis Condominium Ass'n v. Secretary, U.S. Dept. of Housing and Urban Development*, 620 F.3d 62, 67 (1ͤ Cir. 2010) (interpreting similar provision in Fair Housing Amendments Act, but seemingly placing burden on Complainant to show accommodation was reasonable); *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7ͤʰ Cir. 2002) (plaintiff's burden is only to show reasonableness "on its face"). *Compare Reed v. Lepage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001) (interpreting ADA) (holding that plaintiff need only show requested accommodation was feasible "on the face of things"). If Complainant makes this showing, Respondent can defeat the claim by showing that the proposed accommodation was unreasonable, meaning "it imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program." *Oconomowoc Residential Programs*, 300 F.3d at 784. Generally, Respondents are only required to provide a reasonable accommodation if Complainant requests one. *See Reed v. Lepage Bakeries, Inc.*, 244 F.3d at 261.

A request for reasonable accommodation like this triggers an obligation by both parties to, in good faith, enter into an informal, interactive process to determine an appropriate accommodation. *See Carmichael v. Verso Paper, LLC*, 679 F.Supp.2d 109, 133 n.23 (D.Me. 2010). "Where a breakdown in the process has been identified, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. For instance, a party that obstructs or delays the interactive process is not acting in good faith." *Carmichael*, 679 F.Supp.2d at 133 n. 23 (citations and quotations omitted). Failure by the covered entity to engage in the interactive process may constitute a failure to provide a reasonable accommodation, amounting to a violation of the MHRA. *See Jacques v. Clean-Up Group, Inc.*, 96 F.3d 506, 515 (1ˢᵗ Cir. 1996) (employment case). In determining responsibility for a breakdown in the interactive process, courts consider good faith and reasonable efforts in light of all the circumstances. *Goonan v. Federal Reserve Bank of N.Y.*, 12-CV-3859, Opinion and Order (SDNY 2014); *citing Beck v. University of Wisc. Bd. Of Regents*, 75 F.3d 1130, 1135-36 (7ᵗʰ Cir. 1996).

Here, Complainant established her prima-facia case. Son comes within the protections of the MHRA as a person with disabilities, as does Complainant given her association with a disabled person, *see* 5 M.R.S. § 4553(1-D). Respondent knew of Son's disabilities. Complainant requested authorization to offer limited hair stylist services from her home, and subsequently, a halt to foreclosure proceedings and the elimination of accumulated fees and late charges due to what Respondent viewed as continued rule violations. Complainant and Son needed the requested accommodation because Complainant must simultaneously work and care for Son, and she is unable to bring Son to an off-Premises work location. Given the limited scope of Complainant's business activity, the requested accommodation was reasonable on its face, and Respondent rejected Complainant's accommodation requests.

Respondent failed to establish a defense to Complainant's reasonable accommodation request by showing the request was unreasonable. Complainant's business activity may have caused minor annoyance and inconvenience (singular instances of a client parking in a neighboring driveway and knocking on a door, a slight increase in traffic, etc.) yet, it did not pose an undue burden in that it was not too expensive, was not an undue administrative burden, and was not unreasonable for some other reason. Respondent's offers to aid Complainant in relocating her business off-Premises were futile as the very reason for the accommodation request was to keep Son with Complainant, at home, while she worked. Respondent failed to engage in an informal, interactive process to

4

*INVESTIGATOR'S REPORT:* H25-0206, HUD No. 01-25-5951-8

determine whether an appropriate, feasible accommodation existed. Instead of engaging in good faith dialogue with Complainant, Respondent amended its rule to the detriment of Complainant and Son.

Discrimination on the basis of disability (denial of a reasonable accommodation) is found.

## IV. Recommendation:

For the reasons stated above, it is recommended that the Commission issue the following finding:

1) There are **Reasonable Grounds** to believe that Oak Hill Condominiums Association discriminated against Caroline Thibeault based on disability; and

2) Conciliation should be attempted in accordance with 5 M.R.S. § 4612(3).

Angela Morse, Investigator

5

ADDENDUM

**Subject Premises:** Oak Hill Condominiums, Unit 1, Topsham, Maine

**Party Contact Information:**

Complainant:
Ms. Caroline Thibeault
c/o Trafton, Matzen, Belleau, Frenette
PO Box 470
Auburn, ME 04212

Complainant's Counsel:
James Belleau, Esq.
Ten Minot Avenue
PO Box 470
Auburn, ME 04212

Respondent:
Oak Hill Condominiums Association
33 Beryl Loop
Topsham, ME 04086

Summary and Timeline of Investigation

1.  Signed and notarized complaint filed by Complainant with the Commission on June 2, 2025, and with the Department of Housing and Urban Development ("HUD") on June 3, 2025, and provided to Respondent on June 6, 2025;
2.  Case assigned to Investigator on June 3, 2025;
3.  Respondents' Answer filed on June 23, 2025;
4.  Complainant's Answer filed on July 14, 2025;
5.  Notice of Issues and Resolution Conference sent to parties on July 16, 2025;
6.  An Issues and Resolution Conference held on August 6, 2025:

    Summary of Conference:

    Participants:
    Caroline Thibeault - Complainant
    Noah Thibeault - Complainant
    James Belleau, Esq. – Attorney for Complainants
    Peter Leone – Resident and Board Member

    Belleau: Son needs 24/7 care- Dr recommended that C work from home, questioned about who is coming to residence, multiple bd meetings focused on Caroline's activities. Someone called Noah a "menace," asked to videotape people going in out of the unit. Oct 2023 – discussed revisions to rules, new condition crafted to target Caroline's RA request as a commercial activity, other people work from home. Multiple individuals operate businesses throughout the years. Paid association dues, creating false illusion of delinquencies. Middle finger emoji from Roland Guerette. R said

6

*INVESTIGATOR'S REPORT:* H25-0206, HUD No. 01-25-5951-8

allowing C to operate her business would set a precedent. Other similar businesses not required to be accepted. Said Caroline declined "seed" money. Caroline is asking for legal accommodation. Limited, appointment only services. Noah 25 yrs old, severe ASD. Critical need for stable and consistent environment. No access to day programs. Caroline is a licensed hairdresser. 1st RA, now there is a foreclosure lawsuit. 2nd RA in direct response to foreclosure proceeding and goes to the need for Caroline to earn a living. Also, Noah's condition worsened.

Leone: His background is in disabilities studies, special ed, no stranger to the issue of disability. C not targeted because of disability. Not selective enforcement. People who work there do not engage in customer facing services. Letters to show that. During Covid some relaxation of rules. Neighbors submitted that clients bang on her door looking for her. Family and friends not 20-30 clients a week. Revision of association rules to make clear. Assoc. have met with Caroline to attempt to find ways to make things work. Caroline not interested in finding a solution. Not a post hoc adjustment to rules. Assoc. continues to take Caroline's money which they wouldn't do if trying to evict. Payment of fines comes before rental payment. Having adult child live with her is no only way to meet Noah's needs. Business disrupts community.

Caroline: RA #1 June 2023, operate business, RA #2. Moved into condo from 4 acres, didn't want to work from home but at this point this is what she needs to do. He was disrupting trainers at gym, he grabbed her. Case management waitlist. Direct service providers. Needs to earn income and take care of him. Seed money was counterproductive. Fear police are going to get called if he is out in community and he gets dysregulated and he is 6 feet tall. He needs to deescalate after the accident. Request #2 to save home. Mr. Leone wrote a letter to licensing Board. She paid HOA fees every month, but she is delinquent. Fines were for commercial activity out of unit. Neighbor complained about increased traffic on street. Mother is occupant owner fall behind in December of 2023. Taking the HOA dues and applying to fine.

Leone: She understood that w/ delinquencies fines get paid before HOA fees. Customer facing business, Maine Land Use Planning Commission, small home operation does not have regular, scheduled clients. Insurance adjuster works from home. Therapist never has clients go to home. Someone runs a spice business and never has clients come to unit. Not just family and friends. Neighbor had a car behind her in driveway (client) and she couldn't leave. 5 or so vehicles going to business. What if people arrive early. Association took a poll and more than ¾ of residents say they want to enforce declaration. This is not about housing but about a business. Poll fall of 2023. Preponderance of residents believe that there should not be a hair cutting operation in violation of declaration.

Leone: verbal complaints and written. There are no other business with clients going to residence. He has been involved in discussions. No signage allowed, can't even have political signage. A compromise was to help Caroline transition back to community. Caroline rejected all of these. One option low-cost financing to remodeling a place, move equipment to new location. In 3-6 months cut hair in the community, return to earlier situation. This is not right to trump others rights.

Caroline: Building sold. Lost her space. Not doing ok while there. He started grabbing her. Witnessed aggression. Member making comments. Building sold 2023. Begin working from home July 2023. Didn't know about client parking in neighbor's driveway. September 2023 – Neighbor said that she was sick and client knocking on her door. She was monitored in re who comes in and out of the residence.

Caroline: haircare products being sprayed on houses of neighbors after her RA was refused. Several neighbors complained that there was vandalization

Leone – Reasonable? No, many individuals like Noah. Ways to make loved ones needs met. Violative of declaration that they all agreed to.

Belleau: Can adopt rules and regulations consisted with the Declaration. The rules were changed as a result of her asking for permission to operate her business. Rules allowed for commercial activity

7

if didn't affect traffic. Also, she asked to operate on a limited basis, only driveway, limit hours of activity, no walk-ins and only appointments, no overlap.
Requesting fees waived, operation in limited capacity.
Leone: 2 offers, Caroline can operate business from her home but she would need to leave residence and go to clients houses (WOULD NOT WORK WITH NOAH)
2nd; transition out to community
Rules: were clarified "so that people that people know what we mean" Rules changed vs clarified

7.  Close of Evidence Letter sent to parties on August 6, 2025;
8.  Final Submission by Respondent filed August 20, 2025.



# Maine Human Rights Commission

# 51 State House Station, Augusta, ME 04333-0051
*Physical location: 19 Union Street, Augusta, ME 04330*
Phone (207) 624-6290 ▪ Fax (207) 624-8729 ▪ TTY: Maine Relay 711
*www.maine.gov/mhrc*



**Kit Thomson Crossman**
EXECUTIVE DIRECTOR

**Barbara Archer Hirsch**
COMMISSION COUNSEL

## COMMISSION MEETING MINUTES
### October 27th, 2025, MEETING

### *Held in Hybrid Format - In Person (19 Union Street, Augusta, Maine) and via ZOOM*

Commissioner David chaired the meeting and called it to order at 8:30 AM.  Also present were Commissioners Walker, Douglas, Sanders, and Walker.

### AGENDA

Commissioner David moved, seconded by Commissioner Douglas, to accept the parties' request in E23-0289, Norelus v. Procter & Gamble, to table the case until December 1, 2025, to allow the parties to finalize settlement.

4 in favor | 0 opposed.

Commissioner Walker moved, seconded by Commissioner Douglas, to adopt the Agenda and Consent Agenda to accept the Investigators' recommended decisions in each of the cases listed on the Consent Agenda (see listing beginning on Page 3).

4 in favor | 0 opposed.

### MINUTES

Commissioner Sanders moved, seconded by Commissioner Douglas, to adopt the September Commission Meeting Minutes.

4 in favor | 0 opposed.

### ADMINISTRATION

Monthly reports: Executive Director Thomson Crossman discussed reporting on the following Commission activities:

- Personnel: A report was placed on file.
- Compliance: Since the last meeting, there has been 1 unsuccessful conciliation and no successful conciliations, with 2 reasonable grounds cases remaining in active conciliation.
- New Charges: 26 new complaints were filed in September, with a total of 36 new Respondents.
- Withdrawals and dismissals: 29 issued in September, including 15 administrative dismissals, 8 right-to-sue letters, and 6 settlements (1 during MHRC investigation, 3 through the MHRC mediation program, and 2 private settlements) with a total of $259,900 to Complainants.

New Business: None.

At approximately 8:45 A.M. Commissioner David began the Hearing Agenda.

**CASES VOTED ON IN A.M. SESSION**

*E23-0362, Rosemary Pitkin (Portland) v. Convenient M.D. (Portsmouth, NH).* Attorney Maria Fox presented the Complainant's position. Attorney Tim Kenneally presented the Respondent's position. Investigator Jane O'Reilly reviewed another investigator's report and recommendations and answered the Commissioner's questions.

Commissioner David moved, seconded by Commissioner Walker, to find there are No Reasonable Grounds to believe that Convenient M.D. retaliated against Rosemary Pitkin for engaging in WPA- and/or MHRA- protected activity, and the complaint should be dismissed in accordance with 5 M.R.S. § 4612(2).

2 in favor | 2 opposed (Douglass and Sanders opposed).

Pursuant to the Commission's Procedural Rule at 2.07(C) regarding tie votes, the Investigator's findings of No Reasonable Grounds were adopted and the complaint will be dismissed in accordance with 5 M.R.S. § 4612(2).

*E23-0366, Monica Giordano (Hancock) v. Roman Catholic Bishop of Portland, dba Roman Catholic Diocese of Portland (Portland).* Attorney Kristin Aiello presented the Complainant's position. Attorney James Haddow presented the Respondent's position. Investigator Carrie McCarter reviewed their report and recommendations and answered the Commissioner's questions.

Commissioner David moved, seconded by Commissioner Douglas, to find there are **Reasonable Grounds** to believe that Roman Catholic Bishop of Portland discriminated against Monica Giordano on the basis of age, sex, or religion, there are **Reasonable Grounds** to believe that Roman Catholic Bishop of Portland engaged in coercion, intimidation, or interference, there are **Reasonable Grounds** to believe that Roman Catholic Bishop of Portland engaged in retaliation against Monica Giordano in violation of the MHRA or the WPA, and Conciliation should be attempted in accordance with 5 M.R.S. § 4612(3).

4 in favor | 0 opposed.

*E23-0380, Janet Echeverria (Stockton Springs) v. Maine Youth Alliance (Bangor).* Janet Echeverria presented their position. Attorney Mark Franco presented the Respondent's position. Investigator Carrie McCarter reviewed their report and recommendations and answered the Commissioner's questions.

Commissioner Sanders moved, seconded by Commissioner David, to find there are No Reasonable Grounds to believe that Maine Youth Alliance discriminated against Janet Echeverria on the basis of sexual orientation or gender identity, there are No Reasonable Grounds to believe that Maine Youth Alliance discriminated against Janet Echeverria on the basis of sex, there are No Reasonable Grounds to believe that Maine Youth Alliance retaliated against Janet Echeverria for engaging in MHRA- and/or WPA- protected activity, and the complaint should be dismissed in accordance with 5 M.R.S. § 4612(2).

3 in favor | 1 opposed (Walker opposed).

*E23-0405, Denilson Tavares (Portland) v. Nichols Portland, LLC (Portland).* Denilson Tavares presented his position. Respondent and their counsel were not present. Investigator Jane O'Reilly reviewed another investigator's report and recommendations and answered the Commissioner's questions.

Commissioner Douglas moved, seconded by Commissioner Walker, to find there are No Reasonable Grounds to believe that Nichols Portland, LLC discriminated against Denilson Tavares on the basis of race, there are No Reasonable Grounds to believe that Nichols Portland, LLC retaliated against Denilson Tavares in retaliation for MHRA- and/or WPA- protected activity, and the complaint should be dismissed in accordance with 5 M.R.S. § 4612(2).

* Indicates a case in which a "reasonable grounds" finding is recommended

*Minutes are considered to be **draft** until approved by the Commissioners at the next Commission Meeting.*

4 in favor | 0 opposed.

*PA23-0413AB, Dolores Grondin (Lewiston) v. R and K Wellness and Mental Health (Waterville), Ericka Roy (Waterville).* Dolores Grondin presented her position. Ericka Roy presented the Respondents' position. Investigator Jane O'Reilly reviewed another investigator's report and recommendations and answered the Commissioner's questions.

Commissioner David moved, seconded by Commissioner Douglas, to find there are No Reasonable Grounds to believe that R&K Wellness and Mental Health and/or Ericka Roy discriminated against Dolores Grondin o/b/o Gregory Grondin on the basis of disability, and the complaint should be dismissed in accordance with 5 M.R.S. § 4612(2).

4 in favor | 0 opposed.

*H25-0206\*, Caroline Thibeault (Auburn) v. Oak Hill Condominiums Association (Topsham).* Roland Guerette presented the Respondent's position.  Attorney James Belleau presented the Complainant's position.  Investigator Angela Morse reviewed her report and recommendations and answered the Commissioner's questions.

Commissioner Douglas moved, seconded by Commissioner Sanders, to find there are **Reasonable Grounds** to believe that Oak Hill Condominiums discriminated against Caroline Thibeault based on disability, and Conciliation should be attempted in accordance with 5 M.R.S. § 4612(3).

4 in favor | 0 opposed.

## EXECUTIVE SESSION

At approximately 12:25 P.M., Commissioner David moved, seconded by Commissioner Sanders, to go into executive session to discuss pending or contemplated litigation and the Commission's legal rights and duties with Commission Counsel pursuant to 1 M.R.S. §405(6)(E).

4 in favor | 0 opposed.

At approximately 1:11 P.M., the Commissioners voted unanimously to come out of Executive Session.

Commissioner Sanders moved, seconded by Commissioner Douglas, not to litigate E23-0206, *Libby v. Archer's on the Pier*, or PA23-0226, *Bennett v. Youngs Greenhouse.*

4 in favor | 0 opposed.

Commissioner Sanders moved, seconded by Commissioner Douglas, to accept settlement agreements in *MHRC v. Yee* and *MHRC v. Hassett/Maloney.*

4 in favor | 0 opposed.

Commissioner Sanders moved, seconded by Commissioner Douglas, to authorize the Commission to take action, up to and including litigation, to enforce the Maine Human Rights Act with regard to its education provisions.

4 in favor | 0 opposed.

At approximately 1:12 P.M. the meeting was adjourned.

*\* Indicates a case in which a "reasonable grounds" finding is recommended*

## CONSENT AGENDA

The consent agenda is a listing of cases scheduled on the Commission's meeting agenda in which there was no written disagreement to the Investigator's recommendation. Commissioners considered these cases without oral argument by the parties.

| | | |
|---|---|---|
| E23-0361 | Benjamin Cook (Jefferson) v. The Cat Hospital of Maine, Inc. (Manchester) | NRG |
| E23-0339* | Tame Arnold (Westbrook) v. Maximus (McClean, VA) | **RG** |
| E23-0382ABCD* | Michelle Porter (Old Town) v. American Legion (Old Town), Karl Huntley (Old Town), Kevin McGarry (Old Town), Wayne Feero (Old Town) | NRG/**RG** |
| E23-0385* | William Messer (Portland) v. Scarborough Public Schools (Scarborough) | **RG** |
| E23-0427 | Laura Billings (Washington) v. Alsace Restaurant (Union) | NRG |
| E24-0020 | Michael Pettis (Buxton) v. Maine Medical Center (MaineHealth) (Portland) | NRG |

## TABLED

| | |
|---|---|
| E24-0002 | Amybeth Hurst (Old Orchard Beach) v. Town of Old Orchard Beach (Old Orchard Beach) |

*Indicates a case in which a "reasonable grounds" finding is recommended*

*Minutes are considered to be **draft** until approved by the Commissioners at the next Commission Meeting.*



**To:**   Oakhill Condominium Board of Directors
**From:** Debbie and Dennis Dionne
**Date:**  November 1, 2025
**Re:**   Oakhill Condominium Association vs. Caroline Thibeault

On Monday, October 27, 2025, Board President **Roland Guerrette** and Board Member **Peter Leone** appeared before the **Maine Human Rights Commission (MHRC)** as respondents in the case *Oakhill Condominium Association vs. Caroline Thibeault.*

Dennis and I have carefully reviewed the full recording of this public meeting <u>viewable here</u> and the **MHRC Investigator's Report** in its entirety. The evidence presented, along with statements from multiple commissioners and from Ms. Thibeault's attorney, **James Belleau**, led to a **unanimous ruling** that *Oakhill Condominium Association discriminated against Ms. Thibeault on the basis of disability.*

This ruling should leave **no doubt** in anyone's mind: the Association's conduct was wrong — legally, ethically, and morally. The Board's continued pursuit of foreclosure and excessive fines only compounds the harm already done.

The **Oakhill Board needs to take immediate corrective action** by:
• Dropping the foreclosure proceedings against Ms. Thibeault.
• Rescinding all fines and penalties that have been imposed.
• Implementing the reasonable accommodations previously discussed with the MHRC Investigator, Ms. Thibeault, and her attorney — accommodations that would allow her to remain in her home, care for her severely disabled son, and maintain a modest home-based business.

Key Findings Supporting This Demand
• **Reasonable accommodation requests were ignored and denied.** Ms. Thibeault submitted a detailed list of adjustments that the Board neither meaningfully considered nor honored — a direct violation of the Association's obligations under disability law.
• **Thousands of dollars in fines were imposed in retaliation.** The timing and nature of these penalties strongly suggest punitive intent, rather than legitimate enforcement.
• **The Association failed to meet its burden of proof.** The MHRC Investigator and Commissioners were clear: Oakhill's evidence and reasoning did not justify its actions.
• **The facts and the law are squarely against Oakhill.** Commissioners stated that the Association's position would not withstand judicial scrutiny. One Commisioner said **this case is not about Rule 19 and I suggest you get a lawyer.**
• **Commissioners warned of serious consequences.** At least two commissioners described this case as "highly problematic" and cautioned that the combination of foreclosure and fines would "inflame a jury." • Attorney Belleau confirmed he would seek attorney's fees and civil penalties if this
case proceeds to court — a risk that could expose all Oakhill homeowners to substantial legal and financial liability.

At this point, continuing down this path serves no purpose other than to prolong conflict, deepen division, and increase legal exposure for the Association. It is time for this Board to demonstrate leadership, fairness, and integrity — and to correct a grave injustice.
Failure to act now would not only perpetuate discrimination but would also represent a reckless disregard for the MHRC's findings and for the well-being of a vulnerable resident and

her disabled child.

Finally, we remind the Board that under both state and federal law, **individual board members can be held personally liable** when knowingly participating in or perpetuating discriminatory actions after an official finding of discrimination. The time to act responsibly and decisively is now.

Respectfully,
Debbie and Dennis Dionne


EXHIBIT
V

# Hair Studio Emails 2.2.26

## 1. Roland RE: Hair Salon Controversy Update

Please see the following update from the Board of Directors

As previously reported, the Board of Directors entered into a **voluntary** settlement process (this was a MANDATORY CONCILIATION process)  with the hair salon operator in hopes of reaching a reasonable accommodation. This conciliation meeting was hosted by the Maine Human Rights Commission and attended by our attorney and members of the Board. Without getting in to the specific proposal details made by either side, we can assure you that the Board made every effort to reach a satisfactory agreement,  including concessions to drop the foreclosure suit and accrued fines against the owner of 17 Ruby Lane along with a generous transition period. Despite this, we were unable to reach an agreement. For the time being, the status of the salon remains unchanged while we await Summary Judgement from the Sagadahoc County Superior Court. We will communicate further with you as more information becomes available.

Oak Hill Owner Survey
Fifty six (56) of our sixty eight (68) residents responded; an excellent response rate of 82%. Thank you for taking the time to provide us with your feedback.  In addition to receiving many thoughtful comments, we learned that the community is very supportive of the efforts undertaken by the HOA Board. Questions asked and responses are shown below

1. Should the Oak Hill Condo Association press on with the foreclosure suit against Diane Marchetti to enforce our Declaration prohibiting all commercial activity in our development?
    YES 40
    NO 8
    UNDECIDED 8

2. If an accommodation is reached with Caroline Thibeault, should it include protections for the HOA, such as higher insurance premiums paid by shop owner, legal indemnification of the HOA for accidents on our property, proof of a valid   Level One Establishment license, and medical documentation supporting claim that tenant can not work elsewhere?
    YES 50
    NO 3
    UNDECIDED 3

As always, please feel free to reach out should you have any questions.
Roland

## 2.  Barbara Piccarillo  RE: MCHPP Donations for New Mainers

I am thinking of collecting food for our new Mainer families. MCHPP has shared their current needs. I know many of you have headed to warmer climates but if you are around and interested in helping out with collection or drop off, let me know.  I'm thinking of collecting items on Feb 9 to bring in on Feb 10.
Barbara Piccirillo

## 3.  Me RE: Compassion

Barbara and Neighbors,

I find it impossible to reconcile this call for charitable giving with what our community has just endorsed.

A majority of Oak Hill owners recently supported continuing a foreclosure action against a neighbor and her son with severe disabilities—despite a unanimous Maine Human Rights Commission ruling that discrimination occurred. That course of action could cost a disabled child his home and make both mother and son homeless and food insecure.

Publicly collecting food for vulnerable families while privately supporting actions that would harm one in our own community is not compassion. It is hypocrisy.

If we want to be a community that values empathy and justice, those values must apply first to our own neighbors—especially the most vulnerable.

Debbie Dionne

## 4.  Andy RE: Compassion

Debbie,

I've held back as long as I can, as you have continually voiced your opinion to everyone else in the community even when we have responded overwhelmingly, that we do not agree with you.

You have belittled our beliefs in helping others time and again over this one issue, when we as individuals and as a community have supported many charities including ones you have asked us to support. Please get it in your head that we do not support a hair salon in our housing community.

You easily forget that we have offered several times to help Caroline financially and otherwise relocate her business and as a community would do as much as we could to help if we were allowed to sit down and talk this over and find a solution other than to continue to violate our by-laws and rules and regulations. You must be forgetting that Caroline does not own this condominium, her mother does and if anyone wanted to help

her it should be her mother who could probably sell this home for a huge profit and find Caroline a location that allows businesses in their homes.

You and a few others (some who have moved away) continue to support a business in our community even when a huge majority of the residents feel otherwise. In the name of democracy, please leave us alone and either move out or keep your unpopular comments to yourself.

Even better yet, be part of the solution and bring everyone to the table with the goal of finding Caroline a home where she can legally operate her business.

Andy

Andrew Sturgeon
42 Tourmaline Drive
Topsham, Maine 04086
Cell 207.852.0973
email aesturg@gmail.com
43°55'18.5" -69°58'41.0"

## 5.  Arthur RE: Compassion

If you're not part of the solution, you're part of the problem, Debbie.


Never attribute to malice that which is adequately explained by stupidity.
                    Hanlon's razor

Common sense in an uncommon degree is what the world calls wisdom
                    -Samuel Taylor Coleridge

Common sense is not so common.
                    -Voltaire

## 6.  Diane Ackerman RE: Compassion

Please do not call out people in our neighborhood for doing something that is worthwhile.  Correction: Caroline is not disabled, and she has made questionable choices, and there is no chance she and Noah will go homeless. They are not vulnerable.  Isn't it hypocritical to applaud compassion only when it suits you?  Diane Ackerman



EXHIBIT

W

| | |
|---|---|
| **From:** | Caroline Thibeault |
| **To:** | Meredith Scott |
| **Subject:** | Fwd: Outdoor Lights |
| **Date:** | Tuesday, April 7, 2026 1:09:21 PM |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Sent from my iPhone

Begin forwarded message:

**From:** Margaret Zillioux <mzillioux@gmail.com>
**Date:** March 23, 2024 at 3:11:23 PM EDT
**To:** Caroline Thibeault <ctbo4631@gmail.com>
**Cc:** Nancy Weingarten <nancyw2714@gmail.com>, Deb Nowak <Deb_Nowak@comcast.net>, Art Raymond <avroh22@gmail.com>, Paula McKenna <predorg22@gmail.com>
**Subject: Outdoor Lights**

Dear Caroline

I am writing on behalf of the Oak Hill Board of Directors to officially request that you remove your outdoor lights that are not in compliance with the recent revision to Rule 6. Decorations and Lighting. We ask that the non-compliant outdoor lights (including the hanging lights on the porch and lights on the large bushes in the front of your unit) be removed by April 2. If they are not removed by that date, fines will begin on April 3.

I have attached the Oak Hill Rules & Regulations which include Rule 6 for your review. Any questions may be directed to any of us on the Board. We appreciate your cooperation.

Respectfully,
Margaret Zillioux
for the Board of Directors

<Rules and Regs Rev. 3.20.24.pdf>